IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EXELIXIS, INC., | ) | **REDACTED - PUBLIC VERSION** |
| | ) | |
| Plaintiff, | ) | C.A. No.  24-1208 (RGA) |
| | ) | **CONSOLIDATED** |
| v. | ) | |
| | ) | ████████████████ |
| SUN PHARMACEUTICAL INDUSTRIES | ) | |
| LTD. and SUN PHARMACEUTICAL | ) | ████████████████████ |
| INDUSTRIES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>JOINT CLAIM CONSTRUCTION BRIEF</u>**

**CONFIDENTIAL VERSION FILED 12/10/25**
**REDACTED VERSION FILED 12/17/25**

# TABLE OF CONTENTS

**Page**

I.    Representative Claims .................................................................................................. 1

    A.    U.S. Patent No. 11,298,349 – Claim 3 ................................................................ 1

    B.    U.S. Patent No. 12,128,039 – Claim 1 ................................................................ 1

    C.    U.S. Patent No. 8,877,776 – Claim 1 .................................................................. 2

    D.    U.S. Patent No. 11,091,439 – Claim 1 ................................................................ 2

    E.    U.S. Patent No. 11,091,440 – Claim 1 ................................................................ 2

    F.    U.S. Patent No. 11,098,015 – Claim 1 ................................................................ 2

II.   Agreed-Upon Constructions ......................................................................................... 3

III.  Disputed Constructions ................................................................................................ 3

    A.    DISPUTED TERM 1: "COMPOUND IB …"/"COMPOUND IB . . . 6,7-
        dimethoxy-quinoline-4-ol" ................................................................................. 3

        1.    Exelixis's Opening Position .................................................................... 5

        2.    Azurity's Answering Position ................................................................ 15

        3.    Exelixis's Reply Position ...................................................................... 29

        4.    Azurity's Sur-Reply Position ................................................................ 37

    B.    DISPUTED TERM 2: "CRYSTALLINE" ......................................................... 42

        1.    Exelixis's Opening Position .................................................................. 42

        2.    Azurity's Answering Position ................................................................ 47

        3.    Exelixis's Reply Position ...................................................................... 57

        4.    Azurity's Sur-Reply Position ................................................................ 65

i

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Abtox, Inc. v. Exitron Corp.*,
    122 F.3d 1019 (Fed. Cir. 1997)..........................................................................18

*AIA Engineering Ltd. v. Magotteaux International S/A*,
    657 F.3d 1264 (Fed. Cir. 2011)....................................................................61, 67

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
    580 F.3d 1340 (Fed. Cir. 2009)..........................................................................29

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)............................................................................7

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007)....................................................13, 18, 26, 33

*AstraZeneca AB v. Mylan Pharmacueticals, Inc.*,
    No. 1:22-CV-35, 2022 WL 17178691 (N.D. W. Va. Nov. 23, 2022) ..............59

*Avid Technology, Inc. v. Harmonic, Inc.*,
    812 F.3d 1040 (Fed. Cir. 2016)..........................................................................59

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017)..........................................................................23

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)............................................................................6

*Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*,
    477 F. Supp. 3d 306 (D. Del. 2020),..................................................................46

*Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*,
    No. 17-374-LPS, 2018 WL 5077895 (D. Del. Oct. 18, 2018)..........................11

*Celgene Corp. v. Hetero Labs Ltd.*,
    No. 17-3387, 2020 WL 3249117 (D.N.J. June 16, 2020)..................................63

*Chiesi USA Inc. v. MSN Pharmacueticals Inc.*,
    No. CV 19-18564, 2021 WL 4843806 (D.N.J. Oct. 18, 2021)....................19, 33

*Cisco Systems, Inc. v. ITC*,
    873 F.3d 1354 (Fed. Cir. 2017)..........................................................................57

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)....................................................................49, 62

*Continental Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019) ...........................................................................11

*Cordis Corp. v. Medtronic AVE, Inc.*,
339 F.3d 1352 (Fed. Cir. 2003) ...................................................................11, 59

*Cordis Corp. v. Medtronic AVE, Inc.*,
511 F.3d 1157 (Fed. Cir. 2008) .........................................................................59

*Data Engine Technologies LLC v. Google LLC*,
10 F.4th 1375 (Fed. Cir. 2021) ..........................................................................48

*Exelixis, Inc. v. MSN Laboratories Private Ltd.*,
No. 19-2017-RGA, 2023 WL 315614 (D. Del. Jan. 19, 2023) ...................45, 46

*Exelixis, Inc. v. MSN Laboratories Private Ltd.*,
No. 22-228-RGA, 2024 WL 4491176 (D. Del. Oct. 15, 2024) ...........14, 45, 46

*Exeltis USA, Inc. v. Lupin Ltd.*,
No. 22-434-RGA, 2023 WL 2306736 (D. Del. Mar. 1, 2023) ...........................46

*Fenner Investments, Ltd. v. Cellco Partnership*,
778 F.3d 1320 (Fed. Cir. 2015) ...................................................................17, 18

*Forest Laboratories, LLC v. Accord Healthcare Inc.*,
No. 15-272-GMS, 2016 WL 6892094 (D. Del. Nov. 21, 2016) .......................46

*Glaxo Group Ltd. v. Ranbaxy Pharmacueticals, Inc.*,
262 F.3d 1333 (Fed. Cir. 2001) .........................................................................65

*Greenliant Systems, Inc. v. Xicor LLC*,
692 F.3d 1261 (Fed. Cir. 2012) .........................................................................36

*Hill-Rom Services v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ...................................................................57, 62

*Indivior Inc. v. Actavis Laboratories UT, Inc.*,
No. 18-497-RGA, 2019 WL 2098841 (D. Del. May 14, 2019).........................26

*Indivior Inc. v. Dr. Reddy's Laboratories, S.A.*,
752 F. App'x 1024 (Fed. Cir. 2018) .............................................................19, 31

*Intercept Pharmaceuticals, Inc. v. Apotex Inc.*,
No. 20-1105-MN, 2022 WL 856859 (D. Del. Mar. 23, 2022) ...........9, 10, 12, 21, 33

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009) .........................................................................59

*MBO Laboratories, Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007)................................................................49, 62

*Medicines Co. v. Mylan, Inc.*,
    853 F.3d 1296 (Fed. Cir. 2017).......................................................18, 19, 31

*MediciNova, Inc. v. Genzyme Corp.*,
    No. 14-2513, 2019 WL 4170188 (S.D. Cal. Sept. 3, 2019)...........................19

*Merck Sharp & Dohme Corp. v. Xellia Pharmacueticals ApS*,
    No. 14-199-RGA, 2015 WL 82386 (D. Del. Jan. 6, 2015)...........................12

*Novartis Pharmacueticals Corp. v. Abbott Laboratories*,
    375 F.3d 1328 (Fed. Cir. 2004)......................................................................8

*Omega Engineering, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)................................................................48, 67

*Ormco Corp. v. Align Technology, Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007)....................................................................53

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..........................................17, 18, 23, 55, 58

*Promptu Systems Corp. v. Comcast Corp.*,
    92 F.4th 1372 (Fed. Cir. 2024) .....................................................................43

*Purdue Pharma L.P. v. Endo Pharmacueticals, Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006)............................................................62, 63, 68

*In re Rambus Inc.*,
    694 F.3d 42 (Fed. Cir. 2012)........................................................................59

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)................................................................18, 20

*RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*,
    342 F. App'x 628 (Fed. Cir. 2009) ...............................................................69

*Sandisk Corp. v. Memorex Products, Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005)....................................................................59

*Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*,
    345 F. App'x 594 (Fed. Cir. 2009) ...............................................................12

*Shire Development Inc. v. Cadila Healthcare Ltd.*,
    No. 10-581-KAJ, 2015 WL 4596410 (D. Del. July 28, 2015) ...........................6

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005)..................................................................46

*Sprint Communications Co. v. Charter Communications, Inc.*,
    No. 17-1734-RGA, 2019 WL 7037656 (D. Del. Dec. 20, 2019)......................................14

*Summit 6, LLC v. Samsung Electronics Co.*,
    802 F.3d 1283 (Fed. Cir. 2015)..................................................................14

*Teleflex, Inc. v. Ficosa North America Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)..............................................................6, 30

*Thorner v. Sony Computer Entertainment America LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..................................................................13

*Uship Intellectual Properties, LLC v. United States*,
    714 F.3d 1311 (Fed. Cir. 2013)..................................................................23

*Vanguard Products Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2000)......................................................12, 22, 33

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................56

*XMTT, Inc. v. Intel Corp.*,
    No. 18-1810-MFK, 2022 WL 2904308 (D. Del. July 22, 2022)................................36, 41

## STATUTES, RULES, AND REGULATIONS

37 C.F.R. § 42.51(b)(1)(iii)..........................................................................36

## I.    REPRESENTATIVE CLAIMS

The parties have agreed upon the following representative claims for each of the patents at issue in this Joint Claim Construction Brief.

### A.    U.S. Patent No. 11,298,349 – Claim 3

A pharmaceutical composition for oral administration comprising Compound IB;



one or more fillers; one or more disintegrants; one or more glidants; and one or more lubricants, wherein the pharmaceutical composition is a tablet or capsule pharmaceutical composition; and

wherein the pharmaceutical composition is essentially free of 6,7-dimethoxy-quinoline-4-ol.

### B.    U.S. Patent No. 12,128,039 – Claim 1

A pharmaceutical composition for oral administration comprising Compound IB:

and a pharmaceutically acceptable carrier, wherein the pharmaceutical composition is a tablet or a capsule, and wherein the pharmaceutical composition contains 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

**C.    U.S. Patent No. 8,877,776 – Claim 1**

N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N′-(4-fluorophenyl)cyclopropane-1,1-dicarboxamide (L)-malate salt, wherein said salt is in crystalline Form N-2 and said Form N-2 is characterized by at least one of the following:

(i) a solid state 13C NMR spectrum with four or more peaks selected from 23.0, 25.9, 38.0, 41.7, 69.7, 102.0, 122.5, 177.3, 179.3, 180.0, and 180.3, ±0.2 ppm;

(ii) a powder x-ray diffraction pattern (CuKα λ=1.5418 Å) comprising 2θ values at 20.9±0.2 °2θ and 21.9±0.2 °2θ, and two or more 2θ values selected from: 6.4±0.2 °2θ, 9.1±0.2 °2θ, 12.0±0.2 °2θ, 12.8±0.2, 13.7±0.2, 17.1±0.2, 22.6±0.2, 23.7±0.2, wherein measurement of the crystalline form is at room temperature; and/or

(iii) an x-ray powder diffraction (XRPD) pattern substantially in accordance with the pattern shown in FIG. 8.

**D.    U.S. Patent No. 11,091,439 – Claim 1**

N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N′-(4-fluorophenyl) cyclopropane-1,1-dicarboxamide, malate salt, wherein said salt is crystalline.

**E.    U.S. Patent No. 11,091,440 – Claim 1**

A pharmaceutical composition comprising the N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxylphenyl)-N′-(4-fluorophenyl) cyclopropane-1,1-dicarboxamide, malate salt, wherein said salt is crystalline; and a pharmaceutically acceptable excipient.

**F.    U.S. Patent No. 11,098,015 – Claim 1**

A method of treating cancer, comprising administering to a subject in need thereof N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N′-(4-fluorophenyl)           cyclopropane-1,1-

dicarboxamide, malate salt, wherein said salt is the (L)-malate salt or the (D)-malate salt, and wherein said salt is crystalline.

## II.     AGREED-UPON CONSTRUCTIONS

| Claim Term and Asserted Patents and Claims | Agreed-Upon Construction |
|---|---|
| "comprising"<br>• '776 Patent, Claims 1-2<br>• '440 Patent, Claims 1 and 3<br>• '015 Patent, Claims 1-3<br>• '349 Patent, Claim 3<br>• '039 Patent, Claims 1 and 6 | Plain and ordinary meaning, i.e., "including but not limited to" |

## III.     DISPUTED CONSTRUCTIONS

### A.     DISPUTED TERM 1: "COMPOUND IB …"/"COMPOUND IB . . . 6,7-dimethoxy-quinoline-4-ol"

As demonstrated in the parties' Joint Claim Construction Chart (D.I. 73), the parties dispute the proposed term to be construed. Exelixis proposes the following term:

"Compound IB;



Azurity proposes the term "Compound IB . . . 6,7-dimethoxy-quinoline-4-ol."

This term appears in the following asserted claims:

• <u>'349 Patent</u>, Claim 3

- '039 Patent, Claims 1 and 6 (and by dependency, Claims 2-5, 7-11, 13-14, 16-17, 19-20, and 22)

| Exelixis' Proposed Construction | Azurity's Proposed Construction |
|---|---|
| "cabozantinib (L)-malate" | "Cabozantinib (L)-malate that contains a particular amount of the process byproduct 6,7-dimethoxy-quinoline-4-ol and is prepared using a process that includes: (1) the use of 4-aminophenol; (2) the use of a strong pentoxide base; (3) the use of methylethyl ketone as a solvent in the cabozantinib (L)-malate salt forming step; and (4) the use of vacuum distillation to obtain solid cabozantinib (L)-malate." |
| **Exelixis' Explanation of Why Resolution of the Dispute Matters** | **Azurity's Explanation of Why Resolution of the Dispute Matters** |
| Exelixis' position is that the asserted claims of the '349 and '039 Patents are composition and method of treatment claims that do not contain synthetic process limitations.<br><br>Construction of this term is relevant to confirm that process limitations should not be read into the claims.<br><br>Further, it is Exelixis's position that the term that should be construed is "Compound IB  ." | As explained in detail in Azurity's Opening Brief in Support of Defendants' Motion for Judgment on the Pleadings Regarding U.S. Patent Nos. 11,298,349 and 12,128,039 (D.I. 57), Azurity's position is that the asserted claims of the '349 and '039 patents are product-by-process claims directed to compositions prepared using a specific process of making Compound IB with minimal amounts of the process byproduct 6,7-dimethoxy-quinoline-4-ol. Accordingly, it is Azurity's position that the term that should be construed is "Compound IB … 6,7-dimethoxy-quinoline-4-ol" and not "Compound IB" by itself.<br><br>Also, as explained in detail in Azurity's Opening Brief (D.I. 57), the construction of "Compound IB … 6,7-dimethoxy-quinoline-4-ol" relates to noninfringement as the process for preparing the product that is the subject of Azurity's 505(b)(2) NDA differs substantially from the process described in the '349 and '039 patents. |

4

1.     **Exelixis's Opening Position**

Exelixis and Azurity dispute construction of the term "Compound IB … ," which appears in asserted claim 3 of U.S. Patent No. 11,298,349 and claims 1-11, 13-14, 16-17, 19-20, and 22 of U.S. Patent No. 12,128,039 (together, the "Low-Impurity Patents Asserted Claims" of the "Low-Impurity Patents").[1]  Exelixis' proposed construction is rooted in the claims and the specification, which clearly describe "Compound IB" with reference to its chemical structure, *i.e.*, the ***structure*** that is "cabozantinib (L)-malate."  Azurity does not dispute that the chemical structure depicted in the Asserted Claims is cabozantinib (L)-malate, but improperly and selectively imports process steps into its proposed construction in an effort to create a non-infringement position.  As set forth below, the intrinsic evidence does not support Azurity's proposed "product-by-process" construction.

a.     **The Claims Do Not Contain Any Synthetic Process Limitations**

The Low-Impurity Patents Asserted Claims recite "[a] pharmaceutical composition for oral administration comprising Compound IB."  D.I. 73-2, Ex. G ('349 Patent) at claims 1, 3; D.I. 73-2, Ex. H ('039 Patent) at claims 1, 6.  The Low-Impurity Patents Asserted Claims do not include any synthetic process steps but depicts the chemical structure of Compound IB, as exemplified in claim 1 of the '039 Patent:

---

[1] The parties also disagree on which term of the Low-Impurity Patents should be construed. Exelixis proposes construing "Compound IB; [chemical formula]," whereas Azurity proposes construing "Compound IB … 6,7-dimethoxy-quinoline-4-ol."  Azurity's use of an ellipsis further demonstrates the shortcomings of its proposed claim construction.  *See infra*, Section III.A.1.a.

1. A pharmaceutical composition for oral administration comprising Compound IB:



and a pharmaceutically acceptable carrier, wherein the pharmaceutical composition is a tablet or a capsule, and wherein the pharmaceutical composition contains 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

The claims are thus silent as to any synthetic process and simply recite a "pharmaceutical composition" with the claimed impurity level, irrespective of how the composition is obtained. Exelixis' proposed construction is consistent with the claim language, which is the touchstone of the claim construction inquiry. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) ("'[T]he claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim.'" (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998))).

Multiple courts (including the Federal Circuit) have warned against importing process steps into a composition claim. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008) ("Courts must generally take care to avoid reading process limitations into an apparatus claim because the process by which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim." (citations omitted)); *Shire Dev. Inc. v.*

*Cadila Healthcare Ltd.*, C.A. No. 10-581-KAJ, 2015 WL 4596410, at *6 (D. Del. July 28, 2015) ("[T]here is nothing in the patent that suggests that the active ingredient must be 'separately added' into each matrix. To add that requirement would impermissibly import a process limitation into the composition claim."), *aff'd sub nom. Shire Dev., LLC v. Cadila Healthcare Ltd.*, 688 F. App'x 912 (Fed. Cir. 2017).

The presumption against importing process steps into a composition claim applies with full force here. None of the Low-Impurity Patents Asserted Claims uses the word "process." Nor is there any other word in the claims that could plausibly serve as a textual basis for importing the process limitations Azurity has proposed.[2] Azurity's attempt to rewrite the claims to include process language is therefore not supported by the claim language and should be rejected. The Low-Impurity Patents Asserted Claims are devoid of any reference to a process for making the claimed cabozantinib (L)-malate used in the claimed compositions and should not be construed to require one. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1329 (Fed. Cir. 2003) (rejecting argument that claims directed to pharmaceutical compositions of EPO were limited by process by which EPO was obtained, where claim limitations "only [spoke] to the source of the EPO," not "the process by which the EPO [was] express[ed]").

Azurity's proposed construction is additionally flawed insofar as it fails to properly account for the claim language Azurity allegedly seeks to construe. In particular, Azurity's use of an ellipsis in the claim term it proposes for construction sweeps in numerous claim limitations that its proposed construction entirely fails to address. For example, Azurity's proposed construction does

---

[2] Although unasserted independent claim 1 of the '349 Patent (not at issue in this case) includes the word "process," it is an adjective modifying the term "byproducts," *e.g.*, "essentially free of process byproducts or contaminants." The plain meaning of the term "process byproducts or contaminants" is clear: byproducts or contaminants resulting from *a* process, without limitation to any particular steps being used in the process.

not account for limitations in claim 3 of the '349 Patent such as "one or more fillers," "one or more disintegrants," "one or more glidants," "one or more lubricants," "wherein the pharmaceutical composition is a tablet or capsule pharmaceutical composition," and "wherein the pharmaceutical composition is essentially free of 6,7-dimethoxy-quinoline-4-ol."   Azurity's failure to acknowledge express claim language while simultaneously importing process limitations with no basis in the claims underscores Azurity's attempt to rewrite the claims under the guise of claim construction.

> **b.** **The Specification Does Not Support Importing Process Limitations Into the Claims**

Exelixis' proposed construction is also supported by the specification.

***First***, Exelixis' construction is consistent with the description of Compound IB consistently set forth in the specification.  The common specification[3] of the Low-Impurity Patents repeatedly describes "Compound IB" in terms of its structure.  *See, e.g.*, D.I. 73-2, Ex. G ('349 Patent), 4:1-65, 18:23-39, 28:48-51, Figure 1.  And as even Azurity's proposed construction acknowledges, the name of the compound whose structure is depicted in the specification as "compound IB" is "cabozantinib (L)-malate."  *Id.* at 18:24-39 (showing chemical formula for cabozantinib (L)-malate).  The specification does not require use of a specific process to make Compound IB.  *Id.* The specification thus confirms that the term Compound IB, used in the claim together with the same chemical structure as the specification, refers to the compound itself.  *See Novartis Pharms. Corp. v. Abbott Lab'ys*, 375 F.3d 1328, 1335-36 (Fed. Cir. 2004) (district court erred in construing claim term in manner inconsistent with teachings of specification).

---

[3] The '349 Patent and the '039 Patent share the same specification except for the claims. Reference to either patent includes all citations to equivalent portions of the other patent in this group.  Unless otherwise noted, citations to the specification use the '349 Patent specification.

The facts here are similar to those of *Intercept Pharmaceuticals, Inc. v. Apotex Inc.*, C.A. No. 20-1105-MN, 2022 WL 856859 (D. Del. Mar. 23, 2022). There, the district court construed claims directed to pharmaceutical compositions comprising "obeticholic acid Form 1." *Id.* at *3-*4. The defendant argued that because the specification only disclosed making obeticholic acid Form 1 using a particular process, the term should be limited by that process. *Id.*; *see* Ex. 1, *Intercept Pharms., Inc. v. Apotex Inc.*, C.A. No. 20-1105, D.I. 115 (Joint Claim Construction Brief) at 12-13. The court rejected this argument, stating that the specification defined the term without reference to any process limitation. *Intercept*, 2022 WL 856859, at *3 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005)).

**Second**, the specification of the Low Impurity Patents additionally and repeatedly discloses that it is directed towards **compositions** of cabozantinib (L)-malate, without limiting itself to compositions containing cabozantinib (L)-malate made by a particular process. *See, e.g.*, D.I. 73-2, Ex. G ('349 Patent), 1:27-34 ("[T]his disclosure relates to processes for preparing quinolines … and to pharmaceutical compositions containing such compounds."); *id.* at 3:32-41 ("There is also a need for new pharmaceutical compositions containing quinolines such as compound IA [(cabozantinib)] that are essentially free of process byproducts … These and other needs are met by the present disclosure, which is directed to processes for making and compositions containing quinolines or pharmaceutically acceptable salts thereof."). The specification also contains a broad disclosure of various exemplary processes for synthesizing cabozantinib (L)-malate, using permissive, non-limiting language to confirm that the invention is not restricted to any particular synthetic process. *See, e.g., id.* at 3:66-5:5. In *Intercept*, the court rejected efforts to read process limitations into composition claims, explaining that "process limitations will only be 'treated as part of a product claim if the patentee has made clear that the process steps are an essential part of

the claimed invention.'"  2022 WL 856859 at *4 (quoting *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1375 (Fed. Cir. 2007)).  The same rationale applies here.

    ***Third***, the specification expressly states, in numerous locations, that it is not limited to a particular process exemplified in the patent.  For example, it states:

> The foregoing disclosure has been described in some detail by way of illustration and example, for purposes of clarity and understanding.  The invention has been described with reference to various specific and preferred embodiments and techniques.  However, it should be understood that many variations and modifications can be made while remaining within the spirit and scope of the invention.  It will be obvious to one of skill in the art that changes and modifications can be practiced within the scope of the appended claims.  Therefore, it is to be understood that the above description is intended to be illustrative and not restrictive.  The scope of the invention should, therefore, be determined not with reference to the above description, but should instead be determined with reference to the following appended claims, along with the full scope of equivalents to which such claims are entitled.

D.I. 73-2, Ex. H ('039 Patent) at 33:50-66; *see also* D.I. 73-2, Ex. G ('349 Patent) at 33:40-34:2.  Indeed, the section of the specification discussing processes for making cabozantinib (L)-malate expressly states that "[t]he invention is illustrated further by the following examples in Figure 1 and the description thereof, which are not to be construed as limiting the invention in scope or spirit to the specific procedures described in them."  D.I. 73-2, Ex. G ('349 Patent) at 24:13-16.

    While the specification explains that Figure 1 is "[a] synthetic route that can be used for the preparation of [cabozantinib] and the (L)-malate salt …."),[4] it also describes multiple potential variations.  For example, the specification generally states that "the starting materials may be varied and additional steps employed to produce compounds encompassed by the invention" and

_____

[4] The specification explicitly notes that its use of "can" is non-limiting.  D.I. 73-2, Ex. G ('349 Patent) at 7:47-54 ("The word 'can' is used in a non-limiting sense and in contradistinction to the word 'must.'  Thus, for example, in many aspects of the invention a certain element is described as 'can' having a specified identity, which is meant to convey that the subject element is permitted to have that identity according to the invention but is not required to have it.").

10

further recognizes that "it may be necessary to utilize different solvents or reagents." *Id.* at 24:15-23.  Moreover, while Azurity's proposed construction would require use of 4-amino-phenol, the specification clearly states that other reactants could be used.  D.I. 73-2, Ex. G ('349 Patent) at 11:31-37 (referencing the use of "[v]arious compounds of reactant y(l) [that] are commercially available, such as 2-fluoro-4-aminophenol and 4-aminophenol[,]" stating that "the skilled artisan would be able to make any variation of reactant y(l) using commercially available starting materials and by using known techniques to modify these commercially available starting materials to yield various compounds within the scope of reactant y(l).")  Similarly, while Azurity's proposed construction would require use of a pentoxide base, the specification describes the use of various bases, stating that "[o]ther non-limiting examples of suitable reaction conditions … include the use of a suitable base, such as a metal hydroxide or a non-nucleophilic base," and goes on to list numerous examples of suitable bases.  *Id.* at 11:66-12:8.

The specification thus supports Exelixis' proposed construction.  *See Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) ("phrases such as 'one technique,' 'can be carried out,' and 'a way' indicate that [the indicated method] is only one method for making the invention and does not automatically lead to finding a clear disavowal of claim scope"); *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, C.A. No. 17-374-LPS, 2018 WL 5077895, at *6 (D. Del. Oct. 18, 2018) (finding that language such as "can be" suggests alternative methods a POSA may use).

In cases involving claims with similar language, the Federal Circuit and district courts have held that disclosures of an exemplary process, including disclosures that refer to a process as advantageous, cannot suffice to limit the claims to that specific process.  *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003) (declining "to superimpose a process

limitation on the product claims at issue" where claims recited "slots formed therein," as claim did not require a method of formation, and the specification's use of the term "preferably" in the disclosure of particular embodiment "ma[de] clear that the language describes a preferred embodiment, not the invention as a whole"); *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) ("The method of manufacture, even when cited as advantageous, does not of itself convert product claims into claims limited to a particular process.… A novel product that meets the criteria of patentability is not limited to the process by which it was made."); *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, 345 F. App'x 594, 598 (Fed. Cir. 2009) (product claims directed to "optically pure" compound not converted to "product-by-process" claims limited to products made by high performance liquid chromatography (HPLC) method described in specification, because "[t]he specification never assert[ed] that HPLC is required to obtain optically pure oxaliplatin," but rather "characterize[d] HPLC as an 'illustrative method' and a 'representative process' by which the claimed compound 'may be prepared.'"); *Merck Sharp & Dohme Corp. v. Xellia Pharms. ApS*, C.A. No. 14-199-RGA, 2015 WL 82386, at *4 (D. Del. Jan. 6, 2015) (declining to read process into acetate buffer limitation because doing so would "improperly import[] manufacturing process elements into a [composition] claim" that lacked any process requirements).

Nor is there any language in the specification indicating that any exemplified process is a requirement of the invention. *See Intercept*, 2022 WL 856859, at *4. Far from evidencing a disclaimer or disavowal of cabozantinib (l)-malate made by any process other than the steps set forth in Azurity's construction, the language of the specification reflects that the exemplified processes are not the only way to achieve the claimed composition. The facts of this case are dissimilar to cases in which courts have found that the specification described the process as a

"requirement" of the invention or disavowed the use of certain processes. *See, e.g.*, *Andersen*, 474 F.3d at 1366-68.

Azurity's construction is contrary to the plain language of the specification and the black-letter law that courts should not read limitations from the specification into claims or redefine words—particularly where, as here, the patentee has made their meaning clear. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).

### c.    The File History Does Not Support a Product-by-Process Construction

The prosecution history of the Low-Impurity Patents is also consistent with Exelixis' proposed construction of the "Compound IB" term.  For example, during prosecution of Application No. 17/170,275 (the "'275 Application"),[5] the Examiner rejected claims reciting compositions of cabozantinib (L)-malate as obvious over several prior art references.  In response, Exelixis submitted a declaration of inventor Dr. Khalid Shah, who described why development of a storage-stable composition of cabozantinib (L)-malate was difficult and highlighted the unexpected stability of the claimed compositions. *See* D.I. 73-3, Ex. L, pp. 125-34 ("Low-Impurity Shah Declaration").   Like the claim language and specification, the Low-Impurity Shah Declaration repeatedly confirms that the invention is directed to pharmaceutical ***compositions*** of cabozantinib (L)-malate, *see id*. at ¶¶ 8, 13-25, with no indication that such compositions are limited to cabozantinib (L)-malate produced by any specific process.   Likewise, Exelixis' statements accompanying the Low-Impurity Shah Declaration confirm that what is claimed is "a pharmaceutical composition for oral administration," limited only by what is expressly recited in the claim.  D.I. 73-3, Ex. L, pp. 107-24 (App. No. 17/170,275, Applicant Remarks, Jan. 20, 2022)

---

[5] Issued as the '349 Patent, and a parent application of the '039 Patent.

at 4; *see also id*. at 6 ("The Applicant has invented capsule and tablet pharmaceutical compositions that are stable upon storage and that do not give rise to process byproducts or contaminants."); *id*. at 7 ("[T]he claimed pharmaceutical compositions have surprisingly high purity that would not have been expected based on the disclosure of the cited references.").  The prosecution history supports Exelixis' proposed construction.

### d.    The Extrinsic Evidence Supports Exelixis' Construction

As a threshold matter, there is no reason for the Court to reach for extrinsic evidence to construe the claims, given the clarity of the intrinsic record.  Extrinsic evidence "is generally of less significance than the intrinsic record" and "may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290 (Fed. Cir. 2015) (quoting *Phillips*, 415 F.3d at 1317, 1324); *see also Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, C.A. No. 17-1734-RGA, 2019 WL 7037656, at *11 (D. Del. Dec. 20, 2019) ("[C]ourts rely primarily on intrinsic evidence to construe the meaning of a patent…. Attorney statements [of the patentee's attorneys] made in district court litigation years after the inventor filed the patent are not intrinsic evidence and are not useful." (citing *Phillips*, 415 F.3d at 1318)).  But even if the Court were to consider extrinsic evidence, the extrinsic record is consistent with Exelixis' proposed construction.  In every single prior proceeding involving the Low-Impurity Patents, no one—not Exelixis, opposing parties, the PTAB, this Court, ***or even Azurity itself***—ever suggested that the '349 Patent or the '039 Patent recites product-by-process claims.

For example, in *Exelixis, Inc. v. MSN Laboratories Private Ltd.*, C.A. No. 22-228-RGA, 2024 WL 4491176 (D. Del. Oct. 15, 2024) ("*MSN II*"), Exelixis and MSN litigated validity and infringement of the '349 Patent through a four-day bench trial and the asserted claim of the '349 Patent was found not invalid and not infringed.  Throughout that litigation and trial, neither the

parties nor the Court ever suggested that evaluating infringement or validity required addressing unrecited process limitations.[6]

Azurity's position of just a few months ago in two unsuccessful IPR petitions against the Low-Impurity Patents,[7] was the precise opposite of its current litigation position. In pursuing its IPR petitions, Azurity did not propose a product-by-process construction to the Board, but attempted to invalidate the claims by reading them ***broadly***. *See, e.g.*, D.I. 73-3, Ex. N (IPR2025-00210, Paper 2 (PTAB Nov. 18, 2024)) at 10-11; D.I. 73-3, Ex. Q (IPR2025-00427, Paper 2 (Petition) (PTAB Jan. 9, 2025)) at 12 ("Azurity does not believe that any claim terms require construction").

The extrinsic evidence thus supports Exelixis' proposed construction, not Azurity's.

* * *

For these reasons, the Court should adopt Exelixis' proposed construction of "Compound IB …" as "cabozantinib (L)-malate."

## 2.    Azurity's Answering Position

The dispute between Exelixis and Azurity over the term "Compound IB . . . 6,7-dimethoxy-quinoline-4-ol" concerns whether this term simply refers to "cabozantinib (L)-malate" as Exelixis proposes, or whether this term should be construed to encompass an essential process of preparing cabozantinib (L)-malate so as to limit the process byproduct 6,7-dimethoxy-quinoline-4-ol. Here,

---

[6] In fact, in the instant litigation, MSN has stipulated to infringement of the '039 Patent and has not joined Azurity's claim constructions. *Exelixis, Inc. v. MSN Lab'ys Pvt. Ltd.*, C.A. No. 24-1208-RGA, D.I. 47.

[7] D.I. 73-3, Ex. P (*Azurity Pharm., Inc. v. Exelixis, Inc.*, IPR2025-00210, Paper 11 (PTAB Jun. 4, 2025)) at 29; D.I. 73-3, Ex. T (*Azurity Pharm., Inc. v. Exelixis, Inc.*, IPR2025-00427, Paper 13 (PTAB July 2, 2025)) at 2.

the totality of the intrinsic and extrinsic evidence makes clear that this term's meaning cannot be the one Exelixis proposes.

The '349 and '039 patents are directed to cabozantinib malate compositions with minimal amounts of process byproducts and contaminants made by an allegedly new and specific process. During prosecution, in *inter partes* review ("IPR") proceedings, and in prior litigation before this Court, Exelixis repeatedly maintained that the process is an essential and distinguishing inventive feature. Accordingly, Exelixis should be held to its words, and the Court should adopt Azurity's construction: "cabozantinib (L)-malate that contains a particular amount of the process byproduct 6,7-dimethoxy-quinoline-4-ol and is prepared using a process that includes: (1) the use of 4-aminophenol; (2) the use of a strong pentoxide base; (3) the use of methyl ethyl ketone as a solvent in the cabozantinib (L)- malate salt forming step; and (4) the use of vacuum distillation to obtain solid cabozantinib (L)-malate."

### a.    Exelixis Mischaracterizes the Disputed Term

As an initial matter, the parties disagree on the claim term requiring construction. Exelixis' brief purports to seek construction of "Compound IB . . .," whereas Azurity identifies the term as "Compound IB . . . 6,7-dimethoxy-quinoline-4-ol." *See* D.I. 73-1 (Chart Identifying Disputed Terms) at 4, 23. As explained below, the intrinsic evidence—including the claims, specification, and prosecution history—confirms that the asserted claims are product-by-process claims directed to compositions prepared using a specific process that yields Compound IB with only minimal amounts of the process byproduct, 6,7-dimethoxy-quinoline-4-ol. Azurity's proposed claim term, which expressly identifies the byproduct that the claims limit, best reflects the claim language as understood in light of the intrinsic and extrinsic evidence, taken in totality. Accordingly, the Court should construe the term as framed by Azurity: Compound IB . . . 6,7-dimethoxy-quinoline-4-ol.

### b.    The Asserted Claims Invoke the Synthetic Process for Preparing Compound IB

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotes omitted).  The phrase "Compound IB . . . 6,7-dimethoxy-quinoline-4-ol" appears in each asserted claim.  Both the '349 and '039 patents identify "6,7-dimethoxy-quinoline-4-ol" as a process byproduct formed during the synthesis of Compound IB and something to be minimized in pharmaceutical compositions.  D.I. 73-2, Ex. G at 22:11-27.[8]

Indeed, 6,7-dimethoxy-quinoline-4-ol is the only "process byproduct" identified in either patent, and its status as such is confirmed by unasserted claims 1 and 2 of the '349 patent.  *Compare* D.I. 73-2, Ex. G at claim 1, 34:5–26 (reciting "wherein the pharmaceutical composition is essentially free of process byproducts or contaminants") *with* claim 2, 34:27– 29 (reciting "wherein the process byproduct or contaminant is 6,7-dimethoxyquinoline-4-ol"); *see also id.* at 8:15-20.  As *Phillips* instructs, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."  415 F.3d at 1314.  There can be no dispute that 6,7-dimethoxyquinoline-4-ol is the "process byproduct" expressly recited in the asserted claims.

Exelixis' proposed construction of "Compound IB" to simply mean "cabozantinib (L)-malate" ignores the rest of the claim language and improperly divorces the term from its context and the purported invention.  *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1322 (Fed. Cir. 2015) ("The terms used in patent claims are not construed in the abstract, but in the context in which the term was presented and used by the patentee[.]").  When "the actual words of the claim"

---

[8] The '349 and '039 patents share a common specification.  For convenience, common citations to the '039 patent are omitted.

are considered, "Compound IB" in the phrase "Compound IB . . . 6,7-dimethoxy-quinoline-4-ol" plainly refers to more than just "cabozantinib (L)-malate." *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (explaining that "a claim must be read in view of the specification of which it is a part"); *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("[T]he language of the claim frames and ultimately resolves all issues of claim interpretation."). By reciting a composition that is essentially free of "process byproducts," the claims necessarily invoke the process producing that result—namely, the synthesis of Compound IB. Exelixis' attempt to read out this context is inconsistent with the claim language and the intrinsic record.

Exelixis' argument that the claims do not use the word "process" is unavailing. While the law warns against importing limitations from the specification absent clear disclaimer of claim scope, the Federal Circuit has permitted use of the specification to interpret the meaning of a claim. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1373 (Fed. Cir. 2007); *Phillips*, 415 F.3d at 1314; *Fenner*, 778 F.3d at 1322–23 (explaining a claim receives meaning from what persons in the field of the invention would have read in light of the entire specification and prosecution history). Here, the asserted claims expressly recite "6,7-dimethoxy-quinoline-4-ol," which the specification identifies as a process byproduct that forms during Compound IB synthesis. By specifying a threshold amount for the byproduct (e.g., essentially free), the asserted claims necessarily point to a required production process. In this case, the Court should give effect to the patentee's election and not read it as importing a limitation.

Moreover, when process steps are essential to the invention, the Federal Circuit recognizes those steps can be treated as part of a product claim. *See Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1302-1306 (Fed. Cir. 2017); *Andersen*, 474 F.3d at 1375 (Fed. Cir. 2007). As explained in

18

detail below, Exelixis has repeatedly acknowledged—including during prosecution, IPR proceedings, and prior litigation—that the process is an essential, distinguishing feature of the alleged invention. Accordingly, the presumption against importing process steps does not apply here.[9]

The present situation is analogous to *Medicines*, where the claimed product specified a threshold impurity without expressly reciting the word "process."[10] 853 F.3d at 1302–1304. The Federal Circuit held the claims were necessarily limited by the disclosed process because otherwise there would not be "reasonable certainty" regarding the scope of the asserted claims. *See id*. at 1303. In rejecting the plaintiff's interpretation, the court noted that its decision "does not impermissibly add a process limitation to a product claim that does not require a process" because the specification's definition of "batches" by itself injects a compounding process as a limitation in the asserted claims. *Id*. at 1304. The Federal Circuit then turned to the specification to identify the process limitations that were required to afford the claimed result. *See id*. at 1304–1309. Similarly, the asserted claims here recite "Compound IB" and a threshold level of 6,7-dimethoxy-quinoline-4-ol, which necessarily invokes the disclosed process.

---

[9] Exelixis' reliance on case law where courts have cautioned against importing process steps into a composition is unavailing. *Supra* 6–7. Unlike the situation here, those cases did not involve a process that constitutes an essential feature of the alleged invention and are distinguishable on that basis alone.

[10] Other courts have held the same. *See, e.g., Indivior Inc. v. Dr. Reddy's Lab'ys, S.A.*, 752 F. App'x 1024, 1033–34 (Fed. Cir. 2018) (reading a "drying process" limitation into the claim term "continuously cast film" because the patent specification made clear it is "essential"); *Chiesi USA Inc. v. MSN Pharms. Inc.*, No. CV 19-18564, 2021 WL 4843806, at *7–8 (D.N.J. Oct. 18, 2021) (if patentee made clear process steps are "essential" part of claimed invention, then process steps can be treated as part of a product claim); *MediciNova, Inc. v. Genzyme Corp.*, No. 14-CV-2513 JLS (KSC), 2019 WL 4170188, at *22 (S.D. Cal. Sept. 3, 2019) (rejecting plaintiff's arguments of a composition claim and agreeing with defendant that intrinsic evidence of the '237 patent supported construing claims to include a process limitation because "stocks of rAAV" produced by use of, among other things, novel nucleic acid molecules encoding AAV helper functions for rAAV vectors), *aff'd*, 831 F. App'x 506 (Fed. Cir. 2020).

> **c.    The Specification Supports Azurity's Product-By-Process Construction**

Azurity's construction of "Compound IB . . . 6,7-dimethoxy-quinoline-4-ol" is fully supported by the specification. As the Federal Circuit has made clear, a claim term must be construed in view of what the inventors actually invented and intended to cover. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Here, the inventors did not purport to discover a new chemical compound—they disclosed a process for preparing cabozantinib (L)-malate and pharmaceutical compositions including that compound containing minimal amounts of 6,7-dimethoxy-quinoline-4-ol, the only "process byproduct" identified in the patents and levels of which are explicitly claimed.

The common specification confirms that the alleged invention centers on the preparative process, not the mere existence of the compound:

- Title: "Processes for Preparing Quinoline Compounds and Pharmaceutical Compositions Containing Such Compounds." D.I. 73-2, Ex. G (Title) at 53.

- Abstract: "The present invention is directed to processes for making and compositions containing quinolines such as formula I…" D.I. 73-2, Ex. G (Abstract), at 53.

- Field of the Invention: "This disclosure relates to processes for preparing compounds useful for modulating protein kinase enzymatic activity. More specifically, this disclosure relates to processes for preparing quinolines that are useful for modulating cellular activities …." *Id.* at 1:27–34.

- Background of the Invention: "Accordingly, there is a need for the discovery of new processes for making quinolines such as compound IA that minimize the formation of undesirable process contaminants or byproducts. There is also a need for new pharmaceutical compositions containing quinolines such as compound IA that are essentially free of process byproducts." *Id.* at 3:29-35.

- Summary of the Invention: "These and other needs are met by the present disclosure, which is directed to processes for making and compositions containing quinolines or pharmaceutically acceptable salts thereof." *Id.* at 3:38-41.

- Detailed Description of the Invention: The "Processes" section extends over 12 columns of the patents. *Id.* at 8:32-20:34.

- <u>Examples</u>: 15 examples with detailed descriptions of synthetic chemistry at the heart of the invention. *Id.* at 24:12-30:61.

- <u>Claims</u>: All claims either use the phrase "process byproducts or contaminants" or refer to the only identified process byproduct/contaminant by name, 6,7-dimethoxy-quinoline-4-ol, whose formation or lack thereof is intrinsically tied to the synthetic process. *Id.* at 34:5-52; D.I. 73-2, Ex. H at 34:1-35:30.

Thus, the process is an essential part of the alleged invention; it must be specifically employed to minimize the formation of 6,7-dimethoxy-quinoline-4-ol, the only identified "process byproduct."

Exelixis' arguments to the contrary are misplaced. Exelixis argues that the specification defines "Compound IB" solely by its structure. *See supra* at 8. But the specification never limits the claimed compound to the structure alone—it requires the use of a specific process to obtain the claimed product.

Exelixis' reliance on *Intercept Pharmaceuticals, Inc. v. Apotex Inc.*, No. 20-CV-1105-MN, 2022 WL 856859 (D. Del. Mar. 23, 2022) is equally unavailing. *See supra* at 9. In *Intercept*, the court found that the patents "do not clearly treat the process as an essential part of the claimed invention." 2022 WL 856859, at *12. The opposite is true here. The asserted patents expressly claim both Compound IB and minimal levels of byproduct (6,7-dimethoxy-quinoline-4-ol) resulting from the disclosed process. The process is therefore an essential element of the claimed invention.

Nor is Exelixis correct that the discussion of "pharmaceutical compositions" somehow separates the claimed compound from the process. *See supra* at 9–10. Even in those passages, the specification continues to reference the synthesis of Compound IB, the synthetic process, and the resulting byproduct:

In another aspect, the disclosure relates to a pharmaceutical composition comprising a compound of Formula IA or IB and a pharmaceutically acceptable carrier admixed with less than 100 ppm of 6,7-dimethoxy-quinoline-4-ol. 6,7-dimethoxy-quinoline-4-ol, the structure of which is



can be used as reagent e(1) to make chloride f(1) and is a byproduct that may form during the synthesis of Compound IA or IB. Minimizing the concentration of contaminants or byproducts such as 6,7-dimethoxy-quinoline-4-ol in pharmaceutical compositions destined for human administration is desirable.

D.I. 73-2, Ex. G at 22:8-27.   Thus, even if one considers the additional discussion of "pharmaceutical compositions" in the asserted patents, the synthetic process that affords Compound IB and low levels of the process byproduct 6,7-dimethoxy-quinoline-4-ol is still an essential part of the alleged invention.  By contrast, Exelixis' argument requires one to ignore the Title, Abstract, Field, Background, and Summary.  *See supra* at 10–11.  There is no disclosure of obtaining the claimed result without using the synthetic process that minimizes the formation of the claimed process byproduct.

Finally, Exelixis' argument that the specification does not require the use of any particular process to make Compound IB relies on generic statements that the disclosure is "intended to be illustrative and not restrictive."  *Supra* at 10–13.  Both the '349 and '039 patents explicitly state that Compound IB was already known.[11]   *See* D.I. 73-2, Ex. G at 19:25-28 ("Processes for

---

[11] Exelixis cites *Vanguard Prods. Corp v. Parker Hannifin Corp*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) and other cases for the proposition that disclosures referring to a process that is advantageous cannot suffice to limits the claims to that specific process.  However, unlike in *Vanguard Prods.* where the patented product was novel, here, Compound IB was previously known and the process disclosed in the specification is not merely "advantageous" but "essential."  *Id.*

preparing the N-1 and N-2 forms of compound IB are disclosed in WO 2020/083414 . . . .").  Any

purported novelty, therefore, lies not with Compound IB itself, but by producing the product by

the process that minimizes the process byproduct 6,7-dimethoxy-quinoline-4-ol.  *Id*. at 22:8–27.

Accordingly, Azurity's construction—which identifies the specific process that defines the

claimed invention—is the only construction supported by the specification and intrinsic record.

### d.    The Remainder of the Intrinsic Evidence Supports Azurity's Product-By-Process Construction

The prosecution history "informs the meaning of the claim language by demonstrating how

the inventor understood the invention."  *See Phillips*, 415 F.3d at 1317; *Uship Intel. Props., LLC*

*v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) (explaining that an applicant's statements

to the PTO characterizing its invention may disclaim the scope of a claim and disclaiming

statements may be made in response to a rejection over the prior art, or take place in other

contexts.").  Similarly, statements made during an IPR proceeding, whether before or after

institution, may be considered for claim construction and support a finding of prosecution

disclaimer.  *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017).

Here, Azurity's construction of "Compound IB . . . 6,7-dimethoxy-quinoline-4-ol,"

including the specific process steps it recites, follows directly from Exelixis' own statements

during recent IPR proceedings, where Exelixis unequivocally confirmed that this term is defined

by the process included in Azurity's construction:

> As described in the district court trial testimony in the MSN
> litigation, ***Exelixis made numerous, significant changes to the
> Brown process—over an eight-year period—to address formation
> of the 6,7-dimethoxy-quinoline-4-ol impurity during synthesis of
> the 1-3 intermediate, malate salt formation, and drug formulation.
> Specifically, the changes, which are reflected in the synthesis
> described in the '039 patent, included: (1) eliminating the 1-3
> intermediate that degrades to 6,7-dimethoxy-quinoline-4-ol; (2)
> replacing the 4-nitrophenol reagent in step two with 4-
> aminophenol; (3) replacing the mild 2,6-lutidine base in step two***

> ***with a much stronger alkoxide base; and (4) modifying the final malate salt formation step to (a) use vacuum distillation (reducing the heat and water required in the reaction) and (b) replace the acetone solvent with methyl ethyl ketone, which has very different chemical properties.*** In other words, Exelixis developed a process that 'performs different steps, involves different molecules, and results in different chemistries than the [Brown process].'"

D.I. 73-3, Ex. R at 369–70 (brackets in original) (internal citations omitted) (emphasis added).

To avoid IPR institution, Exelixis repeatedly relied on the disclosed synthetic process— and the effort required to develop it—to limit the formation of 6,7-dimethoxy-quinoline-4-ol. These statements constitute intrinsic evidence supporting Azurity's construction:

- "This novel formulation resulted from Exelixis' discovery that an impurity—6,7-dimethoxy-quinoline-4-ol—arose during manufacture of cabozantinib (L)-malate." D.I. 73-3, Ex. O at 236.

- "To achieve the lowest possible levels of [6,7-dimethoxy-quinoline-4-ol], Exelixis developed a new synthetic process, exemplified in the '349 patent." *Id*. at 242.

- "To achieve the lowest possible levels of 6,7-dimethoxy-quinoline-4-ol, Exelixis developed a new synthetic process, exemplified in the '039 patent." D.I. 73-3, Ex. S (Patent Owner's Discretionary Denial Brief in IPR2025-00427) at 5; *see also* D.I. 73-3, Ex. R at 353.

- "Exelixis discovered [6,7-dimethoxy-quinoline-4-ol] formed as a degradation product during synthesis, including from decomposition of the 1-3 intermediate in the Brown process and during formation of the malate salt. . . . Therefore, Exelixis determined 'it was ***critical*** to essentially eliminate the impurity from the ultimate drug formulation' by ensuring 'the lowest levels possible [of [6,7-dimethoxy-quinoline-4-ol]] in the API.'" D.I. 73-3, Ex. O at 241–42 (emphasis added).

- "Exelixis determined 'it was ***critical*** to essentially eliminate the impurity from the ultimate drug formulation' by ensuring 'the lowest levels possible [of 6,7-dimethoxy-quinoline-4-ol] in the API.'" D.I. 73-3, Ex. S at 411 (brackets in original).

- "Therefore, Exelixis determined 'it was critical to essentially eliminate the impurity from the ultimate drug formulation' by ensuring 'the lowest levels possible [of 6,7-dimethoxy-quinoline-4-ol] in the API.'" D.I. 73-3, Ex. R at 353 (brackets in original).

- "Significant, non-routine efforts went into Exelixis' identification, quantification, and process control of 6,7-dimethoxy-quinoline-4-ol—ultimately resulting in the claimed composition." *Id.* at 348.

- "Indeed, Exelixis spent **eight years** making **significant** process changes to develop ***its new synthetic process*** described in the '039 patent, which 'performs different steps, involves different molecules, and results in different chemistries.' With these process changes, Exelixis was able to consistently produce a cabozantinib (L)-malate composition comprising 100 ppm or less of impurities, including 6,7-dimethoxy-quinoline-4-ol, using a variety of excipients and formulation methods, and even upon exposure to heat and humidity." D.I. 73-3, Ex. S at 412 (internal citations omitted) (emphases added)

- "Drs. Myerson and MacMillan both testified at length that the disclosures in the '349 patent (which are the same as those in the '039 patent)—including the new synthetic pathway involving multiple changes from Brown and a new recognition of the importance of controlling for 6,7-dimethoxy-quinoline-4-ol—arose from significant, non-obvious improvements at multiple points in the synthesis of the API." D.I. 73-3, Ex. R at 375.

- "The significance of the novel synthesis and resulting pharmaceutical formulations was recognized by the Examiner and the district court in finding the claims nonobvious. Ground I [of the '349 IPR] never addresses the importance of the novel synthesis disclosed in the '559 application [an ancestor to the '349 and '039 patents] to the achievement of the claimed purity in the final pharmaceutical compositions, even though it is a central issue in Petitioner's argument for Ground II. While a POSA would not have expected the synthesis to guarantee a pure final composition, . . . that artisan would have recognized based on the disclosure of the '559 application that this improved synthesis provided such pure cabozantinib (L)-malate that routine variations within the claimed classes of excipients beyond the specific exemplified formulations could similarly provide pharmaceutical compositions that maintained the claimed purity level, despite potential degradation caused by excipients." D.I. 73-3, Ex. O at 257.

- "Yet Petitioner …. ignores evidence of the challenges encountered by Exelixis and its substantial efforts to develop the synthesis disclosed in the '039 patent and achieve the claimed purity levels." D.I. 73-3, Ex. S at 430.

- "With respect to the claimed purity, what Exelixis' witnesses actually testified was [sic] that formulations using API prepared via prior art synthesis had variable purity; however, once Exelixis developed ***the process*** disclosed in the '349 patent and its priority applications, it consistently obtained formulations having the claimed purity level using a range of excipients." D.I. 73-3, Ex. O at 264-65 (emphasis added).

- "'[I]t's clear that a key feature of the invention was the . . . ability to manufacture API, as described in the '349 process, that was very, very low in the [6,7-

dimethoxy-quinoline-4-ol] impurity. And, thus, can be formulated into a drug product that could be reliably manufactured and be essentially free of the [6,7-dimethoxyquionline-4-ol] impurity.'" *Id*. at 266.

- "Dr. Shah further testified that the 'only way' that a 'pharmaceutical composition [of cabozantinib (L)-malate] can be achieved and be essentially free of the [6,7-dimethoxy-quinoline-4-ol] impurity' would be by 'having the lowest levels of the [6,7-dimethoxy-quinoline-4-ol] impurity possible in the active ingredients. Hence, the commercial process B-2,' which is the process disclosed in the '349 patent." *Id*. at 267.

Exelixis cemented "Compound IB … 6,7-dimethoxy-quinoline-4-ol" as a product-by-process limitation by repeatedly asserting that the changes to the synthetic process for preparing Compound IB were "key" or "critical" distinguishing features of the asserted claims. *See Andersen*, 474 F.3d at 1375 ("[P]rocess steps can be treated as part of a product claim if the patentee has made clear that the process steps are an essential part of the claimed invention."); *Indivior Inc. v. Actavis Labs. UT, Inc.*, No. 18-cv-497-RGA, 2019 WL 2098841, at *3–*5 (D. Del. May 14, 2019) (explaining why the court construed "continuously cast film" in favor of defendant where in previous litigation the same court construed "cast film" to have its plain and ordinary mean; distinguishing the two constructions based upon a specific method of "drying" crucial to achieve the claimed uniformity essential to invention).

Rather than address this intrinsic record, Exelixis points to Dr. Khalid Shah's declaration, submitted during prosecution, claiming it somehow shows that the invention is not limited to any specific process. *See supra* at 13–14. But that position not only directly contradicts Exelixis' statements in the IPRs emphasizing the process as central to the claimed invention, it also ignores that Dr. Shah, in the very same declaration, expressly links Compound IB, the synthetic process, and 6,7-dimethoxy-quinoline-4-ol:

> The process for making Compound IB can give rise to 6,7-dimethoxy-quinoline-4-ol as a decomposition product. The process is described at page 26-28 of the above-captioned application as filed, and requires reacting cabozantinib with L-malic acid. Any

> 6,7-dimethoxy-quinoline-4-ol that is formed during the process
> from Compound IA is carried through to Compound IB.

D.I. 73-3, Ex. L at ¶ 9, at 126.  Thus, Dr. Shah explicitly tied the synthetic process described in the application to the presence of 6,7-dimethoxy-quinoline-4-ol, noting it is "carried through" to Compound IB as a direct result of this process.  That aligns with Dr. Shah's testimony—which Exelixis relied on to defend the asserted claims in the IPRs—that the "only way" to achieve the claimed compositions is through the process of the '349 patent.  *See* D.I. 73-3, Ex. O at 267.

   **e.**  **The Extrinsic Evidence Supports Azurity's Construction**

   Should the Court consider extrinsic evidence, it does not support Exelixis.  *See supra* at 14–15.  As this Court is aware from prior litigation concerning the '349 patent, Exelixis repeatedly represented that the new synthetic process led to the exceptionally low levels of 6,7-dimethoxy-quinoline-4-ol (the process byproduct) in the cabozantinib malate material described in the claims.  *See* MSN II[12], D.I. 162 (Trial Tr. Vol. II, Oct. 24, 2023) at 612:12–18 ("Well, [the process in the '349 patent] was really the only way that we were able to keep the [6,7-dimethoxy-quinoline-4-ol] levels consistently – consistently low in the API, which enabled us to have essentially a product that was able to minimize and keep the [6,7-dimethoxy-quinoline-4-ol] levels as low as we possibly could."); *see also id*. at 649:14–24; *id*. at 671:10–20; *id*. at 687:4–9; *id*. at 697:25–698:7; *id*. at 712:1-5; *id*. at 740:22–741:5; *id*. at 773:5–24; *id*. at 796:5–12; MSN II, D.I. 164 (Trial Tr. Vol. IV, Oct. 26, 2023) at 1069:1–1070:3 ("That is correct, Your Honor, because the -- this synthetic process that's disclosed in the '349 patent is what allows the pharmaceutical composition to be essentially free of the [6,7-dimethoxy-quinoline-4-ol] impurity because it -- the numbers that you saw on Table 2 are quite low, 2 to 12. And that means, as Dr. Shah explained, during

---

[12] "MSN II" refers to *Exelixis, Inc. v. MSN Laboratories Private Ltd.*, No. 22-CV-228-RGA (D. Del.).

manufacturing, you can put that API with excipients, expose it to heat and water, and the actual tablets that are taken by cancer patients will remain free of the impurity."); *id*. at 1071:14–17; MSN II, D.I. 175 (Exelixis' Responsive Post-Trial Brief, Jan. 23, 2024) at 39–40; *id*. at 43; *id*. at 45; *id*. at 59.

Exelixis further highlighted the significant changes it made to the prior art process to successfully defeat an invalidity challenge by MSN, arguing that the process described in the '349 patent was critical to the invention.  *See* MSN II, D.I. 175 (Exelixis' Responsive Post-Trial Brief, Jan. 23, 2024) at 43 ("As Dr. MacMillan explained, the ['349 patent] Process differs from the [prior art] Process in significant ways, and features different steps, chemistries, and reagents … As Exelixis told the FDA, the resulting ['349 patent] Process consistently produced cabozantinib (L)-malate with reduced ppm levels of the [6,7-dimethoxyquinioline-4-ol] impurity."); *see also* MSN II, D.I. 162 (Trial Tr. Vol. II, Oct. 24, 2023) at 673:1–674:15; *id*. at 694:25–695:10; D.I. 163 (Trial Tr. Vol. III, Oct. 25, 2023) at 710:5–11.

Exelixis now suggests that because neither MSN nor Exelixis previously addressed whether asserted claim 3 of the '349 patent contains a product-by-process limitation, this Court should not do so now.  *See supra* at 14–15.  That is incorrect.  Omissions do not equal admissions, and Exelixis' prior statements—both at trial and in IPR proceedings—clearly show the process is essential.  More importantly, Exelixis attempts to impute MSN's decisions and strategies on Azurity with no basis whatsoever.  What MSN chose to argue or not argue in its case is irrelevant here.

Exelixis further argues that Azurity's position is inconsistent because it did not propose a product-by-process construction in the IPRs.  *See supra* at 15.  Again, Exelixis misses the point. "In determining ***validity*** of a product-by-process claim, ***the focus is on the product*** and not on the

process of making it." *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1369 (Fed. Cir. 2009) (emphases added). Not only does Exelixis' argument reflect a misunderstanding of the law, but it once again mischaracterizes Azurity's position on claim construction. *See supra* at 15. Azurity's position in its petition—when correctly quoted—was "[c]onsidering the closeness of the prior art and the specific arguments herein, Azurity does not believe that any claim terms require construction." D.I. 73-3, Ex. Q at 12. Process limitations were not germane to invalidity under 35 U.S.C. §§ 102 or 103. Here, however, the process limitations matter for infringement.

### 3.    Exelixis's Reply Position

To transform composition claims into product-by-process claims, Azurity imports a hodgepodge of selected process steps from just one of the exemplary processes in the specification. This not only violates a cardinal rule of claim construction but finds no support in the intrinsic or extrinsic evidence.

#### a.    The Term Azurity Proposes to Construe Does Not Reflect the Actual Claim Language

Azurity continues to ignore a fundamental flaw with its claim construction position: "Compound IB … 6-7-dimethoxy-quinoline-4-ol" is not a "term" in the Low-Impurity Patent Asserted Claims.[13] Using an ellipsis, Azurity improperly ignores express language describing the claimed compositions and inserts unwarranted process limitations, as demonstrated with Claim 1 of the '039 Patent:

| Claim Language | Claim Language with Azurity's Construction |
|---|---|
| "A pharmaceutical composition for oral administration comprising Compound IB; [chemical formula] and a pharmaceutically acceptable carrier, wherein the pharmaceutical composition is a tablet or a capsule, and wherein the pharmaceutical composition | "A pharmaceutical composition for oral administration comprising ~~Compound IB; [chemical formula]~~ Cabozantinib (L)-malate ~~and a pharmaceutically acceptable carrier, wherein the pharmaceutical composition is a tablet or a capsule, and wherein the~~ |

---

[13] Throughout, Exelixis uses the same defined terms as in its Opening Brief.

| | |
|---|---|
| contains 100 ppm or less of 6, 7-dimethoxy-quinoline-4-ol."<br><br>'039 Patent, Claim 1 | ~~pharmaceutical composition contains 100 ppm or less~~ … that contains a particular amount of the process byproduct 6,7-dimethoxy-quinoline-4-ol <u>and is prepared using a process that includes: (1) the use of 4-aminophenol; (2) the use of a strong pentoxide base; (3) the use of methylethyl ketone as a solvent in the cabozantinib (L)-malate salt forming step; and (4) the use of vacuum distillation to obtain solid cabozantinib (L)-malate.</u>"<br><br>(underlined language added by Azurity) |

In so doing, Azurity has rewritten the Low-Impurity Patent Asserted Claims. Azurity argues that the intrinsic evidence supports its approach to the term to be construed. *Supra* 20-27. But this is circular. Azurity cannot ignore and add limitations without violating the fundamental tenet that the claim construction inquiry "begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) (quoting *Renishaw PLC v. Marposs Societa'per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998)).

### b.    The Presumption Against Importing Synthetic Process Steps Applies

Conceding the general rule against importing limitations from the specification "absent clear disclaimer of claim scope" (*Supra* 18), Azurity tries to shoehorn its argument into exceptions that do not apply in light of the intrinsic evidence, extrinsic evidence, and the caselaw.

### i.    The Claims Do Not Contain Any Synthetic Process Limitations

Faced with composition claims that do not contain express process limitations, Azurity incorrectly argues that the "Asserted Claims ***invoke*** the synthetic process[.]" *Supra* 17 (emphasis added).

For example, even though the phrase "process byproduct" does not appear in the Asserted Claims, Azurity points to ***unasserted*** claims identifying 6,7-dimethoxy-quinoline-4-ol as a

"process byproduct." *Supra* 17.  Moreover, even if the Asserted Claims did refer to 6,7-dimethoxy-quinoline-4-ol as a process byproduct, that would not support limiting the claims to a byproduct of a particular process.  There is no need to import a process limitation because the claims use a structural limitation to recite a maximum amount of 6,7-dimethoxyquinoline-4-ol that the pharmaceutical composition may contain.  *See, e.g.*, '039 Patent, Claim 1.  The structural limitation "6,7-dimethoxy-quinoline-4-ol" points not to a production process—let alone a singular, required, or essential production process—but rather to a composition with no more than the specified threshold level of 6,7-dimethoxy-quinoline-4-ol.

The cases Azurity cites do not support its position.  For example, in *Medicines Co. v. Mylan, Inc.*, the process limitation was grounded in the specification.  853 F.3d 1296 (Fed Cir.  2017) ("the specification's definition of 'batches' by itself injects a compounding process as a limitation").  The Court also found the process limitation necessary to provide "'reasonable certainty' regarding the scope of the asserted claims."  *Id.* at 1303.  Here, there is no such uncertainty.  The claims' express structural limitations specifying certain amounts of 6,7-dimethoxy-quinoline-4-ol (*e.g.*, "100ppm or less") are more precise than Azurity's proposed construction, which elides the express amounts and imports process limitations.  Nor is there a limitation here that requires a process construction or disclaimer, as was the case in *Indivior Inc. v. Dr. Reddy's Laboratories, S.A.*, 752 F. App'x 1024, 1033 (Fed. Cir. 2018) (construing the claim term "continuously cast film").  *Id.* at 1030.  In contrast to these cases, the Asserted Claims contain no textual basis for the process limitations Azurity seeks to import.

        ii.    **The Specification Defines Compound IB With Reference to Its Structure and Does Not Identify Any One Process as Required**

Azurity concedes that a process disclosed as "advantageous" does not convert composition claims into product-by-process claims.  *See supra* 22 n.11.  It thus resorts to arguing that where a

31

process is an "essential, distinguishing feature of the alleged invention," "the presumption against importing process steps does not apply[.]" *Supra* 19.  However, despite repeatedly characterizing the process as an "essential" element of the claimed invention (*e.g.*, *supra* 19-22), Azurity does not identify a single portion of the specification stating any process *is* "required" or "essential." Indeed, Azurity fails to address (or mischaracterizes) portions of the specification that point away from importing a process limitation.  For example, the specification repeatedly and consistently describes "Compound IB" and "6,7-dimethoxy-quinoline-4-ol" in terms of their structures, not as a result of a particular process.  *See, e.g.*, D.I. 73-2, Ex. G ('349 Patent), 4:1-65, 5:6-17, 8:13-20, 18:23-39, 28:48-51, Figure 1.  It also expressly states that the processes included in the specification are **exemplary** and non-limiting, and repeatedly refers to plural "process**es**" including in the portions of the specification Azurity relies on.  *See, e.g.*, *id.* at 8:18-21 ("The disclosure is further illustrated by the following examples, which are not to be construed as limiting the disclosure in scope or spirit to the specific procedures described in them."), 12:34-40 ("As a non-limiting example …."); *see also supra* 20-21 (citing Title, Abstract, Field of Invention and Summary of Invention).  While Azurity waves some of the express language away as "generic" (s*upra* 22), it does not even address the portions of the specification including varying examples of how one skilled in the art may make Compound IB while minimizing 6,7-dimethoxy-quinoline-4-ol.  D.I. 73-2, Ex. G ('349 Patent) at 11:31-37 ("[v]arious compounds of reactant y(l) are commercially available, such as 2-fluoro-4-aminophenol and 4-aminophenol … the skilled artisan would be able to make any variation of reactant y(l) using commercially available starting materials and by using known techniques to modify these commercially available starting

materials to yield various compounds within the scope of reactant y(l).”), 11:66-12:8 (listing suitable bases)).[14]

The cases Azurity relies on to say the specification supports importing a process limitation are readily distinguishable.  They involve situations in which the claims and/or specification explicitly specified how the product ***must*** be made.  *See, e.g.*, *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1372 (Fed. Cir. 2007) (specification stated the composition “requires” manufacture in a particular form); *Chiesi USA Inc. v. MSN Pharms. Inc.*, 2021 WL 4843806, at *7-8 (D.N.J. Oct. 18, 2021) (specification presented process in “mandatory terms”).[15]

Here, in contrast, it is unwarranted to import a process limitation because the specification defines Compound IB and 6,7-dimethoxy-quinoline-4-ol structurally.  Moreover, the specification does not refer to any particular process as “required” or “necessary.”  This case is thus more analogous to *Intercept Pharmaceuticals, Inc. v. Apotex Inc.*, 2022 WL 856859 (D. Del. Mar. 23, 2022) (“the patentee never referred to the jet-milling process as required”).

### iii.    The File History Does Not Support Importing Process Limitations into the Claims

Azurity’s cherry-picked, out of context quotes from the file history (*supra* 24-26) do not support importing process limitations.  Exelixis does not dispute it “made numerous, significant changes to the Brown process—over an eight-year period—to address formation of the 6,7-

---

[14] Azurity’s assertion that the process limitation is justified despite the specification’s clear language because “Compound IB was already known” (*supra* 22-23) is a red herring.  The Low-Impurity Patents do not claim Compound IB, but are directed to pharmaceutical compositions of compound IB having less than specified levels of 6,7-dimethoxy-quinoline-4-ol.  Azurity has not established the structurally claimed compositions—made by any process—were in the prior art and its attempt to distinguish *Vanguard Products Corp v. Parker Hannifin Corp*, 234 F.3d 1370 (Fed. Cir. 2000) fails.  *Supra* 22 n.11.

[15] By contrast, Azurity dismisses the cases presented by Exelixis by stating: “those cases did not involve a process that constitutes an essential feature of the alleged invention[.]”  *Supra* 19 n.9.  Such a basis to distinguish merely assumes the result Azurity seeks.

dimethoxy-quinoline-4-ol impurity during synthesis of the 1-3 intermediate, malate salt formation, and drug formulation." D.I. 73-3, Ex. R at 369-370; *supra* 23-25. However, Exelixis' emphasis of the significance of its discovery and its substantial work to control the impurity does not support reading process limitations into the claims. Exelixis was the first to discover the 1-1 impurity was genotoxic and formed as a degradation product under certain conditions. Exelixis emphasized these discoveries and the years it spent developing a solution to rebut the contention that the claimed cabozantinib (L)-malate composition, essentially free of the 1-1 impurity, was obvious. *E.g.*, D.I. 54, Ex. 16 (*Azurity Pharm., Inc. v. Exelixis, Inc.*, IPR2025-00210, Paper 8 (PTAB Mar. 11, 2025)) at 1-4; *id.*, Ex. 17 (*Azurity Pharm., Inc. v. Exelixis, Inc.*, IPR2025-00427, Paper 10 (PTAB Jun. 6, 2025)) at 1-4. Exelixis never argued that the exemplary processes it disclosed, including in the Low-Impurity Patents, were the only way to prepare the claimed compositions. Nor did Exelixis characterize the claims as product-by-process claims. Contrary to Azurity's assertions (*supra* 26), emphasizing the importance of Exelixis' discoveries and the impact of low-impurity compositions does not limit the claimed compositions to any particular process, and on its own, cannot render any process "essential"—what is essential is the low-impurity composition, not a single process of manufacture.

Nor does the Low-Impurity Shah Declaration support Azurity's position. *Supra* 26-27. As an initial matter, this Declaration, including the language Azurity cites, was offered to support the unexpected properties of the claimed invention; it does not limit the claimed invention. Moreover, the Declaration repeatedly confirms the invention is directed to pharmaceutical compositions of cabozantinib (L)-malate. *See* D.I. 73-3, Ex. L at 125-134 ¶¶ 8, 13-25. Dr. Shah's reference to the presence of a process byproduct does not equate to a statement that a particular process is required by the claims.

This is confirmed by the testimony of Dr. Shah cited (but mischaracterized) by Azurity. Azurity asserts Dr. Shah testified "the 'only way' to achieve the claimed compositions is through the process of the '349 patent." *Supra* 27. However, the actual testimony is: "the 'only way' that a 'pharmaceutical composition [of cabozantinib (L)-malate] can be achieved and be essentially free of the 1-1 impurity' would be by 'having the lowest levels of the 1-1 impurity possible in the active ingredients. Hence, the commercial process B-2[.]'" *See* D.I. 73-3, Ex. O at 267. In the full quote, neither Exelixis **nor** Dr. Shah states that the "only way" to achieve the claimed composition is through the stated process. Instead, Dr. Shah states the only way to achieve *the claimed composition* is by obtaining sufficiently pure active ingredients; process B-2 is just one way to do that.

That Exelixis came up with a new process that created a better and patentable composition does not mean its new compositions are limited to a specific process or that any process would be "essential." The file history does not support importing process limitations into the claims.

### iv. The Extrinsic Evidence Does Not Support Importing Process Limitations into the Claims

If the Court were to consider extrinsic evidence, such evidence is consistent with Exelixis' proposed construction—not Azurity's.

No entity in any prior proceeding involving the Low-Impurity Patents has suggested the Low-Impurity Patents recite product-by-process claims. Exelixis is not seeking to "impute MSN's decisions and strategies on Azurity," *supra* 28, but rather to contextualize Azurity's cherry-picked statements. The *MSN II* testimony Azurity cites focuses on the importance of the composition Exelixis claimed, while disclosing certain exemplary processes used by the inventors to achieve that critical composition. As Azurity itself highlights, these statements were in the context of invalidity challenges and did not involve claim construction.

It is notable that Azurity never suggested in its IPR petitions that the Low-Impurity Patents recite product-by-process claims. Azurity attempts to distract from its gamesmanship by arguing it did not previously propose a product-by-process construction because "[i]n determining validity of a product-by-process claim, the focus is on the product and not on the process of making it." *Supra* 28-29 (quoting *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1369 (Fed. Cir. 2009)). However, in asserting that "process limitations were not germane to invalidity," *Supra* 29, Azurity ignores that if the claims in fact contained process limitations, then in evaluating patentability, Exelixis would have had the opportunity to argue, and the Patent Office would have had the opportunity to assess, any and all distinctive structural characteristics imparted by such process steps (including but not limited to recited impurity levels). *See, e.g.*, *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012) ("the Patent Office in determining patentability considers the process in which a product is formed if that process imparts distinctive structural characteristics.").

Additionally, Azurity's incomplete representation of applicable legal standards does not excuse its failure to raise its proposed product-by-process construction before the Board, or even explain why an alternative position is warranted. *See* Ex. 5, *Revvo Technologies, Inc. v. Cerebrum Sensor Technologies, Inc.*, IPR2025-00632, Paper 20, at 3-4 (Nov. 3, 2025) (precedential) ("[W]hen a petitioner takes alternative positions before the Board and a district court, that petitioner should, at a minimum, explain why alternative positions are warranted."). Azurity never informed the Board of the claim construction position it advances in this litigation. *Cf.* 37 C.F.R. § 42.51(b)(1)(iii) ("a party must serve relevant information that is inconsistent with a position advanced by the party during the proceeding concurrent with the filing of the documents or things that contain the inconsistency"); *XMTT, Inc. v. Intel Corp.*, 2022 WL 2904308, at *2 (D. Del. July

22, 2022) (defendant judicially estopped from raising claim construction inconsistent with its position before the Board in IPR proceeding).

* * *

For these reasons, the Court should adopt Exelixis' proposed construction of "Compound IB …" as "cabozantinib (L)-malate."

### 4. Azurity's Sur-Reply Position

The claims of the '349 and '039 patents are product-by-process claims. Both the intrinsic record and the extrinsic evidence confirm that Exelixis defined its invention not by the structural properties of cabozantinib (L)-malate, but by the process used to make it: a synthetic route that yields material "essentially free" of the process byproduct. Exelixis has repeatedly acknowledged this in prior litigation before this Court and in IPR proceedings involving these same patents. *See supra* at 23–27, 27–29; *see also* MSN II, D.I. 175 at 39-40, 43–44.

The facts are clear: Exelixis argued process-based distinctions to support the validity of its patents both before this Court and the Board, but now contends that those processes are irrelevant to the scope of the claims. Exelixis is caught in a classic paradox—in an attempt to ward off validity challenges, Exelixis relied on the narrow claim scope tied to a specific process; now, however, Exelixis wants to reverse course and broaden the claim to capture alleged infringers. If we take Exelixis' current statements as true, then Exelixis was previously wasting this Court's and the Board's time and, at worst, misleading the Court and the Board with representations about a process Exelixis now admits has no nexus to what is claimed. Allowing Exelixis to get away with such brazen contradiction is fundamentally unfair.

### a. The Proper Term For Construction Is "Compound IB . . . 6,7-dimethoxy-quinoline-4-ol"

Exelixis asks the Court to focus on the compound portion of the claims, but this proposal is incomplete and should be rejected. Contrary to Exelixis' assertions (*supra* 29–30), Azurity construes the term according to the claim language as informed by the intrinsic record. And the intrinsic record confirms that the term's meaning cannot be divorced from the process used to synthesize the claimed composition. Thus, Azurity's construction adheres to, rather than departs from, the fundamental requirement that claim construction begins with the words of the claims and interprets them as a skilled artisan would in light of the intrinsic evidence.

**b.    These Are Product-By-Process Claims**

As Exelixis has repeatedly acknowledged, the synthetic process is an essential feature of the claimed invention. Accordingly, the presumption against importing limitations does not apply. *See supra* 18-19.

**i.    The Synthetic Process is an Essential Part of the Claims**

Exelixis argues that the asserted claims do not contain synthetic process limitations because they do not include the phrase "process byproduct." *Supra* 30–31. Yet, Exelixis ignores that the claims expressly recite "6,7-dimethoxy-quinoline-4-ol," which the specification identifies as the process byproduct formed during Compound IB synthesis and something that should be minimized in pharmaceutical compositions. *Supra* 17–21.

Recognizing the weakness of its position, Exelixis next contends that even if the asserted claims referred to 6,7-dimethoxy-quinoline-4-ol as a process byproduct, that would not support limiting the claims to a byproduct of a particular process. *Supra* 30–31. However, the specification and claim language make clear that 6,7-dimethoxy-quinoline-4-ol is the only process byproduct of the claimed invention, and, as Exelixis repeatedly represented to this Court, the only way to minimize formation of 6,7-dimethoxy-quinoline-4-ol is to use the specific process identified in the Low Impurity Patents. *Supra* 17–23. That the claims include a maximum quantity

of permissible impurity does not change the fact that, until now, Exelixis maintained that the only way to limit the impurity is by utilizing the specific process identified in the patents. Construing the term without reference to the process would divorce the claim language from the patents' teaching, what Exelixis regards as its invention, and how Exelixis previously described its invention to this Court.

Exelixis also emphasizes that the specification does not state any process is "required" or "essential." *Supra* 31-32. But Azurity does not need to point to such magic words: the specification provides the alleged invention is directed to a specific process that defines the claimed invention. *Supra* at 20–21. And although the specification refers to "Compound IB" and "6,7-dimethoxy-quinoline-4-ol" in structural terms, it never limits them to structure alone. *See, e.g.*, *id.* at 21. Nor do references to multiple "processes" or "exemplary" embodiments undermine the underlying teaching that a specific process must be employed to minimize the formation of the only identified process byproduct. Notably, Exelixis did not rely on either of these arguments in the IPR proceedings; instead, Exelixis unequivocally confirmed that the term "Compound IB" is defined by the process consistent with Azurity's construction. *See, e.g.*, *id.* at 22–23.

ii.    **The File History Confirms that the Process is Essential**

Exelixis claims Azurity cherry-picked file-history quotes to support "importing process limitations." *Supra* 33–34. But Exelixis cannot deny it made those statements to avoid IPR institution on these same patents. Exelixis concedes that a "low-impurity" composition is essential to the claimed invention (*id.* at 34), and, in the context of these patents, that can only mean a composition with a limited amount of the process byproduct 6,7-dimethoxy-quinoline-4-ol. *Supra* at 21. The specification—and Exelixis—make clear that the only way to achieve such a "low-impurity" cabozantinib (L)-malate composition is by using the disclosed process. *See, e.g.*, *id.* at 24–26.

39

Exelixis' argument that the Shah Declaration does not support Azurity's position is equally unavailing. *Supra* 34–35. Despite Exelixis' attempts to mischaracterize its content, the Declaration is not strictly limited to alleged "unexpected properties." *Id*. at 35. Indeed, Exelixis relied on the Declaration to argue that the Examiner failed to establish a prima facie case of obviousness. Exelixis' effort to reframe Dr. Shah's testimony regarding process B-2 contradicts its own earlier summary which identified "process B-2" as ***the*** process disclosed in the '349 patent. D.I. 73-3, Ex. O at 267 (emphasis added).

### iii. The Extrinsic Evidence Supports Azurity's Construction

Exelixis incorrectly attempts to attach import to the notion that "no entity in any prior proceeding … has suggested that the Low-Impurity Patents recite product-by-process claims." *Supra* 35. Exelixis itself has repeatedly argued that an essential feature of the claims is the synthetic process it purportedly spent ***eight years*** developing. In any event, the absence of product-by-process construction in prior proceedings is irrelevant: process limitations were not germane to invalidity, but are relevant here for infringement. *Supra* at 28–29.

Exelixis' argument that Azurity should have raised its construction in its IPR petitions similarly falls short. *Supra* 36–37. Whether claims are product-by-process is a claim construction issue pertinent to infringement, not invalidity. Exelixis' reliance on *Revvo* is misplaced. *Revvo Technologies, Inc. v. Cerebrum Sensor Technologies, Inc.*, IPR2025-00632, Paper 20, at 3–4 (Nov. 3, 2025) (precedential); *supra* 36. Azurity took no position before the Board inconsistent with the construction it advances here. Because the Board was never asked to construe the claims as product-by-process—and Azurity never suggested such a construction was foreclosed—there is no inconsistency requiring disclosure under 37 C.F.R. § 42.51(b)(1)(iii).

Exelixis' reliance on *XMTT* is similarly flawed.  *XMTT, Inc. v. Intel Corp.*, No. 18-CV-1810 (MFK), 2022 WL 2904308, at \*2 (D. Del. July 22, 2022); *supra* 36–37.  Judicial estoppel applies when a party persuades a tribunal to adopt a position and later contradicts it.  As discussed above, Exelixis' estoppel theory therefore collapses at the threshold.

*     *     *

Accordingly, the Court should adopt Azurity's construction of "compound IB . . . 6,7-dimethoxy-quinoline-4-ol" as "cabozantinib (L)-malate that contains a particular amount of the process byproduct 6,7-dimethoxy-quinoline-4-ol and is prepared using a process that includes: (1) the use of 4-aminophenol; (2) the use of a strong pentoxide base; (3) the use of methyl ethyl ketone as a solvent in the cabozantinib (L)- malate salt forming step; and (4) the use of vacuum distillation to obtain solid cabozantinib (L)-malate."

## B. DISPUTED TERM 2: "CRYSTALLINE"

Second, the parties dispute the term "crystalline." This term appears in the following asserted claims:

- '776 Patent, Claim 1 (and by dependency, Claims 2-3)

- '439 Patent, Claim 1 (and by dependency, Claims 3-4)

- '440 Patent, Claims 1 and 3

- '015 Patent, Claims 1-3

| Exelixis' Proposed Construction | Azurity's Proposed Construction |
|---|---|
| plain and ordinary meaning, which is "having a regular repeating underlying arrangement of molecules" | "A crystalline form of cabozantinib (L)-malate wherein more than 90% of the cabozantinib (L)-malate is crystalline" |
| **Exelixis' Explanation of Why Resolution of the Dispute Matters** | **Azurity's Explanation of Why Resolution of the Dispute Matters** |
| Exelixis' position is that "crystalline" should be given its plain and ordinary meaning, which does not require a percentage limitation. Construction of this term is relevant to confirm that percentage limitations should not be read into the claims. | As explained in detail in Azurity's Opening Brief in Support of Defendants' Motion for Judgment on the Pleadings Regarding U.S. Patent Nos. 8,877,776, 11,091,439, 11,091,440, and 11,098,015 (D.I. 59), the construction of "crystalline" relates to noninfringement as this claim does not cover the product that is the subject of Azurity's 505(b)(2) NDA. |

### 1. Exelixis's Opening Position

Exelixis and Azurity dispute the construction of "crystalline," which appears in claims 1-3 of the '776 Patent; claims 1, 3, and 4 of the '439 Patent; claims 1 and 3 of the '440 Patent; and claims 1-3 of the '015 Patent (together, the "Crystalline Malate Salt Patents Asserted Claims" of the "Crystalline Malate Salt Patents"). Exelixis' proposed construction is consistent with the plain language of the claims, the common specification, the prosecution history, and the extrinsic evidence. By contrast, Azurity's proposed construction imports a numerical percentage that cannot

be reconciled with the plain meaning of the term "crystalline," the intrinsic evidence, or the extrinsic record.

### a. "Crystalline" Should Be Construed According to the Plain Language of the Claims and Specification

Exelixis' proposed construction reflects the plain and ordinary meaning of the claim term "crystalline." The term "crystalline" describes solid matter that has "a regular repeating underlying arrangement of molecules." D.I. 73-1, Ex. D ('439 Patent) at Fig. 8, 3:64-65, 25:59-26:15.

In the Crystalline Malate Salt Patents Asserted Claims, crystalline is used to describe the state of the claimed cabozantinib malate salt. For example, claim 1 of the '439 Patent recites: "N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N′-(4-fluorophenyl) cyclopropane-1,1-dicarboxamide, malate salt, wherein said salt is crystalline." As another example, claim 1 of the '440 Patent recites: A pharmaceutical composition comprising the N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxylphenyl)-N′-(4-fluorophenyl) cyclopropane-1,1-dicarboxamide, malate salt, wherein said salt is crystalline; and a pharmaceutically acceptable excipient." In each instance, the claims use the word crystalline to specify the type of solid matter that is covered by the claims.

Exelixis' construction comports with this claim language, which never once qualifies the term "crystalline" by any percentage at all, let alone requires a numerical threshold. Azurity's proposed construction not only writes in a non-existent limitation into the claims, but also fails to define the term "crystalline." Azurity's proposal simply repeats the word "crystalline" (twice) without providing any explanation of what crystalline means. *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ("[A] claim construction, if needed at all, should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term.").

The common specification further confirms Exelixis' construction.  The specification makes clear that the Crystalline Malate Salt Patents cover crystalline cabozantinib (L)-malate and compositions thereof, with no numerical threshold for crystalline content.  The disclosure "relates to pharmaceutical compositions comprising a crystalline or an amorphous form of at least one malate salt of [cabozantinib]," and describes how crystalline and amorphous material may be distinguished.  *See, e.g.*, D.I. 73-1, Ex. C ('776 Patent) at 1:31-35, 10:53-55.  The specification further discloses that "[t]he novel salt form of the invention exists in crystalline and amorphous forms," and explains that crystalline and amorphous material are distinct from each other.  *Id.* at 3:13-15, 18:13-16 ("'amorphous' refers to a solid form of a molecule and/or ion that is not crystalline.").  But the specification never associates a percentage threshold of crystalline material to the scope of the claimed inventions.  Indeed, the only place where the specification references "at least about 90 wt. % based on the weight" of the crystalline cabozantinib (L)-malate is in the context of defining a term, "substantially pure," (*id.* at 18:18-20), that does not appear in the claims.

### b. The Prosecution History Does Not Contain Numerical Limits for "Crystalline"

The prosecution history also supports Exelixis' plain-meaning construction of "crystalline."  During prosecution of Application No. 17/070,514,[16] Exelixis specifically affirmed—without limitation—that the "inventors also found that the crystalline malate salt of cabozantinib exhibits an improved dissolution profile compared with the amorphous malate salt," which "confirm[s] the benefits of formulating cabozantinib as the crystalline malate salt."  D.I. 73-2, Ex. J, pp. 131-47 (Response to Office Action) at 5-6.  Although Exelixis submitted a declaration

---

[16] Issued as the '439 Patent.  Application No. 17/070,514 is also an ancestor application to the '440 Patent and the '015 Patent.  The '439 Patent is a descendant of the '776 Patent.

comparing dissolution profiles of pharmaceutical compositions with different percentages of crystalline and amorphous material to provide evidence of the unexpected properties of the claimed invention, Exelixis never argued that the invention of the Crystalline Malate Salt Patents should be limited to any numerical threshold of crystalline cabozantinib (L)-malate content; neither did the Examiner.

### c.    Exelixis' Proposed Definition Is Consistent with the Extrinsic Record

As with the "Compound IB" term, there is no reason for the Court to consult extrinsic evidence to construe "crystalline," as the intrinsic record contains no evidence to suggest ambiguity.  But even if the Court were to turn to extrinsic evidence, it would still find no basis to adopt Azurity's construction.   Indeed, Exelixis' proposed definition of "crystalline" is fully consistent with the extrinsic evidence, including prior related litigation and other courts' constructions of similar terms.

Each of the Crystalline Malate Salt Patents has been subject to prior litigation, including trial.  The record of each case is consistent with Exelixis' proposed construction here.

*First*, in *MSN II*, following agreed-upon testimony from the experts, the Court found that "crystalline" means that the "cabozantinib (L)-malate has a 'regular repeating underlying arrangement of molecules.'"  *MSN II*, 2024 WL 4491176, at *10 (citing testimony of MSN's expert that crystalline meant "a regular repeating underlying arrangement of molecules"); *see* Ex. 2, *MSN II* Trial Tr., Vol. II (D.I. 162) at 537:22-25.

*Second*, in both *Exelixis, Inc. v. MSN Laboratories Private Ltd.*, C.A. No. 19-2017-RGA, 2023 WL 315614, at *15 (D. Del. Jan. 19, 2023) ("*MSN I*") and *MSN II*, the Court did not find (nor did MSN argue) that the claims contained any percentage limitation.  In *MSN I*, involving the '776 Patent, at trial defendant MSN contested only whether its ANDA Product infringed, *i.e.*,

45

whether it contained cabozantinib (L)-malate in crystalline Form N-2.  Ex. 3, *MSN I*, D.I. 275 at ¶¶ 5, 6.  In evaluating whether MSN infringed the '776 Patent, the Court did not find (nor did MSN argue) that any particular percentage of the cabozantinib (L)-malate in MSN's ANDA Product needed to be crystalline Form N-2.  *MSN I*, 2023 WL 315614, at *11.  Instead, the Court assessed whether ***any*** crystalline Form N-2 was detected in MSN's product using the recited testing methods.  *Id*.  Likewise, in *MSN II*, MSN stipulated to infringement of the asserted Crystalline Malate Salt Patents and did not argue (nor did the Court find) that the claims required any specific percentage of crystalline material.  *MSN II*, 2024 WL 4491176, at *1, *11, *23.

***Third***, courts have repeatedly refused to adopt constructions of "crystalline" that depart from the plain meaning of the term, as Azurity's does.  *See, e.g.*, *Exeltis USA, Inc. v. Lupin Ltd.*, C.A. No. 22-434-RGA, 2023 WL 2306736, at *4 (D. Del. Mar. 1, 2023) (finding "crystalline drospirenone" to have its plain and ordinary meaning, "drospirenone in crystalline form," and declining to import a limitation for the percentage of drospirenone that must be crystalline); *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, 477 F. Supp. 3d 306, 313, 342-45 (D. Del. 2020) (plaintiffs' expert "did not need to quantify the amount of [crystalline apixaban particles] because any amount infringes" claim limitation "wherein apixaban comprises crystalline apixaban particles"), *aff'd sub nom. Bristol-Myers Squibb Co. v. Sigmapharm Lab'ys, LLC*, 858 F. App'x 359 (Fed. Cir. 2021); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1346 (Fed. Cir. 2005) (finding claim related to "crystalline paroxetine hydrochloride hemihydrate" covered "any amount" of crystalline form, without further limitation); *Forest Lab'ys, LLC v. Accord Healthcare Inc.*, C.A. No. 15-272-GMS, 2016 WL 6892094, at *1 n.6 (D. Del. Nov. 21, 2016) (rejecting defendants' proposed construction of "crystalline" as "entirely in crystalline form comprising only [certain crystalline forms]" in favor of a plain meaning construction, because

46

defendants' arguments did not "warrant a departure from the plain and ordinary meaning of 'crystalline' when the claim language, specification, and prosecution history are analyzed as a coherent whole.").

The extrinsic evidence therefore supports the plain and ordinary meaning of "crystalline," and is not consistent with Azurity's proposed construction.

\* \* \*

For these reasons, the Court should adopt Exelixis' plain and ordinary meaning construction of "crystalline" as "having a regular repeating underlying arrangement of molecules."

## 2. Azurity's Answering Position

The dispute between Exelixis and Azurity regarding the construction of the term "crystalline" is not a question of chemistry but of claim scope. Azurity does not dispute that the scientific meaning of "crystalline" refers to a material "having a regular repeating underlying arrangement of molecules." However, by omitting the numerical limitation in Azurity's construction, Exelixis seeks to broaden claims in the Crystalline Malate Salt Patents[17] to cover compositions the inventors neither claimed nor intended to claim—specifically, cabozantinib (L)-malate compositions wherein 90% or less of the cabozantinib (L)-malate is crystalline.

Azurity's construction—"a crystalline form of cabozantinib (L)-malate wherein more than 90% of the cabozantinib (L)-malate is crystalline"—is the only construction consistent with the claims read in view of the prosecution history and the common specification. When read in their collective totality, these sources confirm that the patentee claimed only crystalline forms of cabozantinib malate wherein more than 90% of the cabozantinib (L)-malate is crystalline.

---

[17] For purposes of the Joint Claim Construction Brief, Azurity has adopted Exelixis' definition of "Crystalline Malate Salt Patents."

### a.    The Intrinsic Evidence Supports Azurity's Construction of "Crystalline"

The intrinsic evidence compels Azurity's construction. The prosecution history, specification, and claims all demonstrate that "crystalline" cabozantinib (L)-malate refers to compositions wherein more than 90% of the cabozantinib malate is crystalline, not simply a composition containing any amount of crystalline cabozantinib malate.

### i.    The Patentee Disclaimed 90% or Less Crystalline Forms During Prosecution

A patentee may, through a clear and unmistakable disavowal during prosecution, surrender claim scope that would otherwise fall within the ordinary meaning of the claim language. *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1382 (Fed. Cir. 2021) (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009).

Here, Exelixis made such a disavowal. During prosecution of the '439 and '440 patents, Exelixis repeatedly distinguished between the claimed crystalline forms and amorphous and mixed-phase compositions. Exelixis expressly relied on data showing that only fully crystalline forms of cabozantinib malate (e.g., forms wherein more than 90% of cabozantinib (L)-malate is crystalline) achieved the superior dissolution and bioavailability properties that purportedly distinguished the invention from the prior art.

### a)    Exelixis Prosecution Statements Constitute a Clear and Unmistakable Disclaimer

Prosecution disclaimer prevents a patentee, who normally enjoys the "heavy presumption" that a claim term takes it ordinary and customary meaning from "recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). For disclaimer to apply, the disavowal must be "clear and unmistakable." *Id.* at 1325–26. Prosecution arguments drawing distinctions between an

invention and prior art are useful for determining whether the patentee intended to surrender territory, as his or her own words indicate what the invention is not. *See MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007); *see also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374–75 (Fed. Cir. 2008) (finding "clear and unmistakable disavowal" when a patentee clearly characterizes invention in a way to try to overcome rejections based on prior art).

During prosecution of Application No. 17/070,514, which issued as the '439 patent, the Examiner rejected the claims as obvious over the prior art. D.I. 73-2, Ex. J at 124–27. In response, Exelixis argued that the Examiner failed to establish a *prima facie* case of obviousness. *Id*. at 133–35. Exelixis also argued that the claimed crystalline malate salt had unexpected properties, including that the crystalline malate salt of cabozantinib exhibits an improved dissolution profile and bioavailability compared to the amorphous malate salt. *Id*. at 134, 142.

To substantiate these assertions, Exelixis relied on a declaration from a senior executive, Dr. Khalid Shah ("Shah Declaration").[18] The Shah Declaration describes the results of an experiment performed on cabozantinib malate compositions to evaluate the dissolution of the crystalline cabozantinib malate salt relative to the amorphous salt. *Id*. at 148–49. As the table below demonstrates, the compositions consisted of cabozantinib malate that were 100%, 90%, or 80% crystalline, with the remainder being amorphous:

---

[18] Exelixis also submitted the Shah Declaration during prosecution of U.S. Patent Application No. 17/149,365, which issued as the '440 patent, in response to a similar obviousness rejection over the same prior art references. D.I. 73-2, Ex. K at 222–230.

**Table 1:  Batch Description**

| Batch | Description | API Content | |
|---|---|---|---|
| | | Crystalline Form N-2 API amount | Amorphous API amount |
| 1A | 80 mg capsule blend | 80% | 20% |
| 1B | 80 mg capsule blend | 100% | 0% |
| 2A | 40 mg capsule containing tablet blend | 80% | 20% |
| 2B | 40 mg capsule containing tablet blend | 100% | 0% |
| 3A | 20 mg tablet | 80% | 20% |
| 3B | 20 mg tablet | 100% | 0% |
| 4A | 40 mg tablet | 80% | 20% |
| 4B | 40 mg tablet | 100% | 0% |
| 5A | 60 mg tablet | 80% | 20% |
| 5B | 60 mg tablet | 100% | 0% |
| 6A | 100 mg tablet | 100% | 10% |
| 6B | 100 mg tablet | 100% | 0% |

D.I. 73-2, Ex. J at 149.[19]

The Shah Declaration reported that formulations containing 100% crystalline cabozantinib malate dissolved completely and rapidly, whereas those containing even modest amounts of amorphous material dissolved more slowly and incompletely:

---

[19] Table 1 of the March 19, 2021 Shah Declaration appears to contain a typographical error in row 6A.  The table reports that the 6A tablet contains "100% Crystalline Form N-2 API Amount" and "10% API amount," which would total 110%, an impossibility.  Paragraph 16 of the same declaration confirms that Batch 6A "contained a mixture of 90% crystalline Form N-2 and 10% amorphous API." D.I. 73-2, Ex. J at 151. Thus, the correct composition for Batch 6A is 90% crystalline Form N-2 and 10% amorphous API, consistent with the narrative description rather than the numerical entry in Table 1.

Table 5:  Dissolution Result Summary for Batches 1A-5B

| Batch | Percent Drug Released (% LC) | | | | |
|---|---|---|---|---|---|
| | 15min | 30min | 45min | 60min | 90min |
| 1A (80 mg capsule with 20% amorphous API) | 69 | 78 | 83 | 87 | 91 |
| 1B (80 mg capsule with 0% amorphous API) | 94 | 94 | 94 | 95 | 95 |
| 2A (40 mg capsule with tablet blend and 20% amorphous API) | 12 | 15 | 18 | 19 | 21 |
| 2B (40 mg capsule with tablet blend and 0% amorphous API) | 99 | 101 | 100 | 101 | 101 |
| 3A (20 mg tablet with 20% amorphous API) | 43 | 48 | 52 | 53 | 57 |
| 3B (20 mg tablet with 0% amorphous API) | 102 | 102 | 102 | 102 | 102 |
| 4A (40 mg tablet with 20% amorphous API) | 30 | 32 | 35 | 35 | 37 |
| 4B (40 mg tablet with 0% amorphous API) | 103 | 103 | 103 | 104 | 104 |
| 5A (60 mg tablet with 20% amorphous API) | 32 | 59 | 66 | 70 | 74 |
| 5B (60 mg tablet with 0% amorphous API) | 100 | 101 | 101 | 101 | 101 |

*Id*. at 152.

Table 6:    Dissolution Result Summary for Batches 6A and 6B

| Batch | Percent Drug Released (% LC) | | | | | |
|---|---|---|---|---|---|---|
| | 10min | 20min | 30min | 45min | 60min | 90min |
| 6A (100 mg tablet with 10% amorphous API) | 66 | 80 | 83 | 84 | 86 | 92 |
| 6B (100 mg tablet with 0% amorphous API) | 91 | 99 | 99 | 100 | 100 | 100 |

*Id*. at 155.

Exelixis repeatedly cited these results to argue that the invention's advantages stemmed from its complete or near-complete crystallinity.  *Id*. at 134–43.  In doing so, Exelixis explicitly disavowed compositions containing 90% or less crystalline material.  For example, Exelixis stated in response to the Examiner's objection, that the tables above demonstrate that "tablets . . . formulated using the crystalline malate salt dissolved quickly and completely, whereas the presence of a proportion of amorphous malate in the tablet . . . (10% or 20% of active pharmaceutical ingredient (API)) resulted in both slow and incomplete dissolution."  *Id*. at 138, 141.  Exelixis also stated that this is the "precise opposite of what would have been expected by a person of ordinary skill in the art," as a person of ordinary skill in the art would expect the

51

amorphous form to have better dissolution and bioavailability characteristics than its crystalline form:

> Thus, contrary to expectation, the claimed crystalline malate salt provides for improved dissolution (and therefore improved bioavailability) of cabozantinib, as compared with the amorphous malate salt. This finding represents an important technical contribution to the state of the art. The skilled person would not have expected that crystalline cabozantinib malate would have an improved dissolution profile compared with the amorphous malate salt. This was a *surprising and unexpected property* of the claimed crystalline form. Moreover, it is contrary to the teaching in the art regarding the relative solubility of amorphous and crystalline forms. Specifically, amorphous forms are generally known to be more soluble and have greater bioavailability than their crystalline counterparts.

*Id*. at 142 (emphasis in original).  Exelixis further argued that a "*skilled person would have been directed away from crystalline forms by the teaching in the art . . . that amorphous forms are usually much more soluble than their crystalline counterparts. If there were an 'obvious' solution, this would have been the provision of cabozantinib malate in amorphous form*."  *Id*. (emphasis in original).  Exelixis summarized its response to the Examiner by stating that "[t]he claimed crystalline form is highly advantageous because it provides an improved dissolution profile compared with the amorphous form. Thus, the claimed crystalline cabozantinib malate salt is not obvious over the cited references."  *Id*. at 13.[20]

These repeated statements leave no doubt that Exelixis distinguished its invention based on its high degree of crystallinity—specifically forms containing more than 90% crystalline material—and surrendered compositions below that threshold.  Having relied on complete or near-

---

[20] Exelixis made these same arguments to the United States Patent and Trademark Office during prosecution of U.S. Application No. 17/149,365, which issued as the '440 patent.  D.I. 73-2, Ex. K at 134–43.

complete crystallinity to distinguish its invention and secure allowance, Exelixis cannot now expand its claims to encompass compositions that do not have greater than 90% crystallinity.

### b)  The Prosecution Disclaimer Applies to All Crystalline Malate Salt Patents

Although these statements were made during prosecution of the '439 and '440 patents, they apply equally to all four Crystalline Malate Salt Patents. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007) (explaining that "prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications") (quoting *Omega Eng'g*, 334 F.3d at 1333). The relevant inquiry is whether the disclaimed statements "relat[e] to the same subject matter as the claim language at issue." *See id.*

Here, there can be no argument that the subject matter is identical. The claims of all four patents share a common specification, claim priority to the same parent application, and recite "crystalline" cabozantinib malate using identical language (e.g., "said salt is crystalline"). The patentee's prosecution statements regarding the level of crystallinity necessary to distinguish the claimed invention from amorphous or mixed-phase forms were directed to this shared subject matter. Accordingly, the disclaimer applies equally to the '776 and '015 patents, which claim the same crystalline forms and rely on the same intrinsic record.

### c)  Exelixis' Litigation Statements Confirm Disclaimer

Exelixis' own representations in prior litigation reinforce this prosecution disclaimer. In prior litigation against MSN concerning the '439, '440, and '015 patents, Exelixis argued that "[t]he drug products with the hundred percent crystalline material exhibited a much faster dissolution rate compared with the drug product that had the amorphous API added to it. And that was surprising in that the dissolution rate was faster with the hundred percent crystalline material." *See* MSN II, D.I. 162 (Trial Tr. Vol. II, Oct. 24, 2023) at 639:2–7.

Exelixis further represented that the term "crystalline" is used as an adjective to describe the "cabozantinib malate salt" and that "an amorphous solid is not crystalline."  MSN II, D.I. 175 (Exelixis' Responsive Post-Trial Brief, Jan. 23, 2024) at 10–11.  These statements confirm what the intrinsic record already makes clear: the patentee understood and intended "crystalline" to mean, at a minimum, more than 90% crystalline material.

### ii.    The Plain Language of the Claims and the Common Specification Supports Azurity's Construction

The claim language and common specification of the Crystalline Malate Salt Patents further confirms Azurity's construction of "crystalline."  The claims are directed exclusively to crystalline forms of cabozantinib (L)-malate, compositions thereof, and methods of treating cancer using crystalline cabozantinib (L)-malate.  D.I. 73-1, Exs. C at 30:65–31:31; D at 32:21–40; E at 32:5–21; F at 32:4–22.  And the patentee's clear and unmistakable disavowal during prosecution (discussed *supra*) establishes that "crystalline" refers to cabozantinib (L)-malate wherein more than 90% of the cabozantinib (L)-malate is crystalline.

The common specification reinforces this understanding.[21]  It repeatedly contrasts "crystalline" and "amorphous" forms as distinct and mutually exclusive materials.  For example, the specification explains that crystalline cabozantinib (L)-malate exhibits unique x-ray powder diffraction ("XRPD") patterns with identifiable peaks that are distinguishable from the XRPD patterns for amorphous forms: "Table 2 lists characteristic XRPD peak positions ($2\theta\pm0.2°2\theta$) for crystalline Compound (III), Form N-1 and Forms N-1 and N-2 of crystalline Compound (I).  Amorphous forms do not display reflection peaks in their XRPD patterns."  D.I. 73-1, Ex. C at

---

[21] In its opening brief, Exelixis appears to argue that Azurity is seeking to import the definition of "substantially pure" from the specification to limit the claims.  *Supra* 44.  Exelixis is incorrect.  As is clear from Azurity's responsive brief,  Azurity does not rely on any portion of the specification to narrow the claims, but rather simply looks to the specification to confirm the meaning that the patentee assigned to the claim terms.

10:15–19.  This distinction is illustrated in the patent figures.  For example, crystalline cabozantinib malate (Figure 8) shows distinct XRPD peaks compared to the XRPD for amorphous cabozantinib malate (Figure 22):



*See* D.I. 73-1, Ex. C at Figures 8 and 22.  The specification further defines "amorphous" as "a solid form of a molecule and/or ion that is ***not crystalline***."  *See* D.I. 73-1, Ex. C at 18:13–16 (emphasis added).

These disclosures make clear that the patentee claimed only crystalline forms of cabozantinib malate.  When read in light of the prosecution history, they confirm that "crystalline" as used in the claims means forms that are substantially or completely crystalline, consistent with the 90% threshold in Azurity's construction.

### b.    The Extrinsic Evidence Relied Upon by Exelixis Is Irrelevant and Cannot Override the Intrinsic Evidence

Unable to reconcile its proposed construction with the intrinsic evidence, Exelixis instead devotes the same amount of space in its brief to extrinsic evidence in an effort to rewrite the meaning of "crystalline."  But as the Federal Circuit has made clear, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips*, 415 F.3d at 1317 (internal citations omitted).  Extrinsic evidence—including

prior litigation involving different parties and other courts' constructions of similar terms—cannot override the clear statements in the claims, specification, and prosecution history that define the scope of the invention. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583–84 (Fed. Cir. 1996) ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence."). Here, the intrinsic evidence uniformly establishes that "crystalline" refers to forms of cabozantinib (L)-malate that are more than 90% crystalline. Exelixis' reliance on extrinsic sources cannot expand the claims to cover amorphous or partially crystalline compositions that the patentee expressly distinguished and disclaimed during prosecution.

### i. Exelixis' Prior Litigation With an Unrelated Defendant Is Not Relevant to the Claim Construction Issues in this Litigation

Exelixis' reliance on claim constructions from prior litigation is immaterial. *Supra* 45–46. MSN I[22] and MSN II involved a different defendant, a different accused product, and different infringement theories. There, MSN sought approval of a fully crystalline drug product through an Abbreviated New Drug Application, whereas here, Azurity is pursuing approval under a 505(b)(2) application for ▇▇▇▇▇▇▇ drug product. These are distinct products with distinct infringement issues. And, unlike in the current litigation, the parties in those prior litigations did not need to construe the numerical limitation of the term "crystalline" in order to determine whether the accused product infringed the claims. Accordingly, the parties had no reason to litigate—or the Court to decide—that specific issue. The constructions adopted there simply reflected the parties' agreements and the narrow disputes before that court, not a comprehensive determination of claim scope.

---

[22] "MSN I" refers to *Exelixis, Inc. v. MSN Laboratories Private Ltd.*, No. 19-CV-2017-RGA (D. Del.).

Even Exelixis concedes that the prior court was not asked to determine whether "crystalline" in the Crystalline Malate Salt Patents encompasses compositions with 90% or less crystalline cabozantinib malate. *Supra* at 45–46. MSN I and MSN II therefore cannot be read to resolve the question presented in this case. At most, they show that the term "crystalline" referred to its admitted scientific meaning—not the full scope of the claim construed by the intrinsic evidence now before this Court. Accordingly, the prior decisions are neither controlling nor persuasive.

### ii. Exelixis' Reliance on the Court's "Plain and Ordinary" Meaning Ignores the Intrinsic Evidence

In a last-ditch effort, Exelixis contends that courts have consistently refused to adopt constructions of "crystalline" that depart from the term's "plain and ordinary meaning." This argument fails. Although other courts have applied the plain and ordinary meaning of "crystalline" in different contexts, that approach does not apply here given the clear and consistent intrinsic record discussed above. While claim terms are at times given their ordinary and customary meaning, courts depart from that rule when the patentee acts as his or her own lexicographer or disavows the full scope of a claim term in the specification or during prosecution. *Cisco Sys., Inc. v. ITC*, 873 F.3d 1354, 1361 (Fed. Cir. 2017); *see also Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). As discussed above, that is precisely what happened here.

### 3. Exelixis's Reply Position

There is no dispute that Exelixis' proposed construction reflects the plain meaning of the term "crystalline." *Supra* 47 (admitting Exelixis' proposal reflects the "scientific" meaning). Azurity seeks to replace that plain meaning with a construction that, *inter alia*, imports the following requirements into the claims: (1) that the cabozantinib (L)-malate exist in a particular crystalline "form"; and (2) a 90% crystallinity threshold. Both are improper.

As to the first issue, only the '776 Patent claims a specific crystalline "form" of cabozantinib malate, *i.e.*, the N-2 form. No asserted claim from any other asserted patent refers to a "form," and it would violate principles of claim differentiation to import the limitation into those claims.

As to the second issue, there is no disclaimer limiting the claims to "cabozantinib (L)-malate wherein more than 90% of the cabozantinib (L)-malate is crystalline." Azurity fails to point to a single instance where Exelixis made such a statement or distinguished the claimed invention over the prior art based on a 90% (or any other) crystallinity cutoff. Instead, all that Azurity identifies are statements regarding unexpected results obtained by the invention—namely, that crystalline cabozantinib malate (which was not in the prior art) had a more rapid dissolution than amorphous cabozantinib malate (which also was not in the prior art). Such statements touting the unexpected ***results*** of the claimed invention (and not distinguishing the claimed invention over the prior art on that basis) are not ***disclaiming*** claim scope. None of the cases cited by Azurity stands for such a proposition. Accordingly, the Court should adopt Exelixis' proposed construction.

### a.    "Crystalline" Should Be Given Its Plain Meaning

Azurity concedes Exelixis' construction reflects the plain meaning of "crystalline." *Supra* 47. The "heavy presumption" in favor of applying that plain meaning is illustrated by the catalogue of cases—which Azurity fails to grapple with—where courts have uniformly declined to construe "crystalline" with reference to a numerical limitation. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *supra* 46-47 (citing, *inter alia*, *Exeltis* and *Forest Labs*). Indeed, Azurity fails to identify a single instance where any court imported a percentage limitation into the term "crystalline."

### b.    The Asserted Claims Do Not Require a Crystalline "Form"

Azurity's proposed construction imports the requirement that the crystalline cabozantinib exist in a "form." Although crystalline material can exist in a single-phase form, it may not. It may exist as a mixture of forms. It may be crystalline even if it is ***not*** identifiable as a particular form.

Exelixis expressly claimed crystalline "Form N-2" in the '776 Patent. D.I. 73-1, Ex. C at 78-79 ('776 Patent, claims 1-2). In contrast, the claims of the '439 Patent, '440 Patent, and '015 Patent do not reference any "form" at all. Those claims simply recite crystalline cabozantinib malate. Accordingly, Azurity's attempt to import a "form" limitation into the claims violates principles of claim differentiation. *See In re Rambus Inc.*, 694 F.3d 42, 47 (Fed. Cir. 2012) ("To the extent Rambus wanted to limit the memory device to a single chip component, it could have expressly done so."); *see also id.* at 48 (applying doctrine of claim differentiation based on related patents); *AstraZeneca AB v. Mylan Pharms., Inc.*, 2022 WL 17178691, *6-*7 (N.D. W. Va. Nov. 23, 2022) (same).

### c.    The Prosecution History Does Not Contain a Disclaimer

Azurity's disclaimer argument depends entirely on statements made during prosecution. For such statements to rise to the level of a disclaimer, they must be "both clear and unmistakable." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003). The statements must be viewed in context. *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1377 (Fed. Cir. 2009). Often, the most relevant context is where the statements make "distinctions between an invention and prior art." *Supra* 48-49; *see Cordis Corp. v. Medtronic AVE, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008). The standard for disclaimer "is a high one." *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016). Statements that are ambiguous or are susceptible to multiple reasonable interpretations do not amount to a disclaimer. *See Sandisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005).

Here, the statements relied upon by Azurity come nowhere close to the "high" standard required for disclaimer. **First**, the statements do not "draw[] distinctions between [the] invention and prior art," as Azurity incorrectly asserts, *supra* 48-49; rather, the statements tout unexpected results of the claimed invention without reference to any prior-art cabozantinib malate formulation. **Second**, the statements describe a property of embodiments of the invention (improved dissolution)—they do not describe a necessary element of the claims (because the claims do not require any dissolution rate). Accordingly, Azurity's disclaimer argument fails.

> i.    **Azurity Fails To Identify Any Comparison Between the Claimed Invention and the Prior Art**

None of the statements cited by Azurity compare the invention to the prior art. Azurity's disclaimer argument is based on a declaration that Exelixis submitted during the prosecution of Application No. 17/070,514[23] (the "Malate-Salt Shah Declaration"). *Supra* 49-51. The Malate-Salt Shah Declaration describes ***post-priority*** evidence of the unexpected results of the invention. Nothing in the Malate-Salt Shah Declaration compares the invention against ***prior art*** formulations of cabozantinib malate or suggests that a specific percentage of crystallinity distinguishes the invention over the prior art. Indeed, ***none of the references at issue involved cabozantinib malate at all***—let alone a crystalline or amorphous cabozantinib malate.

Tellingly, Azurity's brief glosses over the prior art that was at issue during prosecution (Bannen and Berge). *Supra* 49; D.I. 73-2, Ex. J at 125-126. Bannen discloses cabozantinib alongside over 100 other compounds—it does not disclose a crystalline or amorphous cabozantinib malate salt. D.I. 73-2, Ex. J at 125-126, 133. Berge discloses salts of FDA-approved

---

[23] Issued as the '439 Patent. Application No. 17/070,514 is also an ancestor application to the '440 Patent and the '015 Patent. The '439 Patent is a descendant of the '776 Patent.

pharmaceutical compounds, including malate salts, but does not disclose cabozantinib. *Id.* at 126, 134. In sum, the cited prior art contained no disclosure of ***any*** cabozantinib malate salt.

Because the prior art contained no disclosure of cabozantinib malate salt, Exelixis had no need to disclaim claim scope to overcome the prior art—and did not do so. D.I. 73-2, Ex. J at 148-156; *supra* 49-52; *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1277 (Fed. Cir. 2011) (no disclaimer where statements did not "qualif[y] [the term] to distinguish any of the prior art references"). Instead, Exelixis argued the claimed crystalline malate salt had various ***unexpected properties*** compared to the amorphous salt, such as "improved dissolution" and "improved bioavailability." D.I. 73-2, Ex. J at 142. In support, Exelixis submitted the Malate-Salt Shah Declaration. The declaration described the results of an experiment using twelve compositions containing various percentages of crystalline cabozantinib (L)-malate "to evaluate dissolution of the crystalline API relative to the amorphous salt." *Id.* at 148.

Critically, none of the cabozantinib malate salt formulations involved in the experiment were in the prior art.[24] Indeed, the Malate-Salt Shah Declaration does not even discuss the cited prior art let alone make a comparison to prior art compositions, as Azurity wrongly asserts. *Supra* 48. In short, Exelixis did not disclaim any crystalline claim scope because Exelixis did not draw any "distinctions between [the] invention and [any] prior art."

None of the cases Azurity cites stands for the proposition that an applicant disclaims claim scope when it describes unexpected properties relative to something not in the prior art. Rather, Azurity's cases all involve disavowal over prior art. For example, in *MBO Laboratories, Inc. v. Becton, Dickinson & Co.*, the patentee repeatedly amended claims to overcome prior art and

---

[24] In the same family as the Crystalline Malate Salt Patents, Exelixis also has claims to amorphous cabozantinib malate. *See* Ex. 4, U.S. Pat. No. 12,275,706, claim 1.

expressly limited the invention to specific structural features that differentiated it from the prior art. 474 F.3d 1323, 1327 (Fed. Cir. 2007). And in *Computer Docking Station Corp. v. Dell, Inc.*, the applicants excluded "computers with built-in displays and keyboards" by repeatedly distinguishing their invention as a "portable microprocessing system" with external peripherals, unlike the prior-art laptops they disclaimed. 519 F.3d 1366, 1376-78 (Fed. Cir. 2008).

In short, there is no disclaimer here because there is no example where Exelixis distinguished its invention ***from the prior art*** based on the degree of crystallinity. *See generally Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372-73 (Fed. Cir. 2014).

### ii.    None of the Statements Describes a Claimed Limitation

Azurity's disclaimer argument fails for the second reason that Exelixis' statements regarding improved dissolution do not describe a necessary element of the claim—***because the asserted claims do not require any dissolution rate***.

*Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.* is instructive. 438 F.3d 1123 (Fed. Cir. 2006). In *Purdue*, the claims were directed to controlled-release oxycodone medications for the treatment of pain. *Id.* at 1127. During prosecution, the applicant distinguished its claimed formulation from the prior art because it had "surprisingly discovered" that a fourfold range of dosages achieves the same clinical results as a prior art formulation using an eight-fold range. *Id.* at 1126-27. Based on this discovery, the district court construed the claims as "limited to a four-fold dosage range that controls pain for 90% of patients." *Id.* at 1135. The Federal Circuit reversed, holding that disclaimer was error because although the applicant relied on its discovery of the four-fold dosage range to distinguish its claimed formulations from the prior art, it did not present the dosage range as a ***necessary feature*** of the claimed formulations. *Id.* at 1136. Rather, the applicant only "described it as a property of, or a result of administering, the oxycodone formulations characterized by the [limitations] set forth in the claims." *Id.* "[I]mportant[ly]," the

Federal Circuit noted, "the claims contain no limitations relating to the effectiveness of dosages in controlling pain in patients, and it is the claims ultimately that define the invention." *Id*.

The facts here direct the same result. Like the "surprising[] discovery" in *Purdue*, the "unexpected result" described by Exelixis during prosecution (*i.e.*, rapid dissolution) is not a necessary feature of the invention as the "claims contain no limitations relating to [dissolution rate]." Indeed, the facts here are even less indicative of disclaimer than *Purdue* because Exelixis never distinguished the claimed compositions from the prior art based on the discovered property. *See also Celgene Corp. v. Hetero Labs Ltd.*, 2020 WL 3249117, at *7 (D.N.J. June 16, 2020) (no disclaimer where "the unexpected efficacious treatment … was merely a 'result of administering' the claimed invention"). In short, because Exelixis' statements do not limit the scope of the claimed invention, they do not amount to disavowal.

### d. Exelixis' Construction Is Consistent with the Remainder of the Record

As explained in Exelixis' opening brief, (1) the specification fully supports Exelixis' construction, *supra* 43-45; and (2) there is no reason to consult the extrinsic record, which does not support Azurity's proposed construction, *supra* 45-47.

As to the specification, Azurity fails to identify any instance where Exelixis characterized crystalline material with reference to a percentage threshold. Azurity merely points to passages where the specification states crystalline and amorphous materials are distinct from each other. But that is fully consistent with the claims, which are only directed to crystalline material.

As to the extrinsic record, Azurity's cited statements from *MSN II* fail for the same reason as discussed above. *See supra*, Section III.B.2.b.i.

### e. Azurity's Disclaimer Has No Technical Application to the Claims

Azurity asserts that its disclaimer applies to "all Crystalline Malate Salt Patents" because the "subject matter is identical." *Supra* 53. That is incorrect. Claims 1, 3, and 4 of the '439 Patent and claims 1-3 of the '015 Patent cover crystalline cabozantinib malate generally (and methods of treating with the same). They are directed to the active pharmaceutical ingredient itself. For example, claim 1 of the '439 Patent recites:

N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N'-(4-fluorophenyl)cyclopropane-1,1-dicarboxamide, malate salt, wherein said salt is crystalline. D.I. 73-1, Ex. D at 129. Claims 1 and 3 of the '776 Patent cover the specific N-2 form of crystalline cabozantinib malate (and methods of treating with the same):

> N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N'-(4-fluorophenyl)cyclopropane-1,1-dicarboxamide (L)-Malate salt, wherein said salt is in crystalline Form N-2 and said Form N-2 is characterized by at least one of the following ….

These claims are referred to collectively as the "API claims." By contrast, claims 1 and 3 of the '440 Patent and claim 2 of the '776 Patent (together, the "pharmaceutical composition claims") recite pharmaceutical compositions comprising crystalline cabozantinib malate.

For the API claims, Azurity's incorrect disclaimer theory has no application whatsoever. These claims read on crystalline API in whatever amount and whatever it may be surrounded by (including but not limited to additional components of a tablet). Regardless of whether the material in a pharmaceutical composition is 100% crystalline or is a so-called "mixed-phase composition[]" that is less than 100% crystalline, *supra* 48, the composition infringes the API claims if it includes any *API* that is crystalline cabozantinib malate. *See supra* 49-50 (citing cases).

Further, Azurity cannot explain how it would be scientifically correct to limit API claims to 90% or more crystalline material. Indeed, the percentage of crystalline to amorphous material

64

is not relevant unless a whole-*composition* denominator is artificially introduced into the claims. But, of course, *the API claims do not recite pharmaceutical compositions*.

Even with respect to the pharmaceutical composition claims, Azurity's construction still has no application. All of the asserted claims are "comprising" claims—a term that is not disputed—which the parties agree means they are open-ended and may cover compositions that include *additional* components (such as amorphous material). D.I. 73-1, Ex. A at 2. Azurity's construction requires re-writing the claims to make them closed (to exclude additional material). But that would be improper.

*    *    *

For these reasons, the Court should adopt Exelixis' plain and ordinary meaning construction of "crystalline" as "having a regular repeating underlying arrangement of molecules."

### 4.    Azurity's Sur-Reply Position

Azurity's construction is the only interpretation that aligns with the intrinsic record. Exelixis' proposal, by contrast, improperly seeks to broaden the claims to encompass compositions the patentees did not regard as their invention.

#### a.    "Crystalline" Should Be Construed To Include A Numerical Limitation

While courts often apply the plain meaning of "crystalline," Azurity is not aware of any authority requiring that principle be absolute. Courts have recognized that the term "crystalline" may encompass quantitative aspects where the intrinsic evidence links "crystalline" to a numerical limitation. *See, e.g., Glaxo Grp. Ltd. v. Ranbaxy Pharms., Inc.*, 262 F.3d 1333, 1337 (Fed. Cir. 2001) (relying on intrinsic evidence, the court construed "essentially free from crystalline material" to mean "a maximum crystalline . . . content of less than 10%). The case law does not erect a categorical bar against numerical limitations associated with crystallinity; rather, it reflects a context-specific inquiry driven by the patent's disclosures and how a skilled artisan would

understand the term.  Here, the intrinsic record demonstrates that "crystalline" cabozantinib (L)-malate refers to compositions wherein more than 90% of the cabozantinib malate is crystalline, not simply a composition containing any amount of crystalline cabozantinib malate.  *Supra* 48–55.

### b.    The Asserted Claims Require That The Solid-State Form Of Cabozantinib Be Crystalline

Exelixis argues that Azurity's construction cannot be correct because it requires that the crystalline cabozantinib exist in a form.  *Supra* 58–59.  However, the claims themselves require the cabozantinib malate to be in crystalline form.  Azurity does not propose that the crystalline material cannot exist in a mixture of forms—except for the '776 patent, which is limited to Form N-2—but that more than 90% of the cabozantinib malate must be crystalline.  *See also supra* 47.

Exelixis is conflating "a crystalline form of" with "specific polymorphic form of." Azurity's construction does not require a specific polymorphic form but simply identifies the solid-state form of cabozantinib as crystalline.  Exelixis' mischaracterization of Azurity's use of the word 'form' is particularly confusing as Azurity is using the word in the same way Exelixis did in various parts of its specification.  *E.g.*, D.I. 73-1, Ex. D at 114, 1:41 ("a crystalline or an amorphous form").

### c.    Exelixis' Statements During Prosecution Constitute Clear And Unmistakable Disclaimer

The intrinsic record demonstrates clear and unmistakable disclaimer, and Exelixis' attempt to recast the prosecution history does nothing to change that conclusion.  *Supra* 48–55.

### i.    The Shah Declaration Was Submitted to Overcome an Obviousness Rejection

Exelixis argues that none of the statements Azurity cites compare the invention to the prior art, and that the Shah Declaration simply describes post-priority evidence of alleged unexpected results. *Supra* 60. These arguments are inapposite.[25]

Although the Shah Declaration does not specifically compare the invention to particular formulations in the prior art, it is clear from the patentee's summary that the testing disclosed in the Declaration was performed and submitted specifically to rebut the Examiner's obviousness rejection based on the prior art:

> [A person of ordinary skill] would not have found it obvious to provide cabozantinib malate in crystalline form . . . The claimed crystalline form is highly advantageous because it provides an improved dissolution profile compared with amorphous forms. Thus, the claimed crystalline cabozantinib malate salt is not obvious over the cited references.

D.I. 73-2, Ex. J at 143.

While the Declaration discusses alleged unexpected results, its significance is not limited to post-priority data. Rather, the Declaration is significant in that it specifically addresses the alleged unexpected dissolution of 100% crystalline cabozantinib as compared to amorphous and mixed-phase compositions, and the patentees relied on this testing to distinguish the invention from the prior art. *See supra* 48–53. As such, it is clear that the patentees clearly and unmistakably disavowed crystalline cabozantinib (L)-malate compositions that have 90% or less crystalline material. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003).

### ii.  Exelixis Incorrectly Asserts that None of the Statements Describe a Claimed Limitation

---

[25] The caselaw relied on by Exelixis to support its argument in easily distinguishable. Unlike the patentee in *AIA* Engineering, who did not quantify the term to distinguish the prior art, Exelixis specifically relied on the Shah Declaration and the testing preformed therein to respond to rejections over the prior art. *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1277 (Fed. Cir. 2011).

Exelixis' argument that statements concerning improved dissolution do not describe a necessary element of the claim misses the point.  *Supra* 62–63.  The dissolution characteristics discussed during prosecution are evidence of the alleged unexpected result that the claimed crystalline malate salt had improved dissolution and better bioavailability as compared to the amorphous form.  *Supra* 49–53.  This served as patentees' explanation of why the claimed crystalline form was distinguishable over the prior art.  Because the asserted claims include a crystalline limitation, Exelixis' statements during prosecution tying improved dissolution to the claimed crystalline properties directly bear on claim scope.  Exelixis cannot now divorce the dissolution-related statements from the very crystalline characteristics it relied on to secure allowance of its patents.[26]

### d.    Exelixis' Remaining Arguments Are Unavailing

Exelixis' remaining arguments—that its construction is consistent with the remainder of the record and Azurity's disclaimer argument has no technical application to the claims—are equally unavailing.  *Supra* 63–65.

Regarding Exelixis' first argument, Azurity's previous responses are incorporated herein. *Supra* 47–55.

Exelixis' second argument misconstrues the nature of the disclaimer and the claims themselves.  Azurity does not contend that the claims are textually identical, but that they share the same relevant subject matter—crystalline cabozantinib malate—and that patentees unmistakably disclaimed amorphous and mixed-phase compositions during prosecution to secure

---

[26] Exelixis' reliance on *Purdue* is easily distinguished.  Unlike in *Purdue*, Azurity's construction is directly tied to a claim limitation (e.g., the claimed crystalline malate salt) and is not directed solely to the "invention itself."  *See, e.g.*, *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123 (Fed. Cir. 2006).

allowance of the patents. Exelixis' assertion that the API claims necessarily cover "crystalline API in whatever amount" and "whatever it may be surrounded by" ignores the prosecution history.

Exelixis' contention that Azurity's position requires "re-writing" open-ended "comprising" claims mischaracterizes Azurity's construction. *Supra* 65. Recognizing that "comprising" cannot include subject matter expressly surrendered during prosecution is not rewriting the claims—it is applying established disclaimer law. A patentee cannot use open-ended language to recapture materials it disavowed. *See, e.g.*, *RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, 342 F. App'x 628, 630-32 (Fed. Cir. 2009) (per curiam) (affirming summary judgment of noninfringement finding disavowal of claim scope rebutted the presumption arising from use of an open-ended term).

Exelixis' reliance on the absence of a "whole-composition denominator" (*supra* 64–65) misses the point: patentees relied on the crystalline content distinction during prosecution, and that distinction informs how a skilled artisan would read all claims. The issue is not whether the claims recite a percentage, but whether the intrinsic record shows that mixed-phase and amorphous materials were excluded. Here, it unequivocally does.

*    *    *

Accordingly, the Court should adopt Azurity's construction of "crystalline" as "a crystalline form of cabozantinib (L)-malate wherein more than 90% of the cabozantinib (L)-malate is crystalline."

69

OF COUNSEL:

Lisa J. Pirozzolo
Emily R. Whelan
Kevin S. Prussia
Jonathan A. Cox
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Amy K. Wigmore
Gerard A. Salvatore
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington DC  20037
(202) 663-6000

Cindy Kan
Anna Mizzi
Alexander P. Gorka
WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich Street, 45th Floor
New York, NY  10007
(212) 230-8800

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

_____

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Exelixis, Inc.*

MORRIS JAMES LLP

*/s/ Kenneth L. Dorsney*

OF COUNSEL:

Andrew J. Miller
Elham F. Steiner
Robert A. Delafield II
WINDELS MARX LANE &
MITTENDORF, LLP
One Giralda Farms
Madison, NJ  07940
(973) 966-3200
amiller@windelsmarx.com
esteiner@windelsmarx.com
rdelafield@windelsmarx.com

Caryn L. Cross
156 West 56th Street
New York, NY  10019
(212) 237-1059
ccross@windelsmarx.com

December 10, 2025

_____

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
3205 Avenue North Boulevard, Suite 100
Wilmington, DE  19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants Azurity*
*Pharmaceuticals, Inc., Azurity*
*Pharmaceuticals India LLP, and Slayback*
*Pharma LLC*

71

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 10, 2025, upon the following in the manner indicated:

Kenneth L. Dorsney, Esquire                                  *VIA ELECTRONIC MAIL*
Cortlan S. Hitch, Esquire
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
*Attorneys for Defendants Azurity*
*Pharmaceuticals, Inc., Azurity Pharmaceuticals*
*India LLP, and Slayback Pharma LLC*

Andrew J. Miller, Esquire                                    *VIA ELECTRONIC MAIL*
Elham F. Steiner, Esquire
WINDELS MARX LANE & MITTENDORF LLP
1 Giralda Farms
Madison, NJ 07940-1021
*Attorneys for Defendants Azurity*
*Pharmaceuticals, Inc., Azurity Pharmaceuticals*
*India LLP, and Slayback Pharma LLC*

Caryn L. Cross, Esquire                                      *VIA ELECTRONIC MAIL*
WINDELS MARX LANE & MITTENDORF LLP
156 West 56th Street
New York, NY 10019
*Attorneys for Defendants Azurity*
*Pharmaceuticals, Inc., Azurity Pharmaceuticals*
*India LLP, and Slayback Pharma LLC*

/s/ *Anthony D. Raucci*
_____
Anthony D. Raucci (#5948)