```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE




EXELIXIS, INC.,        )
                       )
      Plaintiff,       )   C.A. No. 24-1208-RGA
                       )
v.                     )
                       )
SUN PHARMACEUTICALS    )
INDUSTRIES, LTD.,      )
                       )
      Defendant.       )
```

```
              Tuesday, January 6, 2026
              9:30 a.m.
              Courtroom 6A

              844 King Street
              Wilmington, Delaware
```

BEFORE:  THE HONORABLE RICHARD G. ANDREWS
    United States District Court Judge


APPEARANCES:

        MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
        BY:  ANTHONY DAVID RAUCCI, ESQ.
        BY:  RODGER DALLERY SMITH, ESQ.

        -and-

        WILMER HALER
        BY:  KEVIN S. PRUSSIA, ESQ.
        BY:  ALEXANDER GORKA, ESQ.
        BY:  LISA PIROZZOLO, ESQ.
        BY:  CHARLENE GEAGHAN-BREINER, ESQ.

                        Counsel for the Plaintiff

APPEARANCES CONTINUED:

MORRIS JAMES, LLP
BY:  CORTLAN HITCH, ESQ.

-and-

BY:  ELHAM STEINER, ESQ.
BY:  CARYN CROSS, ESQ.

Counsel for Azurity

----------------------------

COURT CLERK:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Richard G. Andrews presiding.

THE COURT:  All right.  Good morning.  Please be seated.

So it struck me that it would make sense for the defendant to go first here since basically the plaintiff's position is everything is plain and ordinary meaning, doesn't need to be construed, something along those lines, and it's the defendant who says it should be construed differently.  So Ms. Steiner.

MS. STEINER:  Thank you, Your Honor.

Good morning, Your Honor.  May I approach?

THE COURT:  Yes.

MS. STEINER:  So good morning.  As Your Honor

knows, there's two disputed terms at issue here.  I'm going to go ahead and start with the first one, which is "Compound IB."

THE COURT:  Sure.

MS. STEINER:  So the parties disagree on the claim term to be construed as an initial matter.  Exelixis' proposal is limited.

THE COURT:  Doesn't really matter because the dispute is just whether or not there's a product by process limitation, right?

MS. STEINER:  Correct.

MS. STEINER:  Okay.  Sure.  So the key dispute, like you just said, is whether there is a process step that's essential to the claimed invention.  And Azurity's answer to that question is unequivocally yes, the product -- process steps are essential.  Exelixis' proposed construction contradicts everything it has previously told this court about its patent.  What it's trying to do is distance itself from its own invention to have a potential infringement read on Azurity's product and that's just inappropriate in our opinion.  It directly contradicts what Exelixis told the patent office last year in response to Azurity's IPR petitions.

So on the slide here, as Your Honor has seen from the briefing, is the competing proposals.  And our

proposal is that there is a process that is associated with this product and it should be construed to include that process.

Now, the intrinsic record supports Azurity's construction. It's crystal clear what the patents make clear and what Exelixis made clear when describing its invention to the patent office is that there's a specific process that's critical to making the composition that is disclosed in the claims. And that's supported by the claims, the specifications, and the intrinsic record which consists of the IPR.

Now, what exactly did Exelixis invent? Compound IB was known in the art as was the impurity. What Exelixis allegedly invented was a process for preparing the claimed composition.

So these are product by process claims. When process steps are essential to the invention, the Federal Circuit recognizes that steps can be treated as part of a product claim. Our position is that is exactly what's happening here. Process steps can be treated as part of the product claim that the patentee has made clear that the process steps are an essential part of the claimed invention.

Let's take a look at what Exelixis has said. So starting with the claims, the claims of the '349 and '039

Patent, they all support Azurity's construction. Every single claim of these two patents either recites a process byproduct or recites the only byproduct identified in the claims.

THE COURT: So the two representative claims here in the brief, neither one of them use the phrase "process byproduct," do they?

MS. STEINER: They do not, but they do identify the only byproduct that's identified in the claims, which is the 6,7-dimethoxy-quinoline-4-ol.

THE COURT: So are there any asserted claims that actually use the phrase "process byproduct"?

MS. STEINER: There are not. That claim in the '349 patent is not asserted.

THE COURT: All right. Thank you.

MS. STEINER: But the 6,7-dimethoxy or as I believe its been identified in prior litigation, the 1-1 impurity, is the only classified product and it is identified as a process byproduct.

THE COURT: But it's a chemical and is there any reason why you can't figure out how to make a more pure chemical and then claim the chemical that you've made?

MS. STEINER: There is. There certainly is, but that's not what happened here. What happened here was that the compound, as I said, was known. The impurity was known.

And what Exelixis claims to have invented is a process to get to substantially pure, relatively pure product.  That does not include that by process impurity.

THE COURT:  But you're saying that when you invent a relatively pure product, you can't claim that pure product?

MS. STEINER:  You can claim that pure product. But in this instance, based on what Exelixis has said and based on the language in its patent and in the intrinsic record, it's very clear that that process is essential to getting to that end product.  You can't just use any process.

THE COURT:  Right.  But isn't that the normal way you do things, is you invent something, a pure chemical, and you show in the patent how you can make it, and then you can claim how you make it, and you can claim the chemical that you made.  And somebody else comes along, they come up with another process, maybe they claim that process, but you've got the chemical?

MS. STEINER:  And they do have the chemical. And that was already known.

THE COURT:  Well, so what you're saying is as far as  -- so you're saying the chemical is obvious?

MS. STEINER:  The chemical is obvious, the purity is obvious.

THE COURT:  Okay.  Well, you'll be able to argue that down the road.

MS. STEINER:  Okay.  Now, going back to the claims, it begs the question, even if the process byproduct is not used in the claims and it just refers to the actual impurity by name, it begs the question how does one end up with a process byproduct such as the 1-1 impurity without actually invoking a process.  And as Your Honor just said, there can be a process, but in this instance Exelixis has been abundantly clear that their process is what they came up with to come up with this product that is substantially pure of this impurity.

Now, moving on to the specification, the specification is replete with references to process, the title, the abstract, the field of the invention, they all discuss the process.

THE COURT:  And they also all -- well, a number of them also say here, they say here, you know, it's about not only processes but compositions, processes for making and compositions containing.  They're saying there's two different things here.

MS. STEINER:  There are two different things, but as opposed to the case that Exelixis relies heavily on, the *Intercept* case, there was no restriction requirement at issue in this case.  The patentee never had to choose

between the process and the product claims.  So our position is that by invoking the process as part of the specification and discussing it, and emphasizing the importance of that process, it essentially creates this record of how essential and how critical the process is to the claims -- to the claimed invention.

Even -- so, again, background of the invention, summary of the invention, as you saw, also discuss the process.

Moving on to the intrinsic record.  Even as recently as last year, Exelixis argued a narrow claim scope tied to a specific process to ward off a challenge of validity of these two patent in IPR proceedings that Azurity had initiated.  Exelixis' statement to the patent office characterizing its inventions are part of the intrinsic record.  It shouldn't be able to walk away from them here for the purposes of being able to claim infringement by Azurity's product.

So let's take a look at those statements.  So Exelixis characterized, as I mentioned, a specific process with specific steps.  This is in Exelixis' preliminary response which was filed about mid last year in response to IPR proceedings.  Now, those IPR proceedings were discretionarily denied in I believe June or July of last year, but regardless, prior to that discretionary denial

Exelixis did take this position and in trying to distinguish the invention from the prior art that Azurity had cited, they stated, "In other words, Exelixis developed a process that performs different steps, involves difference molecules and results in different chemistries than the prior art process."

Now, to the extent that Your Honor is inclined to consider extrinsic evidence --

THE COURT:  Yeah, I'm not, so skip that.

MS. STEINER:  Great.

So the facts here line up with the *Medicines* case which is cited in Azurity's portion of the briefs.  The intrinsic record shows that the claims are limited by the disclosed process just as it was in *Medicines*.  The language at issue was "batches."  In this we contend that it is the process byproduct that is identified in the claims.

And *Intercept*, as I mentioned, is the case that Exelixis relies heavily on.  We don't think that applies here.  There is no express definition of the term in the patent specification as there was in that case.  There's also no restriction requirement.  As I mentioned, in the *Intercept* case the patentee had to choose between process claims and product claims and it opted to go with the product claims.  And unlike in *Intercept*, Exelixis made clear that the process is essential.  That's not something

that was the case in the *Intercept* case.

Unless Your Honor has any questions about that claim term, I can move on to the "crystalline" term.

THE COURT:  Yeah, why don't you do that.

MS. STEINER:  Now, with respect to this term, the parties dispute the construction of the term "crystalline."  It's not a question of chemistry, but of claim scope.  Azurity does not dispute that the plain and ordinary meaning of "crystalline" --

THE COURT:  Right.  I got that.

MS. STEINER:  Okay.  The reason we depart from plain and ordinary meaning here is a result of Exelixis' disclaimer during prosecution.

THE COURT:  And one of the other disputes that was raised in the brief by you was something about limiting the form or not limiting the form.  But Exelixis said the only place where the form is limited is where it says it's limited, so that issue goes away, right?

MS. STEINER:  That issue -- I'm not sure -- I mean, I understand what Exelixis was trying to argue.  I don't think that was our intent.  We're not limiting it to a specific form.  It's crystalline form.

THE COURT:  You made it go away, whatever it was.  That's not a dispute.  The only thing that's actually disputed is this 90% business.

MS. STEINER:  Correct.

So, again, the intrinsic record here supports Azurity's construction.  As with the prior term, the specification and the prosecution history make clear that the scope of the claim should be limited beyond just the plain and ordinary meaning.

THE COURT:  Before you go to the specification, you got to look at the claim, right?

MS. STEINER:  Correct.

THE COURT:  And so the four patents at issue, one of them talks about a composition is, the other three don't, they just talk about essentially a chemical, right?

MS. STEINER:  Correct.

THE COURT:  So your argument, isn't it really only directed to the one that claims a pharmaceutical composition?

MS. STEINER:  No.  Our argument applies to all of them.  The disclaimer was specifically in two of the patents, the '439 and the '440 Patents.  Our position is that the case law provides that it does apply equally.  It's the same subject matter.  They have a common specification. The characterization of what their invention was should apply equal across all of the crystalline patents.

Now, a patentee made, through clear and unmistakable disavowal, which our position is, exactly what

happened here.

THE COURT:  I'm sorry, before you get to the disavowal, there's no actual argument that there's disavowal in the specification, is there?

MS. STEINER:  No, not in the specification.  It was during prosecution of the patent.

THE COURT:  Okay.

MS. STEINER:  So our position is that Exelixis did surrender the claim scope that would otherwise fall within the plain and ordinary meaning.

And as I just mentioned, *Ormco* is what we cite to for the proposition that the disclaimer should apply equally across the board.

THE COURT:  Yeah.  That's not the main issue here.  I mean, the main issue, I think, is whether there was any actual clear and unmistakable disclaimer.  So why don't you show me your argument for that.

MS. STEINER:  Sure.  If week go to slide 24, please.

So during prosecution of the '439 and '440 patents, Exelixis relied on data showing that only the fully crystalline forms of cabozantinib malate achieve the superior dissolution.  They submitted a declaration from one of the inventors, Dr. Shah, and what they did was they compared different compositions of cabozantinib malate and

some of which were 100% pure crystalline form and some of which were either 90% or 80% mixed with amorphous liquid. And a declaration was submitted in response to an obviousness rejection and they described the results of the experiment and the compositions and how they evaluated the dissolution.

THE COURT:  So I want to talk about that in a minute.  But, the 90% number, the only place you get that from is by the 6A example where the numbers don't add up, is that right?

MS. STEINER:  Actually, no.  Where we get that, if we go to the next slide, is when you look at the -- I guess it would be the next slide.  So it would be in slide 26, please.

When you look at the 6B, which is the 100mg tablets with zero amorphous, versus 6A which is 100mg tablet with 10% amorphous.

THE COURT:  Right.  But I understand what you're saying.

MS. STEINER:  Okay.  Yeah.  What Your Honor was pointing to was actually I believe a typo because the numbers --

THE COURT:  And that's the reason I was asking, because yes, obviously it's a typo because you can't have 110%, but it sort of begs the question of which one is the

typo, right?  Is it the 100% or is it the 10%?

MS. STEINER:  Well, based on the language in the declaration and the applicant's response, my understanding is that the compositions were either a 100% crystalline, 90%, or 80%.  So I don't think it would -- it would make sense to me, but I guess Exelixis is in a better position to answer that question.  I understand that to be a typo.

THE COURT:  No, no.  Everyone, I think, has agreed it's a typo, but that doesn't indicate -- when you have two numbers that don't add up, saying one is a typo doesn't tell you which one is the typo.

MS. STEINER:  Correct.  Except when you look at the -- go to the next slide.  Next one.

THE COURT:  Well, so I see there why you would say that it's more likely that the 100% is the typo than the 10%.

MS. STEINER:  Right.  And there's no data between 90% and a 100% crystalline, but we know at 90% crystalline the dissolution is slower and incomplete and that's the basis for Azurity's proposed construction which is it has to be more than 90% based on the dissolution data that was provided here and based on the statements that Exelixis made as a result of this data that was presented to the examiner.

THE COURT:  So just connect the dots here for

me.  So Dr. Shah submits his declaration, has his dissolution information and such, and how does this disavow -- is there something connecting this to the argument that disavowed anything that's less than 90%.

MS. STEINER:  Yes.  So the point of this declaration, it was submitted in connection with an obviousness rejection.  The patentee, the applicant was trying to overcome the obviousness rejection from the examiner.  And Exelixis submitted this and repeatedly cited these results to argue that the invention's past advantages stemmed from a complete, ordinary complete crystallinity.  And so when you look at the numbers, you know, like I said there's nothing between 90 and 100%, so it could be that maybe 95% gave them that dissolution that they needed, but that data isn't presented so we do know at 90% it was not the dissolution rate that they presented to the examiner as being favorable and the result of their product.  And so the crystallinity of their product and the fact that they distinguish that from the amorphous form and specifically, actually, according to Exelixis the results were surprising and unexpected because of the claimed crystalline form and they stated that this is the exact opposite of what a person of ordinary skill would have expected.

THE COURT:  And so your argument here is, I think, that you've taken basically a secondary consideration

of non-obviousness that people use when they're prosecuting patents to try to get things to mean non-obvious, so then you're kind of working backwards that, well, the only place where this probably existed was for the 90% or more, and so therefore the claim must be limited to the 90% or more?

MS. STEINER:  In a way, Your Honor.  I think it's more that what Exelixis claimed to be its invention was a product that did have this increased dissolution, favorable difficulties solution rate and was distinguishable from amorphous.

If you look at slide 29, please.  Here Exelixis clearly distinguished its claimed crystalline form from the amorphous form.  And our position is that the only reason that data was presented in the Shah declaration was to show the difference between amorphous forms or a mixture of amorphous and crystalline versus a pure crystalline or nearly pure crystalline to show that this was the -- their invention and the benefit of their invention.  And yes, they did tie it to unexpected results as is usually the case when someone is trying to overcome an obviousness rejection.

THE COURT:  And the fact that the claims themselves don't mention anything about dissolution at all, because you could be, I suppose, if you followed up on disavowal, you could be arguing just as much well they implicitly claim certain dissolution rates.

MS. STEINER: I suppose you could be. The claims do mention that it's a pharmaceutical composition and presumably the benefit of a pharmaceutical composition is to be provided the desired bioavailability based on the dissolution rates.

THE COURT: Well, you say the claims mention pharmaceutical composition. Actually it's one of the four patents. Is that true?

MS. STEINER: Well, I think it's more than one of the four patents.

THE COURT: Again, I'm basing that on the record. The only one that has composition is the '440 Patent for Claim 1.

MS. STEINER: For Claim 1.

THE COURT: And is there somewhere elsewhere you say you're asserting all the Claim 1s?

MS. STEINER: Just bear with me, Your Honor. Yes. So the '015 Patent is a method patent and it is a method of treating cancer.

THE COURT: But it doesn't say "composition."

MS. STEINER: It does not say "composition."

THE COURT: It just described the salt.

MS. STEINER: Correct. As a method of treating cancer in patients.

THE COURT: All right. Well, thank you, Ms.

Steiner.  Let me hear from Mr. Prussia.

MS. STEINER:  Thank you, Your Honor.

MS. PRUSSIA:  Actually, Ms. Pirozzolo is going to address this one.

THE COURT:  Okay.  Well, why don't -- why don't we respond to Ms. Steiner's second argument first.

MR. PRUSSIA:  Okay.  Happy to do that.  I'm actually going to go backward and start with the disclaimer and then go to the claims if that's okay.

THE COURT:  All right.

MR. PRUSSIA:  There's three points on the disclaimer argument that I'd like to make.  Thank you.

The first point is there actually is no statement anywhere in the prosecution history that maps onto their 90% limitation that they're incorporating into their claims as part of their construction.

THE COURT:  Yeah.  I mean, I get that, but they're inferring that from Dr. Shah's declaration.

MR. PRUSSIA:  That's right.  So it's inferred and the only point that I'm making is that this is not a situation which is the typical situation where you have an applicant that makes an express statement over prior art and then that express statement is then being used as a basis of a disclaimer.  They're interpreting data and then trying to use that as a basis of a disclaimer.

THE COURT: Of course the more you have to interpret, probably the less it's clear and obvious.

MR. PRUSSIA: Exactly.

THE COURT: Clear and unmistakable.

MR. PRUSSIA: Yes. That's point one. Point two, again, this is not a classic disclaimer case where you have an applicant -- you have some disclosure in the prior art and the applicant is then coming forward to say, well, our invention is different from the prior art because of this feature or it doesn't include that feature. That's not what's at issue here. But actually neither -- there was no cabozantinib malate salt disclosed in the prior art. There was no amorphous cabozantinib malate salt. There was no crystalline cabozantinib malate salt. So Exelixis had no reason to and did not, in fact, make any distinctions over a cabozantinib malate.

THE COURT: Hold on there for a second, because that's one of the points that's in dispute, because the defendant says, I think, that the Form IB, which I take it as the cabozantinib salt, that the specification said that had be made by the *Brown* process. Been a while, so I forgot the details of the *Brown* process, but how do you -- can you help me on that?

MR. PRUSSIA: So the rejection that was at issue, which is on the slide here on the left, was with

respect to the *Bannen* reference, which discloses the free base. And then -- but no malate salt. And then with respect to the *Burgey* reference, which is one of these generalized references that discloses a bunch of pharmaceutical salts. And so the response -- that's the reason I wanted to put this in front of Your Honor. The response in the prima facie case, which is on the left, is about all of the reasons why a person of skill in the art wouldn't have been motivated to select a malate salt because there was no cabozantinib malate salt disclosed in the prior art. So the applicant makes those arguments as to the prima facie case and then turns to say that there's additional evidence. And this is the additional evidence with respect to the unexpected properties. And in doing so first notes that there are lots of benefits to this invention, including improved, enhanced solubility. You know, it's a free base, has low aqueous solubility. And then goes on to disclose the rapid dissolution that's disclosed as part of the Shah declaration. And in that Shah declaration, and Azurity admits this, there was no comparison to any prior art formulation of a cabozantinib malate salt, because, again, there was no amorphous or crystalline cabozantinib malate salt that was disclosed in the prior art. And I think this is an important point because that is the typical situation. The typical situation would be there's some amorphous malate

salt that's disclosed in the prior art and Exelixis comes in and says, well, our crystalline invention is different because it's substantially pure crystalline or something to that effect, or it's essentially free of amorphous material. That would be the classic situation. This is not that because there was no disclosure in the prior art of any malate salt. And Azurity has not cited a single case where the Court has found disclaimer where the statements were about unexpected properties that were not made to distinguish the invention over the cited prior art. And I think that's an important point.

The second point that I'd like to make, and this goes to something Your Honor was alluding to towards the end, is with respect to what's actually claimed. The Federal Circuit tells us that we need to look at what's actually claimed. And the features that they're pointing to as the basis for the disclaimer, the rapid dissolution, is not a claimed feature and neither, by the way, is the enhanced solubility which we also made reference to in response to the rejection. And so that's important because the claims are what define the invention.

And this is very -- in our view this is very similar to the situation in the *Purdue Pharma* case that the Federal Circuit addressed, the lower court was the SDNY decision. If you go to slide 7

there was a lower court decision out of New York where the disclaimer was applied because during prosecution the applicant described surprising results or a surprising discovery that a lower -- surprisingly effective dosage amount that was achievable with the claimed formulation. And the applicant relied on that surprising result to overcome the obviousness rejection.  The District Court applied a disclaimer to say, okay, well, based on that, we're going to limit the claims to this formulation that had resulted in this, you know, ability to produce effectiveness at a lower dosage range.  And the Federal Circuit reversed saying, as we have on the right side of the slide, "the claims contain no limitations relating to the effectiveness of the dosage in controlling pain in patients.  It is the claims that ultimately define the invention."  This is very much the situation where we have here, where we don't claim anything with respect to rapid dissolution and it's actually even further away, our situation, because in the *Purdue Pharma* case they were explicitly distinguishing the invention over prior art formulations.  And here, as I mentioned before, there were no disclosures in the prior art over a malate salt.  We were not distinguishing the invention over a prior art formulation.  So there is no disclaimer for those three reasons.

But if we go back to the claims themselves, if

we go to slide, the one with the illustrative claims, I think it's important to note where Your Honor started with Azurity, which is we don't think there's any disclaimer, but if there was a disclaimer, it really doesn't have any application at all to what we characterize as the API claims on this slide.  The statements that they're latching onto and the nature of how they've incorporated this new limitation into the claims requiring at least 90% of the material to be crystalline, that only has application to a pharmaceutical composition when there's other stuff in it. It has no application, they haven't explained how it could have any application to a chemical claim, an API claim.  And so we don't think there should be any disclaimer.  But for whatever reason the Court were inclined to apply a disclaimer, it would have no application at all to the API claims.

THE COURT:  Does the composition claims, the '440 Patent, does that give you at a trial some advantage that none of these other claims have?  Do you understand my question?  I guess a different way of asking it is, because it seemed like their best argument is for the '440 Patent is are you getting anything out of that pursuing that along with the rest of these?

MR. PRUSSIA:  Well, I think that -- in which context?

THE COURT: Well, in a trial context, is there some reason why you might win on the '440 Patent and lose on all the rest?

MR. PRUSSIA: I think that because the '439 Patent is only directed towards on the API for infringement, I think it's an easier lift for us, but I don't think there's a meaningful difference with respect to any validity issue.

THE COURT: Okay. Thank you. Anyway, go ahead. So, I mean, that is your -- one of your arguments for these other three patents is that you take the claims that just describe a chemical and saying that however that chemical actually appears in the real world, it has to appear with less than 10% other stuff?

MR. PRUSSIA: Yeah. The way I think about it is these claims are agnostic about anything else except for the crystalline material. That's what they care about. And so if you have a drug product that has some amorphous material and some crystalline cabozantinib malate material, what these claims care about is the crystalline cabozantinib malate, any detectable amount of that material. The amorphous material these claims are agnostic about and what they're sort of doing is rewriting these claims to make the amorphous material relevant and that's not what these claims are about.

THE COURT: I think -- let me go back and study what I've already said about these patents, but you've already had one trial where the malate salt patents, did I find them non-obvious?

MR. PRUSSIA: You did. And Mr. Cooper is here and he's going to correct me if I get this wrong. But I believe the theory was obviousness-type double patenting. That was one of them. And then there was a 112 written description theory as well. And you found in our favor on both issues. The issue is currently on appeal to the Federal Circuit.

THE COURT: Ah, okay. How far along -- how far advanced is that appeal?

MR. PRUSSIA: Our briefing is complete. We're just waiting for an argument date.

THE COURT: All right.

MR. PRUSSIA: Just briefly on the form thing, I wanted to clarify that one point.

THE COURT: Yes.

MR. PRUSSIA: So if we go to slide 8, it's not clear to me what the status is of the form issue. We said in our briefing that this -- they inject this new limitation of form into their construction and we say there's no reason to do, number one. Number two would be inconsistent with claim differentiation given that --

THE COURT:  Well, so I think Ms. Steiner agreed that the only place where Form N-2 limitation is the patent that actually claims Form N-2.

MR. PRUSSIA:  Right.  Claim 1 of the '776.

THE COURT:  But there is -- right.

MS. STEINER:  Yes, Your Honor.

MR. PRUSSIA:  So from our perspective there's no reason or need to have any construction here.  To construe all the other patents --

THE COURT:  Yeah, I think that's washed out.

MR. PRUSSIA:  Okay.  I have nothing else, Your Honor.

THE COURT:  All right.  Ms. Pirozzolo.

MS. PIROZZOLO:  Good morning, Your Honor.  So I'll be addressing the term in the impurity patent.  The dispute centers on whether the term in the impurity patent should be construed in accordance with the patent's structural definition of Compound IB as Exelixis contends or whether the claim should be construed to include for process limitations.  The parties agree that there's a presumption against importing process limitations into composition claims.  There's a limited exception when the process steps are necessary or required for the claimed invention.  So that's the crux of the disagreement here, whether these limitations are required.  And the intrinsic evidence shows

that they're not.

If week put up the slides with the exemplary claim, the claims define Compound IB and the impurity and structural terms.  Compound IB is depicted with a chemical drawing.  And the impurity is referred to as 6,7-dimethoxy-quinoline-4-ol, by its chemical name.  These claims don't use the word "process."  And they don't have a textual hook for importing process limitations, as was true in some of the cases Azurity relies on, like the *Medicines* case, where the term "batch" was in the claims but was defined in the spec to require a compounding process.  So the parties agreed there was a process limitation.  And it's different from the *Nvidia* case where the claim included the term "continuously cast film," so there was a process in the claim.  Here there's nothing.

The specification is also contrary to Azurity's construction.  It doesn't contain words such as "essential" or verbs indicating the process steps in Azurity's construction are mandatory.  It doesn't use words like "must" or "required."

If we go to slide 10, the specification, like the claim, depicts the Compound IB and the impurity with pictures of their chemical structures and also descriptions of the chemical name.  And the specification, if we go to slide 11, uses permissive and non-limiting language with

regard to the processes that are claimed.  It says the examples are non-limiting.  And it specifically says skilled artisans will recognize that you could use other solvents, other reagents.

Azurity attempts to dismiss this language as purely generic, but it's not.  The specification expressly identifies alternatives to the four process steps Azurity wants to import into these claims.

If we go to slide 12, Azurity's construction would require use of 4-aminophenol.  The specification does identify that as one possible reactant, but it expressly states here that a skilled artisan would be able to make variations of the reactant within the scope of the invention.  So this refutes Azurity's position that the 4-aminophenol is required.

Azurity also argues that the claims should require use of a strong pentoxide base.  But if we go to slide 13, the specification identifies a number of bases that could be used.  It does identify sodium tert-pentoxide is preferred, but in column 12, which we have up here, it expressly states that a broader set of bases are suitable and gives a list of examples, including potassium hydroxide and potassium tert-butoxide, so the spec is just not consistent with limiting the claim to a strong pentoxide base.

The third limitation Azurity wants to import is use of methyl ethyl ketone as a solvent in the salt forming step. While the specification does include an example using that as a solvent, it doesn't say it's required. And as you can see, it's -- the step refers generally to processes known in the art in terms of solvents that could be used. And it goes further with examples of cabozantinib malate.

We go to slide 15, and provides a couple of examples, which we have up here, for making cabozantinib malate that use systems -- solvents other than the methyl ethyl ketone. So on the left there's tetrahydrofuran, water and acetonitrile. And on the right is tetrahydrofuran, water, and methyl isobutyl ketone, and tetrahydrofuran. So the spec refutes the claim that methyl ethyl ketone is necessary or essential for the process.

And last, Azurity's construction wants to import vacuum distillation to obtain a solid. The spec does have an example of vacuum distillation, but as you can see on slide 16, it has other methods that are not vacuum distillation. In its claim construction brief, Azurity doesn't even acknowledge these portions of the specification. The specification is the best evidence of what the invention is, the claims and the specification together. And both directly contradict Azurity's positions.

Now, Azurity has talked about statements

Exelixis made in the IPR proceedings, including the work that went into the inventions here.  Exelixis was the first to discover that 1-1 was a genotoxic impurity.  Exelixis was the first to discover it formed as a degradation product and it spent years addressing those issues to come up with the claimed compositions.  In the prior proceeding Exelixis responded to -- in the IPR -- arguments made by Azurity, including arguments that the example in the patent where Azurity is drawing its process limitations from, Figure 1, was obvious in view of the prior art, including the *Brown* process.  In explaining the differences between the prior art and Figure 1, Exelixis pointed out differences between the *Brown* process and what's depicted in Figure 1.  Exelixis never asserted that the specific example in Figure 1 was the only method to make cabozantinib malate with minimal levels of the impurity or argued that the four process steps were essential.  That wasn't an issue in the IPR.  So Exelixis' arguments that the example on Figure 1 differed from the prior art is not the same as an argument that the four process steps are required or necessary to obtain low levels of the impurity.  And this is clear from the specification itself that describes different variations to the example in the patent.

And it's also worth noting that in the IPRs Azurity did not assert that these were product by process

claims. The first time they've asserted these are product by process claims is in this court in this proceeding.

So in conclusion, Azurity's claim construction would impermissibly rewrite a clear composition claim to be a product by process claim, and this would import four process limitations that the spec clearly says can be -- that can be varied and still fall within the scope of the invention. So Azurity's construction is not consistent with the intrinsic evidence or the case law. So we submit Compound IB should be interpreted consistent with the plain language of the claims and the specification.

THE COURT: All right. Thank you.

MS. PIROZZOLO: Thank you, Your Honor.

THE COURT: Ms. Steiner, I'll give you a couple minutes but no more if you want to respond to whatever you want to respond to.

MS. STEINER: Thank you, Your Honor. Just a couple of points on the crystalline issue.

First, Mr. Prussia made a point about how there would be -- that the data that was presented in the Shah declaration was open to interpretation. We disagree that there is anything to interpret. The data is presented there and the result was presented there and the conclusion was presented. We don't think we're interpreting anything, we're just acknowledging what Exelixis said and the point of

that.

Second, with respect to the argument --

THE COURT:  Well, so I think what Mr. Prussia was saying was that the Shah declaration by itself doesn't really help you because it wasn't comparing the invention to the prior art.

MS. STEINER:  Well, it was -- it was submitted. The entire declaration and the data, the experiments that were done were done for the sole purposes of overcoming the rejection, otherwise what would be the point -- I don't know if Exelixis is in the habit of just doing random experiments to submit to the PTO.  So we disagree that it wasn't in the context of that obviousness rejection and in response to what the examiner presented with the prior art.

Also, what Exelixis said in connection with that declaration was that their invention, the crystalline or nearly pure crystalline was different than the amorphous and to the extent that there was anything obvious, I believe their language was that it would have been the amorphous form that was obvious, not the pure crystalline form that they claim to have invented.

The second point with respect to the distinction between the composition and the API, if you look at Table 1, it clearly -- I mean, it is referencing the API content when it talks about crystalline versus amorphous.  So their

argument that it shouldn't apply to the API claims just doesn't seem to make any sense in light of the information that was presented.

That's all.

THE COURT:  All right.  Thank you.

MS. STEINER:  Thank you.

THE COURT:  Okay.  Let me just take a very short break.  Don't go away.  We'll be back in a minute, I hope. But let's take a break.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right.  Thanks.  So I did, as I think should be obvious, read the brief in advance, and think about the issues that were being raised in the brief, and so I think I'm prepared to rule on these two.

The first dispute is whether or not the two patents, which I think, I think they called it API patents, but in any event, there would be '349 and '039 Patents, and whether they are product by process claims.  And the short answer is I don't think they are product by process claims. You know, first off, just looking at the claims, they define a complete invention in using chemical terms which chemists would understand and without reference to anything else. Second, the specifications of the two patents, which is

quoted by the defendant at page 20 of the brief, in numerous places indicates that the invention is not only how to prepare the composition, but the composition itself.  The title is, quote, "Processes for preparing quinoline compounds and pharmaceutical compositions containing such compounds."  That's two things, one of which is "pharmaceutical compositions containing quinoline compounds."  The abstract says, "The present invention is directed to processes for making and composition is containing quinolines such as Formula 1."  The background of the invention says, "There are also a need for a new pharmaceutical compositions containing quinolines such as Compound 1A that are essentially free of process byproducts."  That's, though it uses the word process in there, that's a claim to a -- that's a structural invention. The summary of the invention, it's directed to "processes for making and compositions containing quinolines or pharmaceutically acceptable salts thereof."  The brief says, at page 21, all the claims either, quote, "use the phrase process byproducts or contaminants or referred to the only identified process byproduct contaminant," closed quote, and now I'm -- I'm just going to call it the quinoline byproduct.

And as Ms. Steiner conceded, the asserted claims don't actually include -- none of them include process

byproducts or contaminants, they're just referring to chemicals. So the claims in the specification overwhelmingly, in my opinion, make this not a product by process claim.

Then there is the IPR. And the thing that the defendant cited to me was a statement that Exelixis made in the patent owner's preliminary response talking about improvements to the *Brown* process that Exelixis made. The statement talking about improvements to the *Brown* process doesn't really seem to me to have anything to do with disclaiming the API claims that have been made, you know, adding a disclaimer somewhere, so I just don't think there's disclaimer. There's certainly not a clear and unmistakable disclaimer.

There was also citation to what's called the *Medicines* case, and the, and another case involving I think involving Benckiser, and the reasons why those cases had some process limitation imported into them are not present here. *Medicines*, which you had to import the process in order to make sense of the claims, because otherwise they were kind of vague. And as the plaintiff has pointed out, Reckitt Benckiser including the words continuously cast -- included what they referred to as a textual hook. There is no textual hook here.

And as I said, I don't think there's any need to

consider extrinsic evidence because the extrinsic evidence defeats the defendant's argument.

So the second term is "crystalline." And so everybody agrees as to what its plain and ordinary meaning is, which is something like having a regular or repeating arrangement of molecules. And I think -- and everyone actually also agrees that the dispute that was tentatively raised in the briefing about forms is not actually a dispute because the '876 Patent, which is limited to Form N-2, related to Form N-2. The other three cabozantinib malate salt patents are not related to Form N-2, so that's a non-issue. The question is whether or not there is a clear and unmistakable disavowal of some sort that should be added into the claims. I think the defendant agreed during argument that the only basis for the disclaimer argument is the prosecution history, that the patent claims and specifications give no basis at all for a disclaimer.

And so the question is, what about the prosecution history? And so I guess I have two thoughts about that. Maybe more than two. One is that in the four patents, one of them actually claims a composition, the other three, to the extent that they're claiming cabozantinib, or just claiming some chemical structure, crystalline chemical structure but not the composition.

The second thing is that I think the -- and this

comes up a surprising amount, really. But when the argument is about unexpected properties of the invention, that's not usually going to be a disclaimer that imports the unexpected properties into the claims. And I think that's what the defendant is arguing here. I also think that it is an inferential argument and you can't have an inferential disclaimer that's clear and unmistakable, but it's a harder thing to do and I don't think that it was done here. I think the prosecution history here, as has been pointed out, is simply talking about the unexpected properties to show why the invention is nonobvious and therefore is not a clear and unmistakable disclaimer. I also think, for what it's worth, that it wouldn't make much since as a clear and unmistakable disclaimer if it were such a thing except in a compound claim.

So in any event, that's how I'm going to resolve these disputes. I would appreciate it if the plaintiff would prepare an order for me to sign and submit it within five days. The order being that, presumably jointly agreed to by the parties, basically just containing -- basically embodying the ruling in plaintiff's favor here.

Is there anything else?

MR. PRUSSIA:  Not from plaintiffs, Your Honor.

MS. STEINER:  No, Your Honor.

THE COURT:  All right. Well, thank you for your

time this morning.  Have a nice day.

COURT CLERK:  All rise.

(Court adjourned at 10:35 a.m.)


-----------------------------------


I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.


/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court