IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EXELIXIS, INC., Plaintiff, | C.A. No. 24-1208 (RGA) **CONSOLIDATED** |
| v. | [redacted] |
| MSN LABORATORIES PRIVATE LIMITED., et al., Defendants. | **REDACTED - PUBLIC VERSION** |

**PLAINTIFF EXELIXIS' OPENING BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN OPINIONS <u>OF DRS. DICHTEL, STEED, DONOVAN, ASHWORTH, AND MS. DOTHAGE</u>**

**CONFDIENTIAL VERSION FILED 9/3/26**
**REDACTED VERSION FILED 9/10/26**

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................1

II. LEGAL STANDARD....................................................................................................1

III. CERTAIN OPINIONS OF DR. WILLIAM DICHTEL SHOULD BE EXCLUDED ....................................................................................................1

A. The Court Should Exclude Dr. Dichtel's Obviousness Theory Regarding Brown, Robinson, and FDA GTI Guidance....................................................2

B. The Court Should Exclude Dr. Dichtel's Improper Obviousness-Type Double Patenting Opinion....................................................................................6

IV. MS. DOTHAGE'S TESTING, AND DR. STEED'S OPINIONS RELYING ON IT, SHOULD BE EXCLUDED....................................................................................8

A. Ms. Dothage's Testing Cannot Be Characterized as Following or Based On the Brown Process....................................................................................10

B. Ms. Dothage's Deviations from Brown Cannot Reliably Support Dr. Steed's Opinions Regarding Motivation to Combine or Reasonable Expectation of Success ....................................................................................11

C. There Is No Evidence that Ms. Dothage "Recrystallized" Cabozantinib (L)-Malate ....................................................................................13

V. CERTAIN OPINIONS OF ASHWORTH, DONOVAN, DICHTEL, AND STEED SHOULD BE EXCLUDED ....................................................................15

VI. CONCLUSION....................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan, Inc. v. Apotex Inc.*,
754 F.3d 952 (Fed. Cir. 2014)....................5

*Exela Pharma Scis., LLC v. Eton Pharms.*, C.A. No. 20-cv-365,
2022 WL 806524 (D. Del. Feb. 8, 2022)....................1

*Exelixis, Inc. v. MSN Labs. Pvt. Ltd.*, C.A. No, 22-228,
2024 WL 4491176 (D. Del. Oct. 15, 2024)....................2, 5, 6, 8

*Exelixis, Inc. v. MSN Labs. Pvt. Ltd.*,
No. 25-1236 (Fed. Cir. Aug. 31, 2026)....................5

*In re Rinehart*,
531 F.2d 1048 (C.C.P.A. 1976)....................13

*Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*,
881 F.3d 1376 (Fed. Cir. 2018)....................11

*Ortho Pharm. Corp. v. Smith*,
959 F.2d 936 (Fed. Cir. 1992)....................6

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019)....................6

*Schneider ex rel. Est. of Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003)....................1

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
18 F.4th 1377 (Fed. Cir. 2021)....................5

**Rules**

Fed. R. Evid. 702....................1, 4

## I. INTRODUCTION

Defendants MSN and Azurity do not dispute infringement of the asserted claims[1] of U.S. Patent Nos. 11,298,349 ("'349 patent") and 12,128,039 ("'039 patent,"), which describe and claim pharmaceutical compositions comprising cabozantinib (L)-malate with very low levels (e.g., below 100 ppm) of 6,7-dimethoxy-quinoline-4-ol (the "1-1 impurity"). Defendants are disputing the validity of the Low Impurity Claims under a variety of theories proffered by five experts: Robert Ashworth, William Dichtel, Maureen Donovan, Mary Dothage, and Jonathan Steed. For the reasons discussed, certain of these experts' opinions are not reliable or relevant under governing legal standards and should be excluded.

## II. LEGAL STANDARD

Rule 702, which governs admissibility, "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also* Fed. R. Evid. 702. Additionally, "[a]n expert's opinion that crucially depends on an incorrect legal theory is not likely to be relevant to the Court's fact-finding" and "courts routinely preclude those portions of an expert's report that are premised on a misunderstanding of the law." *Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, C.A. No. 20-365-MN, 2022 WL 806524, at *3 (D. Del. Feb. 8, 2022).

## III. CERTAIN OPINIONS OF DR. WILLIAM DICHTEL SHOULD BE EXCLUDED

Dr. Dichtel offers three principal obviousness theories: (1) a synthetic process described in a prior Exelixis patent publication, Brown,[2] inherently produces cabozantinib (L)-malate with the

[1] Azurity does not dispute infringement of claim 3 of the '349 patent, claims 1, 6, 11, and 13 of the '039 patent. MSN has stipulated to infringement of the '039 patent claims 1-3 and 6-8. D.I. 47. Collectively, these are referenced herein as the "Low Impurity Claims."

[2] Brown refers to WO 2010/083414 (PCT/US2010021194), which is the underlying PCT application that the other three patents asserted in this matter (i.e., the Crystalline Malate Salt Patents) descend from.

levels of 1-1 recited in the Low Impurity Claims; (2) the Low Impurity Claims would have been obvious in view of Brown in combination with various regulatory guidance and literature concerning the control of impurities in pharmaceutical products; and/or (3) the Low Impurity Claims would have been obvious in view of Brown plus a reference known as Kubo.[3] This motion concerns Dr. Dichtel's second theory, as well as his separate opinion regarding obviousness-type double patenting ("OTDP").

### A. The Court Should Exclude Dr. Dichtel's Obviousness Theory Regarding Brown, Robinson, and FDA GTI Guidance

Dr. Dichtel argues that Robinson (a paper reviewing industry's approach to regulatory guidelines on reduction of impurities)[4] and FDA GTI Draft Guidance,[5] would have motivated a POSA to limit levels of 1-1 in the cabozantinib (L)-malate produced by Brown. He further contends that a POSA would have had a reasonable expectation of success in doing so by adding a recrystallization step to Brown. This obviousness opinion should be excluded for two reasons: (1) Dr. Dichtel lacks experience or expertise with respect to purification of pharmaceutical compositions and the regulatory guidance and literature upon which his opinion is based; and (2) Dr. Dichtel's opinion that a POSA would have had a reasonable expectation of success in arriving at the claimed invention through recrystallization is not within the scope of his expertise or supported by sufficient facts or data.

[3] The first two obviousness theories Dr. Dichtel offers are largely recycled from obviousness challenges found unpersuasive in *Exelixis, Inc. v. MSN Labs. Pvt. Ltd.*, C.A. No. 22-228-RGA, 2024 WL 4491176, at *26-27 (D. Del. Oct. 15, 2024) ("*MSN II*").

[4] Derek I. Robinson, *Control of Genotoxic Impurities in Active Pharmaceutical Ingredients: A Review and Perspective, Organic Process Research & Development* (2010) ("Robinson").

[5] Ex. R, FDA Guidance for Industry, *Genotoxic and Carcinogenic Impurities in Drug Substances and Products: Recommended Approaches* (Dec. 2008) ("FDA GTI Draft Guidance").

### 1. Dr. Dichtel is Not Qualified to Offer An Opinion on Motivation Based on Robinson and/or FDA Guidance

Dr. Dichtel is an organic chemist who has no experience purifying pharmaceutical products or ensuring pharmaceutical products are compliant with regulatory guidance. He has "never designed a purification process for a pharmaceutical product," and, outside of this litigation, never calculated the level of an impurity in a pharmaceutical product. Ex. C (Dichtel Dep.) at 16:4-13, 21:9-16; 22:8-21; 23:5-8; 47:8-14. Dr. Dichtel has only read the regulatory guidance that forms the basis of his opinion in the context of this case or other litigation matters, and never in the context of his work as a chemist. Ex. C (Dichtel Dep.) at 16:21-18:11; 212:19-213:18; 213:19-214:7; 220:3-15. Additionally, Dr. Dichtel testified that he has never communicated with the U.S. Food and Drug Administration (FDA) about a pharmaceutical approval process, never advised a company on interactions with FDA relating to a pharmaceutical product, and never devised a strategy to meet FDA guidance for a pharmaceutical product. Ex. C (Dichtel Dep.) at 18:12-19, 23:9-24:7. Accordingly, Dr. Dichtel lacks the experience or training to reliably opine on whether or how regulatory guidance, such as the FDA GTI Draft Guidance, or literature such as Robinson would have motivated a POSA to limit the 1-1 impurity in cabozantinib (L)-malate of Brown.

The conflicts between Dr. Dichtel's opinion on motivation and those of Defendants' proffered regulatory expert further highlight his lack of specialized knowledge regarding the regulatory guidance. Defendants' regulatory expert Dr. Ashworth—who has more than 30 years of experience working with FDA guidance in the pharmaceutical industry, Ex. E (Ashworth Op. Rpt.) ¶¶ 7-10—testified that the FDA GTI Draft Guidance "doesn't apply" to an impurity "until the impurity is identified in the drug substance." Ex. F (Ashworth Dep.) at 46:9-47:2. Despite this, Dr. Dichtel asserts that a POSA would have been motivated to monitor and control the 1-1 impurity throughout manufacturing, stating (contrary to Dr. Ashworth) that "[r]egardless of

whether a POSA would have expected any 1-1 Impurity to be present in cabozantinib (L)-malate, the regulatory guidance required that it be assessed for GTIs." Ex. A (Dichtel Op. Rpt.) ¶ 206; *id.* ¶¶ 168, 208 (opining that a POSA would be "motivated to test for [1-1] and to limit its amount" regardless of any "uncertainty regarding whether the 1-1 Impurity remained" in the cabozantinib (L)-malate); Ex. C (Dichtel Dep.) at 185:10-22.

Dr. Dichtel lacks the necessary expertise to opine on how a POSA would have been motivated by regulatory guidance or industry literature to limit impurities in pharmaceutical products, and his opinion regarding such motivation should be excluded.

**2. Dr. Dichtel's Opinions Concerning Recrystallization Are Unsupported**

Having never designed a purification process for a pharmaceutical product, let alone one using recrystallization, Dr. Dichtel is not qualified to offer the opinion that a POSA would have been motivated to recrystallize Brown's cabozantinib (L)-malate to reduce levels of the 1-1 impurity. Ex. C (Dichtel Dep.) at 22:8-21; 23:5-8.

Moreover, Dr. Dichtel's opinion that a POSA would have had a reasonable expectation of success in reducing the levels of a particular impurity through recrystallization is not reliable or based on sufficient facts or data and, therefore, is inadmissible. Fed. R. Evid. 702. Dr. Dichtel's sole support for his alleged reasonable expectation of success is set forth in two paragraphs, which generically state that a POSA, motivated to limit 1-1, would have a reasonable expectation of success because Robinson "explains that industry had already risen to that challenge" (of purification). Ex. A (Dichtel Op. Rpt.) ¶ 212. Dr. Dichtel then notes that Robinson "provides multiple examples" of purification, stating "[o]ne common and rapid purification technique was crystallization." Ex. A (Dichtel Op. Rpt.) ¶ 213. However, in his expert reports, he does not cite *any example* of industry using recrystallization to reduce impurities below 200 ppm (or lower) as

the Low Impurity Claims require, nor could he recall such an example during his deposition. Ex. C (Dichtel Dep.) at 233:21-234:25.

Additionally, Dr. Dichtel's generic statements about the industry's use of recrystallization are wholly untethered to the claimed invention at issue here—cabozantinib (L)-malate compositions with low levels of the 1-1 impurity. Dr. Dichtel did not consider any issues specific to reducing levels of 1-1 in cabozantinib (L)-malate. In particular, he failed to address a critical issue with respect to recrystallization that was specifically raised by Exelixis' expert Dr. Myerson and in this Court's *MSN II* opinion:[6] that "recrystallization would not have worked to purify the 1-1 impurity because the impurity would be embedded in the crystalline lattice of the API." *MSN II,* at *29;[7] Ex. S (Myerson Rebuttal Rpt.) ¶¶ 318-319. Rather than address this issue, Dr. Dichtel simply ignored it. Ex. C (Dichtel Dep.) at 247:19-248:22 ("I did not specifically evaluate whether the specific impurities in -- well, that – that the 1-1 impurity, I think, is really what we're -- what we're talking about here -- would be embedded in the crystalline lattice of the API. I -- I think that that's a very specific scientific question that I did not opine upon in my report.").

"The reasonable-expectation-of-success analysis must be tied to the scope of the claimed invention." *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021); *see also Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 965-66 (Fed. Cir. 2014) ("[F]ailure to consider the appropriate scope of the ... patent's claimed invention in evaluating the reasonable expectation of success ... constitutes a legal error"). Here, generic references to some level of

---

[6] Dr. Dichtel referred to the Court's *MSN II* opinion in both of his reports. *See, e.g.*, Ex. A (Dichtel Op. Rpt.) ¶¶ 156, 162, 169; Ex. B (Dichtel Reply Rpt.) ¶ 72.
[7] This Court's validity holding with respect to the '349 patent was vacated based on mootness in *Exelixis, Inc. v. MSN Labs. Pvt. Ltd.*, No. 25-1236 (Fed. Cir. Aug. 31, 2026), but Defendants' obviousness theory based on recrystallization in this case is the same theory the Court rejected in *MSN II*.

industry success in other contexts "provide no more than hope" that crystallization could purify the composition. *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019). But "hope … is not enough to create a reasonable expectation of success in a highly unpredictable art." *Id*.

Accordingly, Dr. Dichtel's opinion that the Low Impurity Claims would have been obvious in view of Brown, regulatory guidance (including the FDA GTI Draft Guidance), and Robinson, or that a POSA would have recrystallization motivated to recrystallize Brown's cabozantinib (L)-malate to reduce levels of the 1-1 Impurity should be excluded.

### B. The Court Should Exclude Dr. Dichtel's Improper Obviousness-Type Double Patenting Opinion

Dr. Dichtel argues that the Low Impurity Claims are invalid for OTDP over the claims of Exelixis' U.S. Patent Nos. 10,034,873 (the "'873 patent") and 10,039,757 (the "'757 patent," collectively, the "Formulation Method of Use Patents."). *See, e.g.*, Ex. A (Dichtel Op. Rpt.) ¶¶ 247-265. To reach his OTDP opinion, Dr. Dichtel improperly imports purity limitations into the Formulation Method of Use Patent claims from an embodiment in the specification, thus violating a basic tenet of OTDP analysis and claim construction. Dr. Dichtel's OTDP opinion should thus be excluded because it is inconsistent with governing case law and unreliable. Ex. A (Dichtel Op. Rpt.) at § XI (¶¶ 247-265); Ex. B (Dichtel Reply Rpt.) at § VIII (¶¶ 185-191).

An OTDP analysis requires two steps. *MSN II*, at *3. First, a court construes the claim in the earlier patent and the claim in the later patent and determines the difference. *Id.* Second, the court determines whether the difference in subject matter between the ***two claims*** renders the claims patentably distinct. *Id.* "And it is the claims that are compared when assessing double patenting," not the specification. *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 943 (Fed. Cir. 1992) (rejecting OTDP argument based on examples disclosed in specification of earlier patent).

Here, there is no dispute that the Formulation Method of Use Patent claims upon which Dr. Dichtel's opinion is based do not contain the 1-1 purity limitations that are a critical aspect of the Low Impurity Claims. *See, e.g.*, Ex. G ('873 patent) at cl. 1 ("A method of treating liver cancer, comprising administering to a patient in need of such treatment a tablet pharmaceutical composition comprising: 30-32 percent by weight of Compound I, L-malate salt. …"); Ex. H ('757 patent) at cl. 1 ("A method of treating kidney cancer, comprising administering to a patient in need of such treatment a tablet pharmaceutical composition comprising: 30-32 percent by weight of Compound I, L-malate salt. …"). Indeed, the Formulation Method of Use Patent claims are method of use claims that do not mention the 1-1 impurity at all. Nor do the Formulation Method of Use Patent claims require that the cabozantinib (L)-malate be manufactured by any particular method (let alone one that would result in limited levels of the 1-1 impurity) or have a certain impurity profile—a fact Dr. Dichtel admits. Ex. C (Dichtel Dep) at 284:4-286:20, 290:17-25 (acknowledging that the claims of the reference patents do not require the use of any particular process to synthesize cabozantinib (L)-malate, that such information is only in the reference patents' specification as an embodiment, and that he deemed other embodiments "irrelevant").

In attempting to overcome this fatal shortcoming to his OTDP opinion, Dr. Dichtel has improperly construed the Formulation Patent Method of Use claims by reading in 1-1 purity limitations based on one embodiment (i.e., one of several disclosed methods for making cabozantinib (L)-malate described in the specification of the Formulation Method of Use Patents). *See, e.g.*, Ex. C (Dichtel Dep.) at 289:25-290:16 (admitting that he "read the embodiment using the method described in the low-impurity patents into the claims of the [Formulation Method of Use] patent[]"). This violates a fundamental tenet of claim construction and the OTDP analysis:

"It is the claims, not the specification, that define an invention. And it is the claims that are compared when assessing double patenting." *See, e.g.*, *Ortho*, 959 F.2d at 943.

Dr. Dichtel's OTDP opinion, based upon an impermissible claim construction, is thus improper.[8]

For the reasons set forth above, the opinions in paragraphs 153, 168, 202-214, and 247-265 of Dr. Dichtel's opening report as well as paragraphs 41, 77, 158-170, and 185-191 of his reply report should be excluded.

## IV. MS. DOTHAGE'S TESTING, AND DR. STEED'S OPINIONS RELYING ON IT, SHOULD BE EXCLUDED

Defendants' obviousness theories rest on the "Brown process,"[9] which Defendants' experts contend either (1) inherently produced cabozantinib (L)-malate API with low levels of the 1-1 impurity or (2) could be combined with purification steps, such as recrystallization, to reduce the 1-1 impurity remaining after the Brown process. *See, e.g.*, Ex. A (Dichtel Op. Rpt.) ¶¶ 171–189; Ex. K (Steed Op. Rpt.) ¶¶ 166, 172, 209–213; *see also* Ex. M (Donovan Op. Rpt.) ¶ 244. Although the Court rejected these arguments in *MSN II*, at *26-29, Defendants have largely recycled these theories in their contentions and expert reports. In an effort to bolster their second theory, regarding recrystallization, Defendants have now disclosed old testing from an expert disclosed in *MSN II*: Mary Dothage. But Ms. Dothage's testing is both irrelevant to Defendants' arguments

---

[8] Indeed, Defendants' OTDP argument is akin to the argument that this Court rejected during claim construction where Azurity unsuccessfully attempted to import a process limitation from the specification into the Low Impurity Claims. Ex. J (D.I. 145, Claim Construction Tr.) at 33:17-35:24.

[9] Throughout their reports, both Dr. Steed and Dr. Dichtel use the term "Brown process" to refer to Example 1 in Brown, which discloses kilogram-scale synthesis of cabozantinib (L)-malate. *See, e.g.*, Ex. K (Steed Op. Rpt.) ¶¶ 147–151; Ex. A (Dichtel Op. Rpt.) ¶ 176; *see also* Ex. U (Brown) ¶¶ [0098]-[00114]. Accordingly, references herein to "Brown" or the "Brown process" refer to Brown Example 1 unless otherwise indicated.

and unreliable to support the conclusions regarding recrystallization offered by another of Defendants' experts, Dr. Jonathan Steed.

In 2023—two years before Exelixis brought the instant actions against MSN and Azurity—Ms. Dothage and scientists at EAG Laboratories were retained by counsel for MSN to perform testing concerning the 1-1 impurity in connection with *MSN II*. Ex. O (Dothage Decl.) ¶¶ 1, 5, 7–9; Ex. P (Dothage Dep.) at 25:24–26:15, 31:25–32:3, 35:5–18. That testing was not disclosed or relied upon by MSN in *MSN II*. But after this action was filed and consolidated with the Azurity litigation, Ms. Dothage finalized a declaration on behalf of both MSN and Azurity describing her prior work. Ex. O (Dothage Decl.) (Apr. 22, 2026).[10]

Ms. Dothage's declaration is limited to describing EAG's experimental work, which she oversaw, and its results; she offers no opinions on validity issues in this litigation. Ex. P (Dothage Dep.) at 27:2–16. However, Dr. Steed relies on her declaration to support his opinion that "[a] POSA would have been motivated with a reasonable expectation of success to employ recrystallization to purge any 1-1 impurity from the cabozantinib (L)-malate drug substance manufactured according to the Brown process to below the levels in the Asserted Claims." Ex. K (Steed Op. Rpt.) ¶ 166. Specifically, Dr. Steed states that the Dothage results "corroborate" his opinion that a person of ordinary skill would have had a reasonable expectation of success in using recrystallization to purge the 1-1 impurity below the claimed levels. *See* Ex. K (Steed Op. Rpt.) ¶¶ 209–213; Ex. L (Steed Reply Rpt.) ¶¶ 81–85.

Ms. Dothage's testing is irrelevant and unreliable for the purposes for which Defendants may seek to introduce it. ***First***, both Ms. Dothage and Dr. Steed admit that her experiment did not

[10] Ms. Dothage had no contact with Azurity or its counsel during the laboratory work, and first spoke with Azurity's attorneys when her declaration was being finalized in April 2026, approximately three years later. Ex. P (Dothage Dep.) at 31:3–19.

reproduce the Brown process; instead, Ms. Dothage started with highly pure cabozantinib (L)-malate supplied by ***Exelixis***. She then artificially fortified the Exelixis material with 1-1 and then performed a separate two-step "recrystallization" procedure. Ms. Dothage's testing cannot be characterized to have followed the Brown process. ***Second***, Ms. Dothage's purported recrystallization was performed at a scale more than ***10,000x*** smaller than the Brown process and therefore cannot shed any light on whether a POSA would have had a reasonable expectation of success in achieving the claimed impurity levels simply by adding a recrystallization step to Brown. ***Third***, Ms. Dothage did not actually demonstrate that she created crystalline material, so her testing cannot support Dr. Steed's opinion that "recrystallization" could have been used successfully with the Brown process.

### A. Ms. Dothage's Testing Cannot Be Characterized as Following or Based On the Brown Process

Ms. Dothage's testing does not follow and is not consistent with the Brown process. Despite this, Dr. Steed improperly characterized Ms. Dothage's work as "based on the crystallization used in the Brown process" and asserted that Ms. Dothage "followed the Brown process" to obtain cabozantinib (L)-malate from the free base. Ex. K (Steed Op. Rpt.) ¶¶ 209–213.

There is no dispute that Ms. Dothage's testing did not follow the Brown process, as she has acknowledged. Ex. P (Dothage Dep.) at 39:15–17, 53:19–22; *see also id.* at 55:22–25, 58:1–7, 59:24–60:4, 61:7-62:8 (confirming Brown Steps 1.1 to 1.6 were not part of Ms. Dothage's work). Instead, EAG's testing began with highly pure ***finished*** cabozantinib (L)-malate API, supplied ***by Exelixis***, that was manufactured in 2021 using Exelixis' commercial process—not the Brown process. Ex. P (Dothage Dep.) at 53:19-22; Ex. D (Letter from K. Boyle to J. Cox, May 11, 2026) at 3. Moreover, Ms. Dothage's testing involved artificially fortifying two small samples of the finished Exelixis cabozantinib (L)-malate with the 1-1 impurity, Ex. O (Dothage Decl.) ¶¶ 7-9; Ex.

P (Dothage Dep.) at 74:14–75:1, before converting the fortified cabozantinib (L)-malate into cabozantinib *free base* through precipitation, Ex. O (Dothage Decl.) ¶¶ 10–18; Ex. P (Dothage Dep.) at 43:20–44:4, and finally performed a separate salt-formation step to convert the free base back into cabozantinib (L)-malate, Ex. O (Dothage Decl.) ¶¶ 19–24; Ex. P (Dothage Dep.) at 44:5–13, 88:12–22. This two-stage salt-break and salt-formation process is not disclosed in Brown. *See, e.g.*, Ex. P (Dothage Dep.) at 84:21-85:16. Such testing—establishing only what *could* occur under the specific conditions tested—does not establish what *would* occur under a materially different process. *Cf. Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*, 881 F.3d 1376, 1383-84 (Fed. Cir. 2018) (plaintiff failed to establish conversion under defendant's manufacturing conditions where "Merck's evidence merely supported that MFA *could* convert to MFM by additional mixing" but "made no attempt to prove that Amneal's product *would* convert simply by the additional mixing Amneal performed").

As such, Dr. Steed's opinions characterizing Ms. Dothage's testing as consistent with, following, or based on Brown should be excluded.

### B. Ms. Dothage's Deviations from Brown Cannot Reliably Support Dr. Steed's Opinions Regarding Motivation to Combine or Reasonable Expectation of Success

Dr. Steed also opines that the Dothage testing supports the theory that a POSA would have been motivated to *modify* Brown by adding "recrystallization" steps to remove the 1-1 impurity from cabozantinib (L)-malate manufactured according to the Brown process. *See* Ex. K (Steed Op. Rpt.) ¶¶ 166, 209–213. Specifically, Dr. Steed contends that Ms. Dothage's data corroborate both (a) the "dramatic increase in purity" expected from recrystallization and (b) that the 1-1 impurity would neither enter the crystal lattice nor form through degradation. *Id.* ¶¶ 209–213. His reliance depends on the premise that Ms. Dothage's testing reliably informs what would occur if recrystallization were employed in connection with the Brown process. But neither Ms. Dothage

nor Dr. Steed established that her laboratory-scale methodology could be applied to Brown's commercial-scale process, and her testing therefore cannot reliably support Defendants' motivation or reasonable-expectation-of-success theory.

Brown Example 1 describes a commercial-scale synthetic route that produces approximately ***five kilograms*** of cabozantinib (L)-malate. Ex. P (Dothage Dep.) at 63:5-11; Ex. U (Brown) ¶ [00114] (yielding "5.0 kg" of "Compound (I)" (i.e., cabozantinib (L)-malate)). By contrast, Ms. Dothage's experiment was conducted at laboratory scale, yielding less than ***half a gram*** of cabozantinib (L)-malate per batch—a difference in scale of more than ***10,000x***. Ex. P (Dothage Dep.) at 101:25–102:15 (starting with approximately 0.5 g of free base per batch, each reformed batch yielded between 0.36–0.38 g of solid). Ms. Dothage acknowledged that laboratory-scale conditions do not necessarily translate to larger-scale production and would require additional experimental confirmation. *Id.* at 21:25–22:19, 23:7–20, 24:11–17; *see also id.* at 104:14–22, 111:2–113:1 (admitting that testing did not account for the changes (such as heat transfer, fluid flow, or mass transfer) that might occur at a larger scale). Ms. Dothage offered no opinion (let alone test results) concerning process viability, scale-up, or whether her methodology could be implemented in Brown's kilogram-scale process without further experimentation. Dr. Steed also confirmed that scaling a laboratory process to an industrial scale may require additional experimentation. Ex. Q (Steed Dep.) at 19:12–19. With respect to Ms. Dothage's work specifically, Dr. Steed acknowledged that her gram-scale procedure was a "potential[] starting point for an industrial recrystallization process," but that process engineering and scale-up "wasn't the focus of her inquiry." *Id.* at 181:25–182:17; *see also id.* at 166:1–14.

Thus, neither Ms. Dothage nor Dr. Steed evaluated whether her methodology could be implemented in Brown's five-kilogram-scale process without further experimentation. Her

laboratory-scale experiment cannot be relied upon to establish a reasonable expectation of success at a commercial scale (the Brown process). *See In re Rinehart*, 531 F.2d 1048, 1051, 1053-54 (C.C.P.A. 1976) (requiring "some predictability of success" in a commercial-scale operation).

Additionally, Ms. Dothage's testing did not actually evaluate the proposed modification to Brown on which Dr. Steed's opinion depends. Dr. Steed opines that a POSA seeking to manufacture cabozantinib (L)-malate through Brown's kilogram-scale process would have been motivated to add a recrystallization step at the end of the Brown process to obtain material meeting the claimed 1-1 impurity limits. Ex. K (Steed Op. Rpt.) ¶ 166. But Ms. Dothage did not start with material made according to the Brown process or add a recrystallization step to Brown's process. Instead, as described above, she began with ***finished high-purity*** cabozantinib (L)-malate API and evaluated only whether her separate laboratory procedure removed artificially added 1-1. Accordingly, her testing does not establish what would occur if a POSA implemented the Brown process and added the recrystallization step that Dr. Steed proposes. Both Ms. Dothage's testing and Dr. Steed's opinions relying on it to support his "recrystallization" theory should be excluded.

### C. There Is No Evidence that Ms. Dothage "Recrystallized" Cabozantinib (L)-Malate

Finally, Ms. Dothage never determined whether her "recrystallization" testing actually ***crystallized*** anything—and thus failed to establish a key premise for Dr. Steed's theory that the 1-1 impurity is excluded by the cabozantinib (L)-malate crystal lattice during the purported purification process. Dr. Steed relies on Ms. Dothage's testing to support his opinion that a POSA would have had a reasonable expectation of success because the 1-1 impurity would not substitute into the cabozantinib (L)-malate ***crystal lattice***. *See* Ex. K (Steed Op. Rpt.) ¶ 213. But Ms. Dothage never determined whether there was a "crystal lattice" into which the 1-1 impurity could substitute, because she failed to establish that her experiment actually yielded ***crystalline*** material. Ms.

Dothage performed no solid-state characterization that could establish crystallinity; her testing was limited to HPLC and solution-state NMR, and she conducted no XRPD, Raman spectroscopy, differential scanning calorimetry, or solid-state NMR testing. Ex. P (Dothage Dep.) at 106:10–109:3. Indeed, she admitted that "[d]etermining the crystallinity or polymorphic form of the material was not part of the scope of this work." *Id.* at 108:23–109:4. Dr. Steed agreed. *See, e.g.*, Ex. Q (Steed Dep.) at 172:17-173:2 ("As far as I can recall, she didn't look into the crystalline form or lack thereof."); *id.* at 172:3-6 ("Q. Okay. So Ms. Dothage didn't determine the polymorphic form of what she ended up with? A. That's my understanding. That wasn't part of her remit.").

To be clear, Exelixis does not contend that the asserted Low-Impurity Claims require crystalline cabozantinib (L)-malate—they do not. But because Dr. Steed specifically invokes Ms. Dothage's results to corroborate a crystal lattice-based explanation for why the 1-1 impurity purportedly would be removed by a "recrystallization" step added to the Brown process, Ex. K (Steed Op. Rpt.) ¶ 213, her failure to establish that any recrystallization occurred or any crystal lattice existed renders her testing unreliable for supporting or corroborating Dr. Steed's specific theory. This is another basis for excluding Ms. Dothage's testing and Dr. Steed's reliance on it to support his recrystallization theory.

For the reasons set forth above, Ms. Dothage's entire declaration and testimony should be excluded. Dr. Steed's opinions in paragraphs 209 to 213 of his opening report (Ex. K (Steed Op. Rpt.)) and paragraphs 81 to 85 of his reply report (Ex. L (Steed Reply Rpt.)), which rely on Ms. Dothage's testing, should also be excluded.

## V. CERTAIN OPINIONS OF ASHWORTH, DONOVAN, DICHTEL, AND STEED SHOULD BE EXCLUDED

None of Defendants' experts should be permitted to offer opinions relying on the FDA GTI Draft Guidance. Ex. R (FDA GTI Draft Guidance). Defendants' regulatory expert Dr. Ashworth testified that the FDA GTI Draft Guidance is irrelevant under the facts in this case. Dr. Ashworth has more than 30 years of experience working with FDA guidance in the pharmaceutical industry, where his roles have "included developing and executing global regulatory strategy, adherence to regulatory requirements, [and] interacting with health authorities," Ex. E (Ashworth Op. Rpt.) ¶¶ 7-10. He testified that "expectations of whether the impurity would be present are irrelevant until the impurity is identified in a drug substance" and the FDA GTI Draft Guidance "doesn't apply" to an impurity "until the impurity is identified in the drug substance." Ex. F (Ashworth Dep.) at 46:9-47:2. This testimony expressly contradicted the opinions he offered in his reports, where he contended that the FDA GTI Draft Guidance "would have required testing the cabozantinib (L)-malate drug substance for the 1-1 starting material" because it was a "known starting material." *See, e.g.*, Ex. E (Ashworth Op. Rpt.) ¶¶ 17-19; Ex. T (Ashworth Reply Rpt.) ¶¶ 17-19.

Defendants' experts, Drs. Donovan, Dichtel, and Steed do not contend that 1-1 was identified as an impurity in the prior art. They agree that "[n]othing in the prior art identifies the 1-1 impurity as a degradation product of cabozantinib," Ex. I (Donovan Dep.) at 101:2-9. *See also* Ex. A. (Dichtel Op. Rpt.) ¶ 177 ("any degradation would be expected to be insignificant."); Ex. K (Steed Op. Rpt.) ¶ 195 ("Given the expected stability of the molecule, a POSA would not expect any degradation of the cabozantinib molecule during the recrystallization."). Indeed, Defendants' experts have asserted that "[a]lthough the 1-1 Impurity is present as a starting material, the vast majority of the starting material is consumed immediately in the process" and "any residual

starting material would not be expected to survive the entire Brown Process in any significant amount." Ex. A (Dichtel Op. Rpt.) ¶¶ 175-176.

Instead, Drs. Donovan, Dichtel, and Steed all opine that a POSA would look to the FDA GTI Draft Guidance *regardless* of whether 1-1 was identified or even expected as an impurity, simply because a POSA would have expected that 1-1 was genotoxic. For example, Dr. Dichtel opines that, "[r]egardless of whether a POSA would have expected any 1-1 Impurity to be present in cabozantinib (L)-malate, the regulatory guidance required that it be assessed for GTIs." Ex. A (Dichtel Op. Rpt.) ¶ 206. Dr. Steed likewise opines that "Even if a POSA would not have been able to predict whether the 1-1 starting material would be present at the end of Brown Example 1—or even if a POSA would have expected that there would not be any 1-1 starting material present at the end of Brown Example 1—a POSA nevertheless would have been motivated to analyze the resulting API to confirm whether the 1-1 impurity was present." Ex. L (Steed Reply Rpt.) ¶ 23; *see also* Ex. K (Steed Op. Rpt.) ¶¶ 162, 168-169. Dr. Donovan relies on the same guidance to opine that regardless of whether it was expected, "a POSA would have known that ignoring a PGI is not an option." Ex. M (Donovan Op. Rpt.) ¶ 228; *see generally id.* ¶¶ 133, 184-188.

Dr. Ashworth confirmed that the principles and methods described in the FDA GTI Draft Guidance "don't apply" until an impurity is identified, i.e., known to be present in a drug substance. Defendants cannot show that their experts' opinions based on the FDA GTI Draft Guidance are a reliable application of the principles and methods to the facts of the case. Thus, Drs. Ashworth, Donovan, Dichtel, and Steed should be precluded from offering opinions that rely on the FDA GTI Draft Guidance. *See, e.g.*, Ex. A (Dichtel Op. Rpt.) ¶¶ 106-108, 153, 168, 205, 207-210; Ex. B (Dichtel Reply Rpt.) ¶ 158; Ex. K (Steed Op. Rpt.) ¶¶ 64, 70-77, 86-92, 116-121,

158-169; Ex. L (Steed Reply Rpt.) ¶¶ 23, 25-26, 62-64; Ex. M (Donovan Op. Rpt.) ¶¶ 133, 184-188, 228-229, 248; Ex. N (Donovan Reply Rpt.) ¶ 29; Ex E (Ashworth Op. Rpt.) in full; Ex. T (Ashworth Reply Rpt.) ¶¶ 7, 9-19, 22-25, 31.

## VI. CONCLUSION

For the reasons stated above, Exelixis respectfully requests that the Court preclude

- Dr. Dichtel from offering the opinions in paragraphs 106 to 108, 153, 168, 202 to 214, 247 to 265 of his opening report; paragraphs 41, 77, 158 to 170, 185 to 191 of his reply report.
- Ms. Dothage from offering her declaration in full and testimony concerning her testing and any reliance on such testing by any other expert for Defendants.
- Dr. Steed from offering the opinions in paragraphs 64, 70 to 77, 86 to 92, 116 to 121, 158 to 169, 209 to 213 of his opening report; paragraphs 23, 25, 26, 62 to 64, 81 to 85 of his reply report.
- Dr. Ashworth from offering the opinions in his opening report; paragraphs 7, 9 to 19, 22 to 25, 31 of his reply report.
- Dr. Donovan from offering the opinions in paragraphs 133, 184 to 188, 228 to 229, 248 of her opening report; paragraph 29 of her reply report.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Exelixis, Inc.*

OF COUNSEL:

Lisa J. Pirozzolo
Emily R. Whelan
Kevin S. Prussia
Jonathan A. Cox
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Amy K. Wigmore
Gerard A. Salvatore
Charles T. Cox
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington DC 20037
(202) 663-6000

Anna Mizzi
Alexander P. Gorka
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street, 45th Floor
New York, NY 10007
(212) 230-8800

Christopher M. Cherry
WILMER CUTLER PICKERING
HALE AND DORR LLP
1225 17th Street, Unit 2600
Denver, CO 80202
(720) 274-3135

September 3, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on September 3, 2026, upon the following in the manner indicated:

Kenneth L. Dorsney, Esquire
Cortlan S. Hitch, Esquire
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
*Attorneys for Defendants Azurity Pharmaceuticals, Inc., Azurity Pharmaceuticals India LLP and Slayback Pharma LLC*

*VIA ELECTRONIC MAIL*

Andrew J. Miller, Esquire
Elham F. Steiner, Esquire
Robert A. Delafield II, Esquire
Alan H. Pollack, Esquire
WINDELS MARX LANE & MITTENDORF LLP
180 Park Ave.
Florham Park, NJ 07932
*Attorneys for Defendants Azurity Pharmaceuticals, Inc., Azurity Pharmaceuticals India LLP and Slayback Pharma LLC*

*VIA ELECTRONIC MAIL*

Caryn L. Cross, Esquire
WINDELS MARX LANE & MITTENDORF LLP
156 West 56th Street
New York, NY 10019
*Attorneys for Defendants Azurity Pharmaceuticals, Inc., Azurity Pharmaceuticals India LLP and Slayback Pharma LLC*

*VIA ELECTRONIC MAIL*

Dominick T. Gattuso, Esquire
HEYMAN ENERIO GATTUSO & HIRZEL LLP
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
*Attorneys for Defendants MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc.*

*VIA ELECTRONIC MAIL*

Bryce A. Cooper, Esquire
Kurt A. Mathas, Esquire
Kevin J. Boyle, Esquire
Brian L. O'Gara, Esquire
WINSTON TAYLOR LLP
300 N. LaSalle Dr., Suite 4400
Chicago, IL 60654-3406
*Attorneys for Defendants MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc.*

*VIA ELECTRONIC MAIL*

*/s/ Anthony D. Raucci*

Anthony D. Raucci (#5948)